1  JOSEPH P. RUSSONIELLO (CABN 44332)
   United States Attorney
2  JOANN M. SWANSON (CABN 88143)
   Chief, Civil Division
3  NEILL T. TSENG (CABN 220348)
   Assistant United States Attorney
4
5      450 Golden Gate Avenue, Box 36055
       San Francisco, California 94102-3495
       Telephone: (415) 436-7155
6      FAX: (415) 436-6748
       neill.tseng@usdoj.gov
7
   Attorneys for Defendants
8
                 UNITED STATES DISTRICT COURT
9
              NORTHERN DISTRICT OF CALIFORNIA
10
                      OAKLAND DIVISION
11
   OUR CHILDREN'S EARTH              )    No. C 08-01461 SBA
12 FOUNDATION, a non-profit corporation, )   E-FILING CASE
                                       )
13              Plaintiff,             )    DECLARATION OF HUGH BARROLL
                                       )    IN SUPPORT OF DEFENDANTS'
14          v.                         )    MOTION TO TRANSFER VENUE TO
                                       )    THE DISTRICT OF HAWAII
15 U.S. ENVIRONMENTAL PROTECTION       )
   AGENCY, STEPHEN L. JOHNSON, as      )
16 Administrator of the United States  )
   Environmental Protection Agency, and )
17 WAYNE NASTRI as Regional            )
   Administrator of the United States  )
18 Environmental Protection Agency,    )
                                       )
19              Defendants.            )
                                       )
20 _____)

21      I, Hugh Barroll, declare as follows:

22      1.     I am an attorney employed by the United States Environmental Protection Agency

23 ("USEPA") in its Region 9 office in San Francisco.  I submit this declaration in support of the

24 federal defendants' motion to transfer venue.  I have personal knowledge of the matters in this

25 declaration and could testify competently if called upon to do so.

26      2.     I have been the USEPA Region 9 staff attorney responsible for Clean Water Act

27 enforcement action against the City and County of Honolulu ("Honolulu" or "CCH") since April,

28 2004.  In that capacity, my responsibilities have included familiarizing myself with the

   history of Clean Water Act enforcement involving Honolulu's sewage collection system and

sewage treatment plants; assisting in the evaluation of Honolulu's compliance with the Clean Water Act; developing enforcement actions against Honolulu to address noncompliance with the Clean Water Act; and negotiating settlements to put into place remedies for noncompliance with the Clean Water Act.

3.      In 1994, the United States and the State of Hawaii filed suit in the District Court for the District of Hawaii against Honolulu to address, among other things, Clean Water Act violations associated with discharges of raw sewage from unpermitted points in Honolulu's sewage collection system.  These discharges are commonly referred to as sanitary sewage overflows or "SSOs".  The action was styled United States of America and State of Hawaii v. City and County of Honolulu, Civ. No. 94-00765 DAE (D. Haw.).  A true and correct copy of the complaint in that action is attached as Exhibit 1 to this Declaration.

4.      The action styled United States of America and State of Hawaii v. City and County of Honoulu, Civ. No. 94-00765 DAE (D. Haw.), was settled in 1995 by the entry of a Consent Decree which, among other things, required Honolulu to undertake a long term program of improvements to its sewage collection system.  The work required by the 1995 Consent Decree is expected to be completed no earlier that 2019.  The 1995 Consent Decree remains in effect and a true and correct copy is attached as Exhibit 2 to this Declaration.

5.      In 1999, 2002, 2003 and 2004, USEPA and the State of Hawaii's Department of Health ("HDOH") took a series of administrative enforcement actions against Honolulu to address noncompliance with the Clean Water Act.  USEPA's 1999 and 2002 actions addressed noncompliance associated with treated sewage discharges from Honolulu's Sand Island Treatment Plant.  USEPA's 2003 action addressed noncompliance associated with treated sewage discharges at Honolulu's Honouliuli Treatment Plant.  HDOH's 2004 action addressed noncompliance resulting from SSOs from portions of Honolulu's sewage collection system.

6.      In 2004, Our Children's Earth Foundation, Sierra Club, Hawai`i Chapter, and Hawai`i's Thousand Friends (collectively, the "Environmental Groups") filed suit against Honolulu in the District Court for the District of Hawaii under section 505(a)(1) (33 U.S.C. § 1365(a)(1)) to address SSOs associated with Honolulu's sewage collection system and Clean

1  Water Act violations associated with treated sewage discharges from the Sand Island and

2  Honouliuli Treatment Plants.

3      7.      In 2004 and 2005, USEPA, with the assistance of HDOH, undertook a

4  comprehensive assessment of Honolulu's sewage collection system.  The results of this

5  assessment were compiled into an Audit Report, dated December 2005.  In addition, in 2004 and

6  2005, USEPA and HDOH undertook inspections of the Sand Island and Honouliuli Treatment

7  Plants.  The findings from these inspections were compiled into Inspection Reports.

8      8.      Following the completion of the Audit Report and the Inspection Reports, the

9  United States Department of Justice, on behalf of USEPA, and the State of Hawaii, on behalf of

10  HDOH, invited Honolulu to enter into settlement negotiations to address: (i) noncompliance with

11  the 1995 Consent Decree; (ii) violations of the administrative enforcement actions set out above

12  in paragraph 4; (iii) additional Clean Water Act violations associated with discharges of

13  treatment sewage from the Sand Island and Honouliuli Treatment Plants; and (iv) Clean Water

14  Act violations associated with SSOs from Honolulu's sewage collection system.

15      9.      In conjunction with this invitation to Honolulu, the United States Department of

16  Justice and the State of Hawaii invited the Environmental Groups, including Our Children's

17  Earth Foundation, to participate in these settlement negotiations.  The Environmental Groups

18  agreed to participate in these negotiations.

19      10.      At or about the time that the Environmental Groups agreed to participate in these

20  settlement negotiations, the Environmental Groups, including Our Children's Earth Foundation,

21  entered into a Confidentiality Agreement with the United States and the State of Hawaii.

22  Counsel for the Environmental Groups and counsel for the State of Hawaii executed the

23  Confidentiality Agreement on December 7, 2005.  Counsel for the United States executed the

24  Confidentiality Agreement on December 12, 2005.   A true and correct copy of the

25  Confidentiality Agreement is attached as Exhibit 3 to this Declaration.

26      11.      In the Confidentiality Agreement, the parties thereto, inter alia, "recognize and

27  agree that all written and oral communications related to any investigations regarding violations

28  at CCH's [sewage treatment plants] and/or collection system, ... or any other matters related to

DECLARATION OF HUGH BARROLL
C 08-01461 SBA                                3

1   potential judicial or administrative enforcement actions against CCH or related to CCH's

2   [sewage treatment plants] and/or collection system are being made in anticipation of litigation."

3   Confidentiality Agreement ¶ 8.

4       12.    In the Confidentiality Agreement, the parties thereto, inter alia, "agree and

5   acknowledge that the common interest privilege and confidentiality established by this

6   Agreement is held jointly by all parties and that no party to this Agreement is authorized to

7   unilaterally waive the privilege with respect to any information or documents shared pursuant to

8   this Agreement." Confidentiality Agreement ¶ 11.

9       13.    The Confidentiality Agreement further provides that "[t]he confidentiality

10  obligations established by this Agreement shall remain in full force and effect, without regard to

11  whether the Agreement is terminated pursuant to Paragraph 16 and without regard to whether the

12  claims are terminated by final judgment or settlement." Confidentiality Agreement ¶ 15.

13      14.    Following the execution of the Confidentiality Agreement, the United States, the

14  State of Hawaii and the Environmental Groups entered into negotiations with Honolulu in an

15  effort to settle their respective Clean Water Act enforcement claims.  To support these

16  negotiations, the United States provided a number of documents to the Environmental Groups as

17  contemplated by and consistent with the terms of the Confidentiality Agreement.  Documents

18  provided to the Environmental Groups pursuant to the Confidentiality Agreement include, but are

19  not limited to, the 2005 Audit Report, and settlement communications discussing USEPA's and

20  HDOH's investigations concerning Honolulu's sewage collection system and sewage treatment

21  plants.

22      15.    Following the initiation of settlement negotiations, in March 2006, a key

23  component in Honolulu's sewage collection system, the Beachwalk Force Main, ruptured

24  causing a large sewage spill (estimated by Honolulu to total 48 million gallons) in the Waikiki

25  District of Honolulu.  As a consequence, the United States, the State of Hawaii, the

26  Environmental Groups and Honolulu focused the negotiations on an interim settlement to

27  address collection system issues associated with important Honolulu force mains.

28      16.    These negotiations led to the negotiation of a Stipulated Order between the United

States, the State of Hawaii and Honolulu tailored to address injunctive relief issues associated with the Beachwalk Force Main spill. While the Environmental Groups, including Our Children's Earth Foundation, participated in many of the sessions that led to the negotiation of the Stipulated Order, the Environmental Groups are not parties to the Stipulated Order and opposed its entry.

17. On May 8, 2007, the United States and the State of Hawaii filed a civil action for injunctive relief against Honolulu in the District Court for the District of Hawaii to address certain alleged Clean Water Act violations resulting from the Beachwalk Force Main Spill.

18. Concurrently with the filing of the 2007 Complaint, the United States and the State of Hawaii lodged the Stipulated Order in settlement of the claims alleged in the 2007 Complaint. A true and correct copy of the Stipulated Order is attached as Exhibit 4 to this Declaration.

19. On May 24, 2007, the Environmental Groups were granted intervenor status in the 1994 action. True and correct copies of the Magistrate's Findings and Recommendations on the Motion to Intervene and the Court's Orders adopting the Magistrate's Findings and Recommendations with respect to intervention in the 1994 action are attached as Exhibit 5 to this Declaration. On June 26, 2007, Environmental Groups, including Our Children's Earth Foundation, were granted intervenor status in the 2007 action. True and correct copies of the Magistrate's Findings and Recommendations on the Motion to Intervene and the Court's Orders adopting the Magistrate's Findings and Recommendations with respect to intervention in the 2007 action are attached as Exhibit 6 to this Declaration.

20. The United States filed a Motion for Entry following the lodging of the Stipulated Order. To support its Motion for Entry, the United States filed, inter alia, a Declaration of JoAnn Cola. A true and correct copy of the Declaration of JoAnn Cola is attached as Exhibit 8 to this Declaration.

21. On October 10, 2007, the Court entered the Stipulated Order. A true and correct copy of Judge Ezra's Order Approving Entry of Stipulated Order is attached as Exhibit 7 to this Declaration.

22.    In the Stipulated Order,

[t]he Parties expressly recognize that the filing of the Complaint limited to these specific claims and the filing of this Stipulated Order do not resolve and are without prejudice to other claims of the Governments regarding compliance with the 1995 Consent Decree, the [Clean Water] Act, or State law, including, but not limited to, the Governments' claims for civil penalties with regard to the matters set forth in this Complaint.

Following entry of this Stipulated Order, the Parties intend to negotiate in good faith a comprehensive remedy addressing all compliance issues associated with CCH's wastewater system.

Stipulated Order at p. 2.

23.    Following entry of the Stipulated Order, the Court imposed conditions on the Environmental Groups' intervention. These conditions include:

(3) any party may file a motion seeking to stay the litigation for a reasonable time to allow the parties to further engage in settlement discussions; and (4) the Court will assist and facilitate compliance and/or settlement by scheduling telephonic or in-person status conferences on a periodic basis.

Findings and Recommendations to Impose Conditions on Intervention, Civ. No. 07-00235 (D. Haw. November 21, 2007) (Magistrate Judge Chang) (adopted by minute order, December 12, 2007). See Exhibit 6.

24.    The United States, the State of Hawaii and Honolulu are presently engaged in settlement negotiations, as contemplated by the Stipulated Order and the Court's Order imposing conditions on the Environmental Groups' intervention. Magistrate Judge Kevin Chang is actively supervising these settlement negotiations and had directed the parties to keep the Environmental Groups informed as to the status of negotiations.

I declare under penalty of perjury that the foregoing is true and correct.

Executed this 6ᵗʰ day of June, 2008, at San Francisco, California.

HUGH BARROLL

DECLARATION OF HUGH BARROLL
C 08-01461 SBA                    6

Exhibit 1

LOIS J. SCHIFFER
Acting Assistant Attorney General
Environment and Natural Resources Division
United States Department of Justice
LESLIE ALLEN
Trial Attorney
Environmental Enforcement Section
Environment and Natural Resources Division
United States Department of Justice
P.O. Box 7611
Washington, D.C.  20044-7611
Telephone:  (202) 514-4114

ELLIOT ENOKI
United States Attorney
District of Hawaii
MICHAEL CHUN
Assistant United States Attorney
Room 6100, PJKK Federal Building
300 Ala Moana Blvd., Box 50183
Honolulu, Hawaii  96850
Telephone:  (808) 541-2850

ROBERT A. MARKS    2163
Attorney General of Hawaii
SONIA FAUST        627
LAURENCE K. LAU    1466
Deputy Attorneys General, State of Hawaii
Kekuanao'a Building, Room 200
465 South King Street
Honolulu, Hawaii 96813
Telephone (808) 587-3050

Attorneys for Plaintiffs

FILED IN THE
UNITED STATES DISTRICT COURT
DISTRICT OF HAWAII

OCT 3  1994

at 10 o'clock and 35 min. A M.
WALTER A. Y. H. CHINN, CLERK

| | |
|---|---|
| UNITED STATES OF AMERICA, ) <br><br> and ) <br><br> STATE OF HAWAII, by Robert A. Marks, Its Attorney General, and PETER A. SYBINSKY, Ph.D., Director of Health, State of Hawaii, ) <br><br> Plaintiffs, ) <br><br> v. ) <br><br> CITY AND COUNTY OF HONOLULU, Defendant. ) | CIV. NO.  94-00765  DAE <br><br><br> COMPLAINT; SUMMONS |

COMPLAINT - 1 -

ATTEST: A True Copy
WALTER A.Y.H. CHINN
Clerk, United States District
Court, District of Hawaii
By _____
                    Deputy

The United States of America ("United States"), by authority of the Attorney General of the United States and through the undersigned attorneys, acting at the request of the Administrator of the United States Environmental Protection Agency ("EPA"), and Plaintiffs State of Hawaii, by Robert A. Marks, its Attorney General, and Peter A. Sybinsky, Ph.D., Director of the Hawaii Department of Health ("DOH") (collectively, "State"), through their undersigned counsel, allege the following:

<u>PRELIMINARY STATEMENT</u>

1.  The United States brings this civil action pursuant to Section 309 of the Federal Water Pollution Control Act ("Clean Water Act" or "Act"), 33 U.S.C. § 1319, for assessment of civil penalties and injunctive relief against the City and County of Honolulu ("CCH" or "Defendant").  The City discharged pollutants from its Collection System, which were not authorized under Section 301(a) of the Act, 33 U.S.C. § 1311(a).  The City also failed to develop, fully implement and enforce, a pretreatment program for Industrial Users of its Publicly Owned Treatment Works ("POTWs" or "treatment plants"), as required by Section 307(b) and (d) of the Act, 33 U.S.C. § 1317(b) and (d), and the implementing regulations, 40 C.F.R. Part 403, and in violation of the National Pollutant Discharge Elimination System ("NPDES") permit for one of its treatment plants.  The State brings this action for violations of Section 342D-50(a), Hawaii Revised Statutes ("HRS"), and seeks the imposition of civil

COMPLAINT - 2 -

penalties and injunctive relief for violations referenced in that section.

<u>JURISDICTION AND VENUE</u>

2.  This Court has jurisdiction over this action pursuant to 28 U.S.C. §§ 1331, 1345, 1355, and Section 309(b) of the Act, 33 U.S.C. § 1319(b).  This Court has supplemental jurisdiction over the claims asserted by the State of Hawaii pursuant to HRS §§ 603-21.5(2) and (3), 342D-11, 342D-30(a), and 342D-56, and 28 U.S.C. § 1367.

3.  Venue is proper in this district pursuant to 33 U.S.C. § 1319(b) and 28 U.S.C. §§ 1391(b) and (c) and 1395(a), and pursuant to HRS § 603-36(1), because it is the judicial district in which CCH is located and in which the violations occurred.

<u>DEFENDANT</u>

4.  Defendant CCH is a "municipality" within the meaning of Section 502(4) of the Act, 33 U.S.C. § 1362(4), and is also a "person" within the meaning of Section 502(5) of Act, 33 U.S.C. § 1362(5).

5.  CCH is a county in the State of Hawaii created by statute and has the power to sue and be sued.  HRS § 46-1.5(22).

<u>STATUTORY BACKGROUND</u>

6.  Section 301(a) of the Clean Water Act, 33 U.S.C. § 1311(a), prohibits the discharge of pollutants into waters of the United States by any person except in accordance with Section 301 of the Act, 33 U.S.C. § 1311, and as authorized by and in

COMPLAINT - 3 -

compliance with certain other sections of the Act, including, inter alia, Sections 307 and 402 of the Act, 33 U.S.C. §§ 1317, 1342.

7.  Pursuant to Section 402(a) of the Act, 33 U.S.C. § 1342(a), the EPA Administrator ("Administrator") may issue an NPDES permit that authorizes the discharge of pollutants directly into Navigable Waters, or Waters of the United States, but only upon compliance with the applicable requirements, inter alia, of Sections 301 and 307 of the Act, 33 U.S.C. §§ 1311 and 1317, and such other conditions as the Administrator determines are necessary to carry out the provisions of the Act.

8.  Pursuant to Section 402(b) of the Act, 33 U.S.C. § 1342(b), the Administrator may approve a proposal submitted by a state to administer the NPDES program in that state.  The Administrator approved Hawaii's proposal to administer the NPDES permit program in Hawaii.

9.  Pursuant to federal law, the State of Hawaii, Department of Health is, and at all relevant times has been, authorized to issue NPDES permits in conformity with federal law. 39 Fed. Reg. 43,759.

10.  Section 307(b) of the Act, 33 U.S.C. § 1317(b), authorizes the Administrator to promulgate regulations establishing pretreatment standards governing the introduction of pollutants into a POTW "for those pollutants which are determined not to be susceptible to treatment by such [POTW] or which would interfere with the operation of the POTW."

COMPLAINT - 4 -

11.    Pursuant to Sections 307(b) and 501(a) of the Act, 33 U.S.C. § 1317(b), § 1361(a), the Administrator of EPA promulgated "General Pretreatment Regulations for Existing and New Sources of Water Pollution," which are codified at 40 C.F.R. Part 403, to ensure implementation of the pretreatment standards established under Section 307(b) of the Act, 33 U.S.C. § 1317(b).

12.    The regulations contained in 40 C.F.R. Part 403 govern Industrial Users that introduce pollutants into a POTW, see, e.g., 40 C.F.R. §§ 403.5, 403.6, and 405-424.    The regulations also govern POTWs that implement programs designed to control such industrial discharges.    See, e.g., 40 C.F.R. § 403.8 et seq.

13.    Pursuant to 40 C.F.R. § 403.8(a), any POTW (or combination of POTWs operated by the same authority), with a total design flow greater than 5 million gallons per day and receiving from Industrial Users ("IUs") pollutants which Pass Through or Interfere with the operation of the POTW or are otherwise subject to Pretreatment Standards must establish a POTW Pretreatment Program.

14.    Pursuant to 40 C.F.R. § 403.8(b), the Pretreatment Program must be administered by the POTW to ensure compliance by IUs with applicable Pretreatment Standards and Requirements.

15.    Pursuant to 40 C.F.R. § 403.8(f), a POTW pretreatment program must contain certain legal authorities and procedures, and these authorities and procedures shall at all times be fully and effectively exercised and implemented.

16.   Section 309(b) and (d) of the Act, 33 U.S.C.
§ 1319(b) and (d), provide for commencement of actions for
injunctive relief and/or civil penalties for violations of, <u>inter
alia</u>, Sections 301, 307, and 402 of the Act, 33 U.S.C. §§ 1311,
1317 and 1342, including the conditions and limitations of NPDES
permits.  Section 309(d) authorizes the imposition of civil
penalties, which are not to exceed $25,000 per day for each
violation.

17.   Section 342D-50(a), HRS, provides that no person
shall discharge any water pollutant into state waters, or cause
or allow any water pollutant to enter state waters, except in
compliance with this chapter, or a permit or variance issued by
the Director.

18.   HRS §§ 342D-4 and 342D-5 authorize DOH to regulate
discharges of water pollutants and effluent into POTWs, and HRS
§ 342D-50(c) prohibits discharges of water pollutants and
effluent into POTWs in violation of pretreatment standards or
permit conditions relating to pretreatment.

19.   DOH, under HRS ch. 342D and other statutes, has
adopted the following rules:  Hawaii Administrative Rules ("HAR")
ch. 11-54, entitled "Water quality Standards;" ch. 11-55,
entitled "Water Pollution Control;" and ch. 11-62, entitled
"Wastewater Systems."

20.   HAR § 11-55-03 prohibits the violation of HRS
§ 342D-50 or any NPDES permit.

COMPLAINT - 6 -

21.   HAR § 11-55-24 adopts pretreatment standards (incorporating national standards by reference) and regulates users of POTWs.

22.   HAR § 11-62-06(g) prohibits in part wastewater spills, overflows, and discharges onto the ground or into state waters.

23.   Pursuant to HRS §§ 342D-11, 342D-30, and 342D-31, the State is authorized to seek injunctive relief and penalties not to exceed $10,000 for each day of each violation of, <u>inter alia</u>, HRS § 342D-50(a), HAR §§ 11-55-03, 11-55-24, or 11-62-06(g), or any NPDES permit.

<u>GENERAL ALLEGATIONS</u>

24.   Defendant CCH owns and operates eleven POTWs, as defined in Section 212 of the Act, 33 U.S.C. § 1292, and in 40 C.F.R. § 403.3(o).  These treatment plants treat domestic and industrial wastewater for the major portions of the island of Oahu, Hawaii.

25.   CCH "discharges pollutants" within the meaning of Section 502(6) and (12) of the Act, 33 U.S.C. § 1362(6), (12), from its POTWs through "point sources" within the meaning of Section 502(14) of the Act, 33 U.S.C. § 1362(14), into the Pacific Ocean, and other "navigable waters" within the meaning of Section 502(7) of the Act, 33 U.S.C. § 1362(7), and 40 C.F.R. § 122.2.

26.   CCH's treatment plants receive wastewater from an approximately 1900 mile Collection System, which includes pipes,

COMPLAINT - 7 -

manholes, sewer lines, pump stations, and appurtenances thereto
that convey domestic and industrial wastewater to CCH's treatment
plants.

27. Pursuant to Section 402(a) of the Act, 33 U.S.C.
§ 1342(a), and the authority delegated to the State of Hawaii
under Section 402(b) of the Act, 33 U.S.C. § 1342(b), the State
issued NPDES permits to CCH's POTWs. In general, these permits
authorize CCH to discharge pollutants from specific outfalls of
its POTWs into the Pacific Ocean and other Navigable Waters (or
Waters of the United States), subject to certain limitations and
conditions. These permits do not authorize discharges from CCH's
Collection System.

28. On July 29, 1982, EPA approved a POTW pretreatment
program for CCH. In accordance with the approved POTW
pretreatment program, CCH was required to develop, implement, and
administer the pretreatment program, in accordance with 40 C.F.R.
§ 403.8, for all of its treatment plants within its entire
service area, including developing and enforcing local limits to
implement general and specific prohibitions set forth in the
pretreatment regulations.

29. CCH developed a pretreatment program for its Sand
Island treatment plant. The NPDES permit for the Sand Island
plant, Permit No. HI 0020117, issued by the State on June 15,
1983, incorporates EPA's Pretreatment Regulations at 40 C.F.R.
Part 403, as well as CCH's approved POTW pretreatment plan. That
permit was modified on September 5, 1986, and was to expire on

COMPLAINT - 8 -

April 30, 1988.  However, the permit was subsequently administra-
tively extended, pursuant to 40 C.F.R. § 122.6, was reissued on
January 5, 1990, and became effective on February 20, 1990.

FIRST CLAIM FOR RELIEF

FAILURE TO IMPLEMENT PRETREATMENT PROGRAM

30.   Paragraphs 1 through 28 are realleged and
incorporated herein by reference.

31.   For at least the past five years, CCH has failed to
comply with EPA's pretreatment regulations and has failed to
fully implement its approved Pretreatment Program.

32.   In accordance with 40 C.F.R. § 403.8 and its
approved general POTW pretreatment program, CCH was required to
develop, implement, and administer the pretreatment program at
all of its individual POTWs that discharge to surface waters,
have NPDES permits, and meet the requirements of 40 C.F.R. §
403.8(a).  However, except for the Sand Island plant, CCH failed
to develop, implement, and administer the pretreatment program at
its treatment plants, including Honouliuli, Kailua, Kaneohe,
Wahiawa, Waianae, Ahuimanu, and Whitmore Village.

33.   As an example, in accordance with 40 C.F.R.
§ 403.8(f), CCH was required to identify and locate all possible
IUs that are subject to CCH's pretreatment program, to conduct
industrial waste surveys, and to create an inventory of
industrial contributions within the service areas of the POTWs.
CCH has failed to complete this survey and identification
process.

COMPLAINT - 9 -

34.  CCH's violations of these pretreatment requirements are violations of 40 C.F.R. § 403.8 and Sections 301 and 307 of the Act, 33 U.S.C. §§ 1311 and 1317.

35.  Pursuant to Section 309(d) of the Act, 33 U.S.C. § 1319(d), Defendant CCH is liable for civil penalties not to exceed $25,000 for each day of each violation of Sections 301 and 307 of the Act, 33 U.S.C. §§ 1311, 1317, and EPA's pretreatment regulations.

36.  Unless restrained by order of the Court, pursuant to Section 309(b) of the Act, 33 U.S.C. § 1319(b), Defendant CCH will continue to violate Sections 301 and 307 of the Act, 33 U.S.C. §§ 1311, 1317.

### SECOND CLAIM FOR RELIEF

### FAILURE TO IMPLEMENT PRETREATMENT PROGRAM AT SAND ISLAND

37.  Paragraphs 1 through 35 are realleged and incorporated herein by reference.

38.  CCH has failed to fully implement its pretreatment program at its Sand Island treatment plant, in violation of its NPDES permit for that plant since the effective date of the permit.

39.  Part III of the Sand Island NPDES Permit (No. HI0020117) incorporates, as enforceable conditions of the permit, EPA's Pretreatment Regulations in 40 C.F.R. Part 403 and the CCH pretreatment program approved by EPA.  CCH has violated the regulations and the approved pretreatment program in numerous

COMPLAINT - 10 -

respects.  These violations include, but are not limited to the following:

a.  CCH failed to implement the necessary legal authorities to enable it to carry out the pretreatment program, including, <u>inter</u> <u>alia</u>, the authority to require IUs to comply with applicable pretreatment standards and requirements.  This failure violates 40 C.F.R. § 403.8(f)(1).

b.  CCH failed to develop and implement procedures to enable it to identify and locate all possible IUs and to identify the character and volume of pollutants discharged by these IUs to the Sand Island Plant.  This failure violates 40 C.F.R. § 403.8(f)(2).

c.  CCH has not met the requirements of 40 C.F.R. § 403.8(f)(2)(v) relating to inspections, sampling, and monitoring.

40.  CCH's violations of the pretreatment requirements prescribed through its NPDES Permit for the Sand Island treatment plant are violations of permit conditions or limitations implementing Sections 301 and 307 of the Act, 33 U.S.C. §§ 1311, 1317, in a permit issued pursuant to Section 402 of the Act, 33 U.S.C. § 1342, and HRS § 342D-50(a).

41.  Pursuant to Section 309(d) of the Act, 33 U.S.C. § 1319(d), Defendant CCH is liable for civil penalties not to exceed $25,000 for each day of each violation of its NPDES permit, Sections 301, 307, and 402 of the Act, 33 U.S.C. §§ 1311, 1317, and 1342, and EPA's pretreatment regulations.

COMPLAINT - 11 -

42.    Pursuant to HRS § 342D-30, CCH is liable for civil penalties not to exceed $10,000 for each day of each violation.

43.    Unless restrained by order of the Court, pursuant to Section 309(b) of the Act, 33 U.S.C. § 1319(b), Defendant CCH will continue to violate Sections 301, 307, and 402 of the Act, 33 U.S.C. §§ 1311, 1317, and 1342.

<u>THIRD CLAIM FOR RELIEF</u>

<u>UNPERMITTED DISCHARGES FROM COLLECTION SYSTEM</u>

44.    Paragraphs 1 through 42 of the Complaint are realleged and incorporated by reference.

45.    The NPDES permits issued to CCH's POTWs allow discharges to Navigable Waters, or Waters of the United States, from specified discharge points.  The permits do not allow discharges from CCH's Collection System.

46.    Because of line blockages, pump station equipment failures, and structural pipe failures associated with inadequate preventive maintenance, and excessive infiltration and inflow in its system, there have been chronic overflows and spills from CCH's collection system that have resulted in discharges of raw sewage or partially treated wastewater to surface waters.  From 1987 to 1992, for example, CCH experienced approximately 61 unpermitted discharges greater than 1000 gallons from its collection system into Waters of the United States, and it experienced many discharges of less than 1000 gallons.  The larger spills include two on or about April 9, 1991:  a 50 million gallon spill of raw sewage into Pearl Harbor, and a

COMPLAINT - 12 -

267,000 gallon spill of raw sewage into the Ala Moana beach area, which resulted in the closing of that beach for a period of time.

47.  By these discharges, CCH has violated Section 301 of the Act, 33 U.S.C. § 1311, which prohibits the discharge of pollutants except in compliance with NPDES permits, and has violated HRS § 342D-50(a) and HAR § 11-62-06(g).

48.  Pursuant to Section 309(d) of the Act, 33 U.S.C. § 1319(d), Defendant CCH is liable for civil penalties not to exceed $25,000 for each day of each violation of Section 301 of the Act, 33 U.S.C. § 1311.

49.  Pursuant to HRS § 342D-30, CCH is liable for civil penalties not to exceed $10,000 for each day of each violation.

50.  Unless restrained by order of the Court, pursuant to Section 309(b) of the Act, 33 U.S.C. § 1319(b), Defendant CCH will continue to violate Section 301, 33 U.S.C. § 1311.

<u>PRAYER FOR RELIEF</u>

WHEREFORE, the United States and the State request this Court to issue the following relief:

1.  A judgment for the United States imposing civil penalties on the City and County of Honolulu not to exceed $25,000 per day for each past violation of the Clean Water Act, the pretreatment regulations, and CCH's NPDES permits;

2.  A judgment for the State imposing civil penalties on the City and County of Honolulu not to exceed $10,000 per day for each past violation of Hawaii law;

COMPLAINT - 13 -

      3.  An injunction ordering the City and County of Honolulu to comply with the terms of its NPDES permits, the Clean Water Act, and the pretreatment regulations and with Hawaii water quality laws as set forth above; and

      4.  Such other relief as this Court deems appropriate.

Respectfully submitted,

**FOR THE UNITED STATES OF AMERICA**

_____
LOIS J. SCHIFFER
Acting Assistant Attorney General
Environment and Natural Resources
    Division
U.S. Department of Justice

_____
LESLIE ALLEN, Senior Lawyer
Environmental Enforcement Section
Environment and Natural Resources
    Division
P.O. BOX 7611
U.S. Department of Justice
Washington, D.C. 20044
(202) 514-4114

ELLIOT ENOKI
United States Attorney
District of Hawaii

By: _____
MICHAEL CHUN
Assistant United States Attorney
Room 6100, PJKK Federal Building
300 Ala Moana Blvd., Box 50183
Honolulu, Hawaii  96850

Of Counsel:

THELMA ESTRADA
Assistant Regional Counsel
U.S. Environmental Protection Agency, Region 9
75 Hawthorne Street
San Francisco, California 94105

COMPLAINT - 14 -

JOSEPH THEIS
Attorney Advisor
Office of Enforcement
U.S. Environmental Protection Agency
401 M Street, S.W.
Washington, D.C.  20460

FOR PLAINTIFFS STATE OF HAWAII AND
PETER A. SYBINSKY, Ph.D

SONIA FAUST        627
LAURENCE K. LAU    1466
Deputy Attorneys General
State of Hawaii
Kekuanao'a Building, Room 200
465 South King Street
Honolulu, Hawaii 96813
Telephone (808) 587-3050

COMPLAINT - 15 -

# United States District Court

**DISTRICT OF** ___HAWAII___

UNITED STATES OF AMERICA and STATE OF HAWAII,
by Robert A. Marks, Its Attorney General,
and PETER A. SYBINSKY, Ph.D., Director
of Health, State of Hawaii

## SUMMONS IN A CIVIL ACTION

**CASE NUMBER:**

v.

CITY AND COUNTY OF HONOLULU

**TO:** (Name and Address of Defendant)

THE ABOVE-NAMED DEFENDANT

**YOU ARE HEREBY SUMMONED** and required to file with the Clerk of this Court and serve upon

**PLAINTIFF'S ATTORNEY** (name and address)
Michael Chun, AUSA                    and
Room 6100, PJKK Federal Building
300 Ala Moana Blvd., Box 50183
Honolulu, HI 96850

Robert Marks, Attorney General, State of Hawaii
Sonia Faust, Deputy Attorney General
Lawrence K. Lau, Deputy Attorney General
Kekuanao'a Building, 465 South King Street
Honolulu, HI 96813

an answer to the complaint which is herewith served upon you, within ___20___ days after service of
this summons upon you, exclusive of the day of service. If you fail to do so, judgment by default will be taken
against you for the relief demanded in the complaint.

OCT   3 1994

WALTER A.Y.H. CHINN
**CLERK**

(s) Rosemary Damron



**DATE**

**BY DEPUTY CLERK**

Exhibit 2

LOIS J. SCHIFFER
Assistant Attorney General
Environment and Natural Resources Division
United States Department of Justice
LESLIE ALLEN
Trial Attorney
Environmental Enforcement Section
Environment and Natural Resources Division
United States Department of Justice
P.O. Box 7611
Washington, D.C.  20044-7611
Telephone:  (202) 514-4114

STEVEN S. ALM
United States Attorney
District of Hawaii
MICHAEL CHUN
Assistant United States Attorney
Room 6100, PJKK Federal Building
300 Ala Moana Blvd., Box 50183
Honolulu, Hawaii  96850
Telephone:  (808) 541-2850

MARGERY S. BRONSTER   4750
Attorney General of Hawaii
HEIDI M. RIAN   3473
LAURENCE K. LAU   1466
Deputy Attorneys General, State of Hawaii
Kekuanao'a Building, Room 200
465 South King Street
Honolulu, Hawaii 96813
Telephone (808) 587-3050

Attorneys for Plaintiffs

FILED IN THE
UNITED STATES DISTRICT COURT
DISTRICT OF HAWAII

MAY 1 5 1995

at 9 o'clock and 44 min. W M
WALTER A. H. Y. CHINN, CLERK

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF HAWAII

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | CIV. NO. 94-00765DAE |
| | ) | |
| and | ) | |
| | ) | |
| STATE OF HAWAII, by Margery S. | ) | |
| Bronster, Its Attorney General, | ) | |
| and LAWRENCE MIIKE, M.D., | ) | ~~PROPOSED~~ |
| Director of Health, State of | ) | ORDER FOR ENTRY OF |
| H~~awa~~ii, | ) | CONSENT DECREE |
| | ) | AS MODIFIED; CONSENT DECREE |
| Plaintiffs, | ) | AS MODIFIED BY STIPULATION |

OR ENTRY
NT DECREE,
~~ED~~ - 1 -

ATTEST: A True Copy
WALTER A.Y.H. CHINN
Clerk, United States District
Court, District of Hawaii
By Barbara J. Kamida
                      Deputy

v.                                    )
                                      )
                                      )
CITY AND COUNTY OF HONOLULU,          )
                 Defendant.           )
                                      )

This Court finds that the proposed Consent Decree, signed by all parties and lodged with this Court on October 3, 1994, together with the amendments made to pages 42 and 49 (as agreed to by the parties pursuant to their Joint Stipulation for Modification of Lodged Consent Decree, filed on February 24, 1995) is fair, reasonable, consistent with the Clean Water Act, and in the public interest.

Accordingly, IT IS HEREBY ORDERED that the decree, as modified, is entered as an Order of this Court. A copy of the Consent Decree, which incorporates the modifications, is attached hereto.

DATED THIS ___15___ DAY OF ____May____, 1995.

                                    _DAVID A. EZRA_____
                                    DAVID A. EZRA
                                    UNITED STATES DISTRICT JUDGE

Submitted by:

_____
LESLIE ALLEN
Senior Attorney
Environmental Enforcement Section
Environment and Natural Resources Division
United States Department of Justice

USA & STATE OF HAWAII, et al. v. CITY & COUNTY OF
HONOLULU, ET AL., CIVIL NO. 94-00765 DAE
"[PROPOSED] ORDER FOR ENTRY OF CONSENT DECREE AS MODIFIED".
"CONSENT DECREE AS MODIFIED BY STIPULATION"
ORDER FOR ENTRY
OF CONSENT DECREE,
AS MODIFIED - 2 -

LOIS J. SCHIFFER
Acting Assistant Attorney General
Environment and Natural Resources Division
LESLIE ALLEN
Environmental Enforcement Section
U.S. Department of Justice, P.O. Box 7611
Washington, D.C.  20044-7611
Telephone:  (202) 514-4114

ELLIOT ENOKI
United States Attorney
District of Hawaii
MIKE CHUN
Assistant United States Attorney
Room 6100, PJKK Federal Building
300 Ala Moana Blvd., Box 50183
Honolulu, Hawaii  96850
San Francisco, California  94105
Telephone:  (808) 541-2850

ROBERT A. MARKS    2163
Attorney General of Hawaii
SONIA FAUST        627
LAURENCE K. LAU    1466
Deputy Attorneys General, State of Hawaii
Kekuanao'a Building, Room 200
465 South King Street
Honolulu, Hawaii 96813
Telephone (808) 587-3050

Attorneys for Plaintiffs

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF HAWAII

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| and | ) | |
| | ) | |
| STATE OF HAWAII, by Robert A. | ) | Civil No. |
| Marks, Its Attorney General, | ) | |
| and PETER A. SYBINSKY, Ph.D., | ) | |
| Director of Health, State of | ) | |
| Hawaii, | ) | |
| | ) | |
| Plaintiffs, | ) | CONSENT DECREE |
| | ) | |
| v. | ) | |
| | ) | |
| CITY AND COUNTY OF HONOLULU, | ) | |
| | ) | |
| Defendant | ) | |

## TABLE OF CONTENTS

I.  JURISDICTION AND VENUE . . . . . . . . . . . . . . . 2

II.  BINDING EFFECT . . . . . . . . . . . . . . . . . 2

III.  BACKGROUND . . . . . . . . . . . . . . . . . . 3

IV.  OBJECTIVES . . . . . . . . . . . . . . . . . . 5

V.  DEFINITIONS . . . . . . . . . . . . . . . . . . 6

VI.  PRETREATMENT COMPLIANCE PROGRAM . . . . . . . . . 7

VII.  COLLECTION SYSTEM COMPLIANCE PROGRAM . . . . . 15

VIII.  SUPPLEMENTAL ENVIRONMENTAL PROJECTS . . . . . . . 31

IX.  PROGRAM MANAGEMENT AND PROGRESS REPORTS . . . . . 43

X.  PENALTY FOR PAST VIOLATIONS . . . . . . . . . . 46

XI.  STIPULATED PENALTIES . . . . . . . . . . . . 47

XII.  Procedure for Submittals and Approvals of Plans . . 50

XIII.  FORCE MAJEURE . . . . . . . . . . . . . . 50

XIV.  DISPUTE RESOLUTION . . . . . . . . . . . . 53

XV.  CERTIFICATION . . . . . . . . . . . . . . . 54

XVI.  RIGHT OF ENTRY . . . . . . . . . . . . . . . 54

XVII.  EFFECT OF DECREE AND NONWAIVER PROVISIONS . . . . . 55

XVIII.  FAILURE OF COMPLIANCE . . . . . . . . . . . . . 57

XIX.  COSTS OF SUIT . . . . . . . . . . . . . . . . . 57

XX.  CONTINGENT LIABILITY OF STATE OF HAWAII . . . . . 57

XXI.  FORM OF NOTICE . . . . . . . . . . . . . . . . 58

XXII.  MODIFICATION . . . . . . . . . . . . . . . . 59

XXIII.  PUBLIC COMMENT . . . . . . . . . . . . . . . 59

XXIV.  CONTINUING JURISDICTION OF THE COURT . . . . . . 60

i

XXV.   EFFECTIVE AND TERMINATION DATES . . . . . . . . . . . 60

EXHIBIT A:   PRETREEATMENT SCHEDULE

EXHIBIT B:   SEWER I/I SCHEDULE

WHEREAS:

Plaintiff United States of America ("United States"), on behalf of the United States Environmental Protection Agency ("EPA"), and Plaintiffs State of Hawaii, by Robert A. Marks, its Attorney General, and Peter A. Sybinsky, Ph.D., Director of the Hawaii Department of Health ("DOH") (collectively, "State"), filed a Complaint herein concurrently with the lodging of this Consent Decree, alleging that Defendant, City and County of Honolulu ("CCH"), has violated the Clean Water Act, 33 U.S.C. § 1251 et seq. ("the Act"), the Hawaii Revised Statutes, Chapter 342D ("H.R.S."), and the conditions and limitations of its National Pollutant Discharge Elimination System ("NPDES") permits.

CCH does not admit any allegations of the United States' and the State of Hawaii's Complaint and denies that it has willfully, knowingly, or negligently violated any provision of the Act or the conditions or limitations of its NPDES permits.

Pursuant to Section 309(e) of the Act, 33 U.S.C. § 1319(e), the State of Hawaii shall be liable for payment of any judgment, or any expenses incurred as a result of complying with any judgment entered against CCH to the extent that the laws of the State prevent CCH from raising the revenues needed to comply with such judgment.

The Parties agree, and the Court finds, that settlement of these matters without further litigation or trial of any issues is in the public interest and that the entry of this Decree is

1

the most appropriate means of resolving these matters.

NOW THEREFORE, it is hereby ORDERED, ADJUDGED, and DECREED as follows:

I.   <u>JURISDICTION AND VENUE</u>

This Court has jurisdiction over the subject matter of this action and over the parties pursuant to Section 309(b) and (e) of the Act, 33 U.S.C. § 1319, and 28 U.S.C. § 1367.  The Complaint states a claim upon which relief may be granted under Section 309(b) of the Act, 33 U.S.C. § 1319(b).  This Court has jurisdiction over the claims asserted by the State of Hawaii, pursuant to its Hawaii Revised Statutes, and 33 U.S.C. § 1365. Venue is proper in this District pursuant to 28 U.S.C. §§ 1391 and 1395, and Section 309(b) of the Act, 33 U.S.C. § 1319(b). The parties waive any and all objections they may have to the Court's jurisdiction to enter and enforce this Consent Decree.

II.  <u>BINDING EFFECT</u>

A.   The provisions of this Consent Decree shall apply to and be binding upon CCH and its successors and assigns.  CCH certifies that its undersigned representatives are fully autho-rized by CCH to enter into the terms and conditions of this Consent Decree, to execute it on behalf of CCH and to legally bind CCH to its terms.  Except as indicated otherwise in Section XIII. E (Force Majeure) of this Consent Decree, any action taken by any contractor or consultant retained by CCH to implement CCH's duties under this Consent Decree shall be considered an action of CCH for purposes of determining compliance with this

2

Consent Decree.  In any action to enforce this Consent Decree, CCH shall not raise as a defense the failure by any of its agents, servants, contractors, employees, successors or assigns to take actions necessary to comply with the Decree.  Nothing herein is intended to restrict or limit any remedies and legal rights of CCH against those whose actions or inactions prevented compliance with this Decree.

B.   CCH shall provide a copy of this Decree, or make the Consent Decree available, to each contractor retained to perform any activity required by this Decree.  Prior to transfer of ownership, operation, or other interest in CCH's facilities, including the collection system or any part thereof, CCH shall provide a copy of this Decree to any successor in interest.  Such transfer, however, shall have no effect on CCH's obligation to comply with this Consent Decree unless the Consent Decree is modified pursuant to Section XXII to reflect such a change.  CCH shall notify in writing the United States Department of Justice (DOJ), EPA, and DOH at least thirty (30) days in advance of any such transfer.

III. <u>BACKGROUND</u>

A.  Defendant CCH is itself a publicly-owned treatment works ("POTW"), and owns and operates eleven "POTWs," as defined in Section 212 of the Act and in 40 C.F.R. § 403.3(o), which are referred to herein as "wastewater treatment plants" ("WWTPs"). These treatment plants treat domestic and industrial wastewater for the major portions of the island of Oahu, Hawaii.

3

B.    On July 29, 1982, EPA approved a pretreatment program for the POTW.  In accordance with the approved POTW pretreatment program, CCH was required to develop and administer a pretreatment program for its entire service area, including developing and enforcing local limits to implement general and specific prohibitions set forth in the pretreatment regulations.

C.    In its Complaint, the United States alleges that by failing to develop and administer a pretreatment program for all of its treatment plants and by failing to comply with certain of the pretreatment conditions of the Sand Island NPDES permit, Permit No. HI 0020117, CCH has violated Section 307 of the Act, 33 U.S.C. § 1317, which prohibits persons from operating any source in violation of any applicable pretreatment requirements.

D.    CCH's treatment plants receive wastewater from an approximately 1900 mile collection system, which includes pipes, manholes, sewer lines, pump stations, and appurtenances thereto that convey domestic and industrial wastewater to CCH's WWTPs. In its Complaint, the United States alleges that because of problems with line blockages, pump station equipment failures, and structural pipe failures associated with inadequate preventive maintenance, and excessive infiltration and inflow in its system, there have been chronic overflows and spills from CCH's collection system that have resulted in discharges of raw sewage or partially treated wastewater to surface waters.

E.    CCH's NPDES permits authorize discharges from specific points of the WWTPs and do not authorize discharges from the

4

Collection System.  In its Complaint, the United States alleges that, by its discharges of raw sewage or partially-treated effluent from its collection system, CCH has violated Section 301 of the Act, 33 U.S.C. § 1311, which prohibits the discharge of pollutants except in compliance with NPDES permits.

IV.  OBJECTIVES

The objectives of this Consent Decree are:

A.  To require CCH to come into and maintain compliance with the Clean Water Act, specifically Section 301, which prohibits discharging pollutants except in compliance with the Act, and Section 307, which prohibits persons from operating any source in violation of any applicable pretreatment requirements;

B.  To require CCH to revise and implement its pretreatment program to regulate industrial discharges to the WWTPs, including developing and enforcing technically-based local limits to implement general and specific prohibitions set forth in the pretreatment regulations.

C.  To require CCH to establish a schedule under which CCH shall install or implement preventive maintenance and sewer replacement and rehabilitation necessary to reduce and prevent Spills from its collection system; and

D.  To further the goals and objectives of the Act, particularly Sections 101, 301, and 307 of the Act, 33 U.S.C. §§ 1251, 1311, and 1317.

5

V.  DEFINITIONS

Unless otherwise defined herein, terms used in this Decree shall have the meaning given to those terms in the Clean Water Act, 33 U.S.C. § 1251 et seq., the regulations promulgated thereunder, and in any applicable NPDES permit.

"CCH or POTW Pretreatment Program" or "Pretreatment Program" shall mean the following collection of documents and any subsequent lawful amendments thereto:  the pretreatment program originally approved by EPA Region 9 on July 29, 1982, for the City and County of Honolulu; CCH's Sewer Ordinance implementing the pretreatment program; the proposed revisions to CCH's Sewer Ordinance (which were submitted by CCH to EPA on August 27, 1992, and are currently being rewritten in accordance with EPA's recommendations); and the pretreatment requirements incorporated as permit conditions in the NPDES permit for the Sand Island treatment plant (NPDES permit No. HI 0020117).

"Collection System" shall mean all pipes, manholes, sewer lines, pump stations, and appurtenances thereto under ownership of CCH that convey domestic and industrial wastewater to CCH's WWTPs.

The term "day" as used herein shall mean calendar days.  If a submission is due on a weekend or a federal holiday, the submission date will be the next business day.

"Surface Waters" shall mean waters of the United States as defined by 40 C.F.R. § 122.2.

"Spills" shall mean Dry Weather Spills from CCH's Collection

6

System that reach Surface Waters or Storm Drains.  "Dry Weather Spills" shall mean any overflows from CCH's Collection System that are caused by any reason other than infiltration and inflow (I&I) related to heavy rains.  Examples of Spills include but are not limited to, overflows caused by grease blockage, root block-age, sewer line collapse, power outage or pump station malfunc-tion.

"Storm Drain" shall mean pipes, conduits, or channels, excluding street gutters, used for conveying storm and surface runoff from rainstorms.

VI.   PRETREATMENT COMPLIANCE PROGRAM

A.   Implementation of CCH Pretreatment Program

1.   CCH shall fully and effectively implement and enforce, throughout its entire service area, the provisions of 40 C.F.R. Part 403, the CCH Pretreatment Program and any pretreat-ment requirements that have been, or are in the future, incorpo-rated in its NPDES permits.

2.   CCH's failure to fully and timely implement any provisions of 40 C.F.R. Part 403, the CCH Pretreatment Program or any pretreatment requirements in its NPDES Permits, shall consti-tute a violation of this Consent Decree.

3.   CCH shall review and implement its Pretreatment Program as follows and in accordance with the schedule identified in Exhibit A attached to this Consent Decree:

B.   Island-Wide Industrial User Survey and Database

7

CCH shall update the Industrial User (IU) inventory compiled pursuant to 40 C.F.R. § 403.8(f)(6), at a minimum, on an annual basis in accordance with its approved IU survey plan.

C. <u>Industrial Wastewater Discharge Permits</u>

1. CCH shall ensure that no Industrial Wastewater Discharge Permits (IWDPs) are issued with variances from limits in either applicable national categorical pretreatment standards or local limits. CCH shall immediately initiate a review of all existing IWDPs to eliminate all such variances as soon as practicable.

2. CCH shall not include compliance schedules in any existing or new IWDPs that extend the deadline for compliance with national categorical pretreatment standards or any pretreatment standard in 40 C.F.R. § 403.5 that is currently effective.

3. Within 90 days after issuance of an IWDP to any newly-identified SIU, CCH shall verify through its own inspection, sampling and analysis, that the SIU has attained compliance with all applicable pretreatment standards.

D. <u>Compliance Monitoring</u>

1. In the period from July 1, 1993 to June 30, 1994, and annually thereafter, CCH shall inspect all SIUs, including those newly identified through the IU survey, complete an inspection report for each SIU, and place that report in the respective file for each SIU within 45 days of the date of inspection. Each inspection shall include, at a minimum, visual inspections of all industrial processes that generate a wastewater discharge, a

8

visual review of all treatment, sampling, and laboratory
equipment, a review of plant records, and a review of all
outfalls and sampling points.  In the event sampling and
laboratory testing is required to determine whether an IU is an
SIU, and if such testing may prevent completion of the report
within the 45-day period, CCH shall notify EPA and identify a
schedule subject to EPA approval for completion of the report.

2.    CCH shall obtain an initial sample of the process
wastewater discharge of any newly identified SIUs and analyze it
for all applicable categorical pretreatment standards, local
limits, and prohibitive discharge limits set forth in 40 C.F.R.
§ 403.5.  Annually, CCH shall sample and analyze the process
wastewater discharge of each permitted SIU for all applicable
categorical pretreatment standards plus those parameters with
established local limits and prohibitive discharge limits set
forth in 40 C.F.R. § 403.5 that are reasonably expected to be
present in the SIU's wastewater discharge.

3.    CCH shall confirm once annually during an SIU
inspection that the SIU sample location provides a representative
sample and flow of each regulated process stream and satisfies
any requirements imposed by the categorical pretreatment stan-
dards applicable to such SIU.  For those SIUs for which sampling
at the end of process is not feasible and where more than one
categorical regulated process stream exists, CCH shall apply the
combined wastestream formula set forth in 40 C.F.R. § 403.6(e) to
determine appropriate downstream limits for each process flow.

9

4.    CCH shall ensure that all of its SIUs perform appropriate sampling and analysis techniques and accurate reporting in accordance with 40 C.F.R. Part 136 and 40 C.F.R. § 403.12 respectively, or CCH shall take appropriate enforcement actions against the SIUs for noncompliance with such requirements.

E.    Development of Technically-Based Local Limits

1.    CCH shall develop technically-based local limits as required in 40 C.F.R. § 403.5(c)(1), or demonstrate that they are not necessary as provided in 40 C.F.R. § 403.8(f)(4).  The development of technically-based local limits shall be performed for each WWTP in accordance with the schedule in Exhibit A and with the guidelines in EPA's "Guidance Manual on the Development and Implementation of Local Discharge Limitations under the Pretreatment Program" (December 1987, supplemented in May 1991). The local limits development shall include the following: sampling and analysis, identification of pollutants of concern, determination of maximum allowable headwork loadings, development of allocation methodology, and proposed local limit revisions.

2.    CCH shall analyze the influent, effluent and sludge at each of its WWTPs for the following pollutants:  all priority pollutants identified under Section 307(a) of the Act, 33 U.S.C. § 1317(a), pollutants that are regulated by its existing local limits, pollutants under national categorical pretreatment standards that apply to its IUs, and all other pollutants that are regulated by CCH's NPDES permits.  CCH shall sample and assess the impacts of these pollutants on its WWTPs, sludge

10

disposal options and receiving waters.

3.    CCH shall conduct flow-proportional, composite sampling of the effluent and influent at each WWTP for all of the pollutants described in Paragraph 2 above, as well as composite sampling of the sludge at each WWTP, with a minimum of twelve (12) discrete samples taken at equal time intervals over the 24-hour period.  CCH shall sample and analyze the sludge for the same pollutants as the influent and effluent sampling and analysis.  Furthermore, CCH shall establish sample points in its collection system that will allow CCH to sample residential domestic wastewater within the collection system to determine the background concentration and loading from domestic sources.

4.    In the event that a pollutant scan indicates the presence of any pollutants described in Paragraph 2 above, CCH shall conduct follow-up investigations, which may include sampling of that pollutant, to determine whether a local limit for such pollutant is necessary.  CCH shall conduct a headwork analysis to determine the maximum allowable influent loadings that will ensure that CCH can meet the requirements of 40 C.F.R. § 403.5.

5.    By July 31, 1994, CCH shall submit a report to EPA and to DOH of the maximum allowable headwork loadings to its WWTPs that will still allow the WWTP to meet the effluent limitations contained in its NPDES Permits.  This report shall:

a.    Include calculations of the treatment plant removal efficiencies and provide sufficient documentation of the

11

residential contribution to justify the amount of loading that is available to the industrial and commercial users;

   b. Describe any actions that will be taken to lower contributions from domestic or water supply sources; and

   c. Include the calculation of the loading that remains for allocation to the non-domestic (both commercial and industrial) sources.

   6. By July 31, 1994, CCH shall submit a report to EPA and to DOH describing the proposed method for determining loading allocation for each non-domestic user. The allocation may include an analysis of methods such as industrial contributory limits, mass-based limits, concentration limits, required percentage reduction of pollutants, etc. CCH shall provide data on the industrial and commercial users to justify the methodology of required reductions.

   7. By July 31, 1994, CCH shall submit a report to EPA for review and concurrence, and to DOH for review and approval, proposing revisions to the local limits and the timeline for compliance with the limits by Industrial Users, including any commercial users.

   8. In the event that local limits revisions are necessary, CCH shall enact a sewer ordinance containing the revised local limits no later than 150 days following EPA concurrence and DOH approval of the revised local limits.

   9. In the event that the local limits are revised, CCH shall notify, in writing, each industrial user of the revised

local limits within 30 days following CCH's enactment of the amended sewer ordinance.

        10.   Within three (3) months of enacting the amended sewer ordinance that contains the revised local limits, CCH shall issue, reissue or modify the Industrial Wastewater Discharge Permit for each SIU to include the revised local limits.  CCH shall establish an enforceable compliance schedule for each SIU that cannot comply with the revised local limits within 3 months of notification of the local limits.  The compliance schedule shall require the SIU to achieve final compliance with all revised local limits as soon as practicable.

    F.    <u>Enforcement Response Plan</u>

        CCH shall fully implement its Enforcement Response Plan (ERP), as reviewed by EPA, in accordance with 40 C.F.R. § 403.8(f)(5).

    G.    <u>Adequate Legal Authority in Sewer Ordinance</u>

        By December 31, 1994, CCH shall enact a revised Sewer Ordinance consistent with the proposed Sewer Ordinance that has been reviewed by EPA and approved by DOH.

    H.    <u>Program Staffing and Resources</u>

        1.   Within 30 days of the date of entry of the Consent Decree, CCH shall have committed sufficient resources and qualified staff to fully implement its Pretreatment Program and comply with this Consent Decree.

        2.   CCH shall provide regular training to its pre-treatment staff on regulations and program implementation suffi-

cient to fully implement its Pretreatment Program and comply with this Consent Decree.

I. Compliance Certifications

1. By December 31, 1994, CCH shall submit a certification to EPA and DOH that it has reviewed its existing approved Pretreatment Program and its Sewer Ordinance to ensure that it is fully consistent with 40 C.F.R. Part 403.

2. By December 31, 1994, CCH shall submit a certification to EPA and DOH stating either 1) that as to all SIUs identified as of December 31, 1993, none is in significant noncompliance ("SNC," as defined at 40 C.F.R. $403.8(f)(2)(vii)); or 2) for any SIU that is in SNC, that an appropriate enforcement action has been taken in accordance with the ERP and that the SIU has been required to achieve full compliance as soon as practicable in accordance with the ERP. CCH shall base its certification on monitoring data collected by CCH and the IUs within the previous 6 months.

3. By December 31, 1994, CCH shall submit a certification to EPA and DOH stating that all SIUs that were identified as of December 31, 1993, and that are subject to national categorical pretreatment standards have: (a) installed treatment equipment necessary to comply with all applicable categorical pretreatment standards (or any more stringent local limits) and are properly operating such equipment; and (b) have achieved "full compliance" with these pretreatment standards.

4. For purposes of this subsection, "full compliance"

14

means that the SIU has demonstrated three consecutive months of compliance with all applicable pretreatment standards and reporting requirements, with no pretreatment violations during this period, as evidenced by sampling data collected by CCH during this period to confirm compliance.

     5.  The certifications required by this subsection may be submitted in parts, provided certifications covering all SIUs are completed by the dates specified.

     6.  If EPA disagrees with CCH's certifications, EPA may require CCH to undertake additional work in order to come into full compliance with its Pretreatment Program and this Decree.

VII.  <u>COLLECTION SYSTEM COMPLIANCE PROGRAM</u>

   A.  <u>Reduction of Spills from Collection System</u>

     1.  CCH shall use its best efforts to prevent, to the maximum extent reasonably possible, Collection System Spills in terms of frequencies, duration and volume.  At a minimum, CCH shall improve the allocation and use of its maintenance crew and equipment so that CCH can respond to reported Spills in a timely manner, thereby preventing, containing, or minimizing Spills.

     2.  Within 30 days of the date of entry of the Consent Decree, CCH shall submit to EPA for review and approval its annual goals for 1994 through 1999 for reduction of Spill frequencies and/or volumes from its Collection System.  These projected annual goals for reduction of Spill frequencies and/or volumes will be in effect beginning January 1, 1994, and CCH will use its best efforts to meet these goals.  These goals will be

15

reviewed annually and may be adjusted to reflect improvements in CCH's Collection System preventive maintenance efforts.

3.    CCH remains liable under the Act for <u>any</u> unauthorized discharges from its Collection System, and the United States and the State retain all authority, judicial and administrative, to seek injunctive relief and/or penalties pursuant to federal and State laws concerning such unauthorized discharges. Discharges that meet the definition of bypass under 40 C.F.R. § 122.41 as well as discharges excused under Section XIII (Force Majeure) of this Consent Decree are not unauthorized discharges for the purpose of this Consent Decree.

4.    <u>Spill Reduction Action Plan</u>:  By December 31, 1995, CCH shall submit to DOH for review and to EPA for review and approval, a long-term comprehensive Spill Reduction Action Plan (SRAP) that is specifically aimed at reducing the number and volume of Spills from its Collection System to the maximum extent practicable.  Upon approval of the plan by EPA, CCH shall implement the plan in accordance with the approved schedule.  At a minimum, the SRAP shall include the following items:

a.  A Preventive Maintenance Plan for the entire CCH Collection System which shall have the following:

i.  Schedules for preventive maintenance activities and a system for setting priorities for sewer line inspections and cleaning based on the history of Spills and the incidence of problems with grease and root blockages in a particular sewer line;

16

ii.  Schedules for surveillance of all sewer lines including one or more of the following methods, as appropriate: surface inspections, direct visual inspections, closed circuit television inspections and/or smoke testing;

iii. Flow velocity observations, as necessary, for the purpose of maintenance planning;

iv.  Schedules for regular cleaning of all sewer lines using appropriate equipment on an appropriate frequency, based on the data used in analyzing and developing the Preventive Maintenance Plan;

v.   Schedules for inspection, flushing and/or cleaning of the entire Collection System.  The SRAP shall identify an appropriate schedule and frequency for cleaning and/or flushing the entire Collection System;

vi.  Procedures for responding to and containing Spills and minimizing Spill volume;

vii. Procedures for performing routine sewer line repairs to prevent Spills due to improper pipe bedding, line loads, earth movement, root growth damage, openings in sewer line and faulty building sewer connections;

viii. Procedures for identifying and correcting any other system deficiencies, such as misaligned pipes, grade deviations, solids build-up, hydrogen sulfide gas generation, pipe deformation, hydraulic overloads, misaligned or damaged manhole covers and manholes;

ix.  Procedures for conducting grease-trap

17

inspections at each IU with grease traps at least once every six month period and, where necessary, procedures for taking enforcement action against such non-complying IUs;

        x.  Use of maps of the sewer system with numbered manholes for easy reference in locating Spills and performing corrective maintenance; and

        xi.  Procedures for identifying and replacing pipelines and facilities that are reaching the end of their useful lives, including addressing the need for replacement of all sewer lines in the Facility Plans developed by CCH in the future.

        b.  An evaluation of CCH's Collection System staff, listing the existing staff and their functions and CCH's plans for meeting the staffing demands of each element of the SRAP as enumerated in Paragraph 4.a above;

        c.  A system for monitoring the inventory of available spare components for CCH's Collection System equipment, including pump station components, and a plan and schedule for normal replacement of these components; and

        d.  An analysis of available data concerning CCH's Collection System, including the Spills from the Collection System for the two-year period covering October 1, 1991 to September 30, 1993, the causes of these Spills and a schedule for future preventive maintenance work to prevent these Spills from recurring.

        5.  <u>Interim Preventive Maintenance Activities</u>:  Until

18

CCH commences implementation of the SRAP, CCH shall perform, at a minimum, the following interim preventive maintenance activities:

    a. Using the list of Collection System Spills from the four quarters prior to the entry of the Consent Decree, conduct inspections as well as flushing and/or cleaning, where necessary, in areas and segments of sewer lines where there has been a history of Spills. During the cleaning and/or flushing of these lines, if the crew detects or suspects a problem at the sewer line, CCH shall take the necessary corrective action as soon as possible;

    b. Conduct inspection, flushing and/or cleaning of at least 300 miles of sewer line per year. If necessary, CCH shall schedule its existing maintenance crew for overtime work during weekends and/or contract out to private firms some of the sewer line cleaning to accomplish these cleaning requirements;

    c. Conduct surface and direct visual inspections of sewer lines during routine cleaning. All crews shall report inspections of lines where Spills are caused primarily by grease and/or roots blockage;

    d. Conduct grease-trap inspections at each IU with grease traps at least once every six month period and, where necessary, take enforcement actions against such non-complying IUs; and

    e. Provide maintenance crews with copies of its sewer system maps with numbered manholes.

    B. <u>Collection System and Pump Station Personnel Training</u>

1. Annually, at a minimum, CCH shall conduct regular training of its Collection System and pump station personnel on the following:

    a. operation of pump stations and optimization of pump operation;

    b. use of the bypass/overflow/spill report;

    c. measurement and estimation of the rates of flow or total volume of wastewater released;

    d. cleanup and remedial measures following a Spill;

    e. posting of notices of Spills for the protection of public health;

    f. monitoring and collecting samples for fecal coliform bacteria and other human health related concerns; and

    g. performing routine and on-call grease trap inspections.

C. <u>Information Management</u>

1. By December 31, 1995, CCH shall have completed the installation and shall have begun use of a computerized Wastewater Information Management System (WIMS) as described in detail below. This system shall provide the ability to maintain both graphical and descriptive data of the CCH sewer system, track all major maintenance activities and allow the evaluation of the data collected, thereby assisting CCH in evaluating the needs and problems of its collection system. By the deadline stated above, CCH shall have a minimum of four (4) staffing

positions available to support this system and shall have completed the application, development and initial database for the modules of the system described in this paragraph. By August 31, 1994, CCH shall have ordered the computer hardware consisting of work stations, personal computers, printers, and network appurtenances and software consisting of Arc/Info, Oracle RDMS, network, work order management, Windows emulation, and word processing to support a minimum of twenty-seven (27) users on this system which CCH shall install as soon as possible after receipt. The following modules shall be installed and their use shall have begun by August 31, 1994:

a. The Sewer Information Maintenance System (SIMS) module will be developed to update the CCH Geographic Information System (GIS) sewer coverage, thereby maintaining both graphical and descriptive data of the CCH sewer system. As new sewer construction is completed or corrections are identified by maintenance crews, the drawings received will be entered into the information management system. Information regarding sewer length, size, material, manhole inverts, lateral location, lateral size, lateral length, installation date, and installation project name will be entered into the GIS sewer coverage.

b. The Collection System Maintenance System (CSMS) module will be developed to provide tracking capabilities of the major maintenance activities such as television inspections, line flushing, construction repairs, and lateral installations. Daily records of these activities will be inputted and

21

stored in this subsystem for later evaluation.  This subsystem will also include the ability to generate work orders and track costs for scheduled and emergency maintenance activities.

      c.  The General Applications (GA) module will consist of a collection of tools to query the data collected by maintenance personnel and evaluate the data with respect to the spatial distribution of the sewer system, and produce reports and plots of the results of the analysis.  These analyses can be used to adjust preventive maintenance schedules and program any necessary line rehabilitation projects.

      2.  By December 31, 1995, CCH shall complete the development of the Sewer Connection Application System (SCAS) and the Sewer Flow Analysis System (SFAS) modules as described below:

      a.  The SFAS will provide the calculation tools to determine the approval or denial of sewer connection requests.

      b.  The SCAS will be developed to process CCH sewer connection application forms, check the results of flow analysis performed by SFAS for approval or denial of connection requests, and issue connection permits and receipts for approved applications.

      3.  Until the WIMS comes on line, CCH shall use an interim data system to track the following information regarding all Spills from its Collection System:  date(s) and volume of Spill; size and location of the sewer line involved in the Spill; history of the problems with that particular sewer line; a summary of the preventive maintenance at that sewer line since

22

July 1, 1992; and, any information about the cause of the Spill
that could be useful in preventing a recurrence of the problem.

    D.  <u>Pump Station Operation</u>

      1.  Within 60 days of the date of entry of this
Consent Decree, and annually thereafter on January 31st of each
year, the City shall submit to DOH and EPA a report regarding the
status of the operation and maintenance of all pump stations.
This report shall be submitted as part of the progress report
required in Section IX of this Decree, and it shall list any pump
station breakdowns that resulted in unauthorized discharges to
Surface Waters in the prior year as well as actions the City has
taken or will take to prevent similar occurrences in the future.

    E.  <u>Program for Sewer Rehabilitation and Minimization of
Infiltration and Inflow</u>

      1.  To prevent and/or reduce the frequency and volume
of dry weather and wet weather spills from its Collection System
and wet weather bypasses at Sewer Pump Stations and WWTPs, CCH
shall undertake rehabilitation of its entire Collection System;
institute corrective measures to minimize infiltration and inflow
("I&I"); and provide adequate hydraulic capacity for its system.
To achieve this program for sewer rehabilitation and minimization
of I&I, CCH shall prepare a Long-Term Sewer Rehabilitation and
I&I Minimization Plan (Sewer I/I Plan) in accordance with the
guidelines and the performance standards described in the EPA
Handbook "Sewer System Infrastructure Analysis and Rehabilita-
tion," (EPA/625/6-91/030 October 1991) hereinafter called "the

23

EPA Handbook."  The Sewer I/I Plan shall be developed and implemented in accordance with the phasing and schedule shown in Exhibit B and described as follows:

    2.  Sewer I/I Plan Phases and Schedule:

        a.  CCH shall conduct the assessment of the infiltration and inflow problem and shall develop and implement the Long Term Sewer I/I Plan in the following phases:

           i.  Phase I: I&I Assessment Phase

           ii.  Phase II: Pilot Study Phase

           iii. Phase III: Rehabilitation Program

        b.  Phase I (I&I Assessment Phase) shall be conducted in three stages as follows:

           i.  Stage I:  Interim I&I Assessment

           ii.  Stage II: Preliminary Cost-Effectiveness Assessment

           iii. Stage III: Final Sewer I/I Plan

This phase, in Stages I and II, shall also involve hydraulic capacity and structural integrity assessments of the Collection System.

        c.  In Phase II (Pilot Study Phase), CCH shall undertake a pilot study covering one or more basins as appropriate.  The pilot study shall involve rehabilitating all main sewer lines under the ownership of CCH within the selected pilot study basins to determine the cost-effectiveness of the various methods and techniques as may be currently in general use for rehabilitating sewer lines.

d.    In Phase III (Rehabilitation Program), CCH shall develop and undertake a 20-year rehabilitation program covering the remainder of its island-wide collection system, based on the findings, conclusions and cost-effectiveness evaluations resulting from Phases I and II.

e.    The schedule for completion of the phases shall be as follows:

| Phase and Activity | Completion Deadline |
|---|---|
| Phase I: I&I Assessment Reports | |
| Interim Assessment | October 1, 1994 |
| Preliminary Cost-Effectiveness | December 31, 1995 |
| Final Sewer I/I Plan | December 31, 1999 |
| Phase II:  Pilot Study | December 31, 1998 |
| Phase III: Rehabilitation Program | December 31, 2019 |

3.    Deliverables:  The work to be accomplished within each of the phases and the deliverables that will be submitted by CCH to EPA for review and approval are as follows:

a.    Phase I:  I&I Assessment

i.    Interim I&I Assessment:  By October 1, 1994, CCH shall submit a report that includes:

(a)    A description of the flow monitoring program conducted during the winter months of November 1992 to March 1993, including a delineation of the collection system basins that were monitored;

(b)    A description and characterization of the extent and impact of I&I problems for each collection

25

system basin identified above, based on the available flow
monitoring data;

(c)   An interim hydraulic capacity
assessment which shall consist of interim dynamic modeling of the
larger collection system sewer lines using the flow monitoring
data obtained as of the winter season 1992-1993.  (This hydraulic
capacity assessment shall not include capacity assessments of
pump stations and treatment plants.);

(d)   An interim structural integrity
assessment of selected sewer lines in the collection systems
based on limited field inspections performed during 1993; and

(e)   Identification of projects included
by CCH in its Fiscal Year 1994-1995 Capital Improvements Program
(CIP) and Operating Budgets which relate to the conclusions of
the interim hydraulic capacity and structural integrity
assessments and which CCH will implement.  CCH may identify other
projects that will be included in later, but not necessarily
specific, fiscal year budgets.

ii.   Preliminary Cost-Effectiveness
Assessment:  By December 31, 1995, CCH shall submit a report that
includes:

(a) a description of the flow monitoring
program conducted as of March 31, 1995, including delineation of
all collection system basins monitored as of that date;

(b) a description and characterization
of the extent and impact of I&I problems for each collection

26

system basin, based on the flow monitoring data collected as of March 31, 1995;

(c) identification of "problem" basins which shall be programmed, in accordance with the EPA Handbook, for future Sewer System Evaluation Surveys (SSES) and identification of "non-problem" basins which shall be eliminated from further I&I investigations;

(d) a preliminary cost-effectiveness analysis for all "problem" basins identified as described above conducted in accordance with the EPA Handbook to tentatively identify the most cost effective method or methods for addressing excessive I&I conditions;

(e) an assessment of the hydraulic capacity of pump stations, main sewer lines and treatment plants in each collection system basin which shall include: (1) an analysis of groundwater intrusion and exfiltration; (2) dry weather and wet weather flow estimates using the flow monitoring data available as of March 31, 1995; and (3) identification of operational problems such as surcharges and bypasses in the collection system.

(f) An assessment of the structural integrity of those collection system sewer lines which will be investigated in 1994. The assessment shall: (1) report the results of corrosion studies; and (2) make recommendations for replacing or rehabilitating sewer lines which are identified as in need of structural repair, rehabilitation or replacement.

(g) Identification of priorities for the sewers to be rehabilitated, as a result of structural assessments, including identification of projects for funding in the budgets for each fiscal year from July 1, 1996 to June 30, 2001, which CCH will implement once funded.

iii. <u>Final Sewer I/I Plan</u>: By December 31, 1999, CCH shall submit a Final Sewer I/I Plan that includes:

(a)  Flow monitoring to determine the resulting conditions in the basin after the rehabilitation work required by the Pilot Study in Subsection b (Phase II: Pilot Study) is completed;

(b)  An analysis of the flow data to determine the extent of I&I reduction in the pilot study basin;

(c)  An assessment of the potential for extending the rehabilitation work to other basins including the need for rehabilitating private sewer laterals, if appropriate;

(d)  A plan for rehabilitating the sewer collection systems over a 20-year period based on a final cost effectiveness assessment of the available techniques for rehabilitation which have been evaluated as a result of the Pilot Study Phase;

(e)  Identification of an appropriate "design storm" in terms of exceedance frequency and magnitude for the purpose of determining the level of allowable infiltration and inflow in each basin;

(f)  Standards for the allowable

28

infiltration and inflow in each basin in units of gallons per capita per day or gallons per acre, as appropriate;

(g)  Prioritization of the collection system basins for the 20-year rehabilitation program based on the extent of I&I and the frequency and volume of spills;

(h)  Detailed project descriptions for the rehabilitation work that needs to be done in each "problem" collection basin including:  (1) project name or facility identifier; (2) length of sewer or description of facility; (3) type of rehabilitation work including technical description of rehabilitation method; (4) project timeframe for completion of construction; and (5) engineering and construction cost estimates.

(i)  Five-year milestones for completion of the entire twenty-year sewer rehabilitation program.  These milestones shall be selected to ensure that the work is conducted in a priority order throughout the twenty-year period.

b.  Phase II:  Pilot Study - By December 31, 1998, CCH shall submit a plan for conducting a pilot study in one or more collection system basins selected on the basis of the flow monitoring results from 1992-1993.  The pilot study shall:

(1)  Perform flow monitoring to determine the conditions in the basin prior to the rehabilitation work;

(2) Investigate the feasibility of using various techniques as may be generally in use for rehabilitating and correcting I/I problems; and

29

(3) Undertake complete rehabilitation of all main sewer lines and those portions of laterals under the ownership of CCH within the pilot study basin.

c.   Phase III:  Rehabilitation Program - CCH shall undertake a 20-year rehabilitation program to be completed by December 31, 2019, based on the Final Sewer I/I Plan, as approved by EPA, and in accordance with the priorities and schedules presented in the approved plan.  The rehabilitation program priorities and project schedules shall be reviewed annually and all revisions shall be submitted to EPA for review and approval.

F.   Quarterly Spill and Bypass Reports

Commencing with the first progress report required by Section IX of this Decree, and as part of each progress report thereafter, CCH shall include details of all Collection System spills (dry and wet weather) and WWTP emergency bypasses caused by I&I that occurred in the previous quarter.  For each spill and bypass reported therein, CCH shall provide the following information, if available:

1.  the remedial actions it took to prevent a recurrence of such a spill;

2.  the last date the sewer line was cleaned;

3.  the time CCH received notice of the spill or bypass;

4.  the actions taken to prevent the discharge from reaching surface waters;

30

5.   the history of spills in that particular line;
and

6.   plans for additional actions to decrease the
frequency and/or volume of spills in the area in the future,
including plans for increasing preventive maintenance at the
spill site, increasing grease trap inspections in the affected
areas where appropriate (in cases where the spills are related to
chronic grease blockages), and short-term and long-term
rehabilitation of any damaged area of the sewer line.

VIII.   SUPPLEMENTAL ENVIRONMENTAL PROJECTS

A.   CCH's Commitment to Effluent and Sludge Reuse Projects

1.   It has been CCH's policy to make advancements in
the areas of effluent and sludge reuse.  CCH's interest in reuse
projects is reflected by its commitment to these Supplemental
Environmental Projects (SEPs) as provided herein in this Consent
Decree.

2.   CCH is committed to the undertaking of beneficial
and feasible effluent and sludge reuse projects and, to this end,
commits to spend the following amounts for each project under the
conditions provided for in this Consent Decree:

a.   For Effluent Reuse, CCH commits to spend at
least $20 million, unless EPA agrees
otherwise;

b.   For Sludge Reuse, CCH commits to spend at
least $10 million, unless EPA agrees
otherwise.

31

3.    CCH's commitments provided in this Section will in no manner restrict or prohibit any further actions CCH chooses to take in the area of reuse, so long as it does not conflict with the provisions herein.

B.    <u>EPA's and DOH's Acceptance of CCH's Proposals for Reuse Projects</u>

EPA and DOH accept CCH's voluntary proposals toward the undertaking of environmentally beneficial projects, which are now incorporated into this Consent Decree.

C.    <u>Joint Statement of Commitment</u>

EPA, DOH and CCH jointly commit herein to mutually work in good faith towards the feasible undertaking of these supplemental environmental projects.  To this end, the parties commit to:

1.    Communicate regularly on at least a quarterly basis on the status of the projects; and

2.    Expedite decision-making and review and approval processes for the SEPs.

D.    <u>Sludge Reuse SEP</u>

1.    EPA, DOH and CCH recognize that currently there are several methods for beneficial sludge reuse.  For purposes of this SEP, CCH agrees to implement one or more of the following methods toward a SEP that shall beneficially reuse sludge: recycling sludge into compost and marketing as a soil conditioner; agricultural use; energy production; conversion to fuel; or other uses approved by EPA.  CCH agrees that the reuse of sludge as landfill cover shall be considered a secondary

32

method for beneficial reuse and will resort to this secondary reuse method only if all other methods are not feasible.

    2. In order for CCH to fulfill this commitment, CCH is currently undertaking an Invitation for Bids for a Beneficial Reuse Project and agrees to meet the following schedule should an award be made as a result of the Invitation for Bids:

    a. Two and a half (2.5) dry tons of municipal sludge per day by December 31, 1995;

    b. An additional two and half (2.5) dry tons of municipal sludge per day by December 31, 1996; and

    c. At least ten (10) dry tons of municipal sludge per day from January 1, 1998 until December 31, 2005.

    3. Submittals of Beneficial Sludge Reuse Proposals:

    EPA acknowledges that CCH is currently inviting bids for a Beneficial Sludge Reuse Project to be undertaken by a privately-owned company with financial commitment from CCH. CCH shall send to EPA via telefax a summary of the proposal it plans to accept, indicating the time by which EPA's approval or disapproval must be received. If EPA fails to approve the proposal within the time specified in CCH's telefax, the proposal shall be deemed approved by EPA. In the event CCH submits data or information subject to any confidentiality restrictions imposed by the selected proposer with respect to any proprietary data and information, and the information is subject to confidentiality pursuant to 40 C.F.R. §§ 2.201 et seq., EPA agrees to keep the information confidential in accordance with 40

C.F.R. §§2.201 et seq. EPA also agrees to keep the content of the proposal confidential until CCH awards the contract.

4.    Procedure if No Contract is Awarded

a.    In the event that the current Invitation for Bids does not result in an award for a Beneficial Sludge Reuse project and if no protests are filed, within the time required by City regulations for filing protests, CCH will notify EPA of its intention not to award a contract. Within ninety (90) days of such notice, CCH agrees to submit a plan and a schedule for undertaking its own project. CCH agrees that the plan will investigate the most economically viable and ecologically beneficial reuse project. The plan shall identify an appropriate course of action to achieve feasible beneficial reuse of sludge. CCH agrees to conduct a one year investigation of:

i. the feasibility of various treatment/reuse projects for CCH sludge, including direct land application of "Class B" sludge, composting and marketing of "Class A" sludge, alkali treatment and reuse, and other heat-treatment and other treatment methods;

ii. the existing and potential market for treated sludge, including the potential for CCH and the State to use sludge products, and the potential market for landscaping, agriculture, golf courses, etc.; and

iii. the costs versus benefits of various reuse options, taking into account the future landfill costs and capacities, the capital and operational costs of incineration,

34

and the costs and relative benefits and risks of various reuse options as compared to landfilling or incineration.

      b.  CCH agrees to submit the final report to EPA for approval in accordance with the schedule submitted pursuant to paragraph a above.  The report shall include conclusions, recommendations, and a plan and schedule for implementation of the sludge reuse project.  The report shall also identify any revisions to the sludge reuse commitment schedule outlined in Paragraph D.2 of this Section, provided, however, CCH agrees to make all practicable efforts to meet the volume commitment set forth in Paragraph D.2.  In addition, this report shall include identification of, and a statement of qualifications for, the supervising contractor or engineer selected by CCH to perform the proposed SEP.

      c.  Upon EPA's approval of the report, CCH agrees to implement the SEP in accordance with the approved plan and schedule.

E.    **Effluent Reuse SEP**

   1.  CCH agrees to implement a SEP that shall beneficially reuse effluent by one or more of the following methods:

      a.  Surface Reuse

Application of treated wastewater effluent for decorative impoundments, irrigating park land, golf courses and

35

other large landscapes as well as agricultural fields, cooling industrial processes, and other uses conceptually approved by DOH and EPA.

      b.  Subsurface Reuse

      Recharging treated wastewater effluent into local groundwater aquifers. Use of treated wastewater by recharging groundwater aquifers may be considered a beneficial reuse if the quality of the treated wastewater does not degrade the existing quality and uses of the aquifer, and CCH can demonstrate to DOH and EPA that the treated wastewater being injected into these aquifers will be beneficially used. Any groundwater recharge of treated effluent must comply with State and federal health regulations.

      2.  CCH agrees to beneficially reuse wastewater under the following schedule:

      a.  Two (2) million gallons per day (mgd) of municipal effluent by July 1, 1998;

      b.  An additional three (3) mgd of municipal effluent by June 30, 1999;

      c.  At least ten (10) mgd of municipal effluent per day by from July 1, 2001 until at least July 1, 2011.

      3.  By July 1, 1995, CCH agrees to prepare a plan and schedule for implementation of the effluent reuse SEP that shall achieve the schedule set forth in paragraph E.2 of this Section. The plan shall also include identification of, and a statement of qualifications for, the supervising contractor or engineer

36

selected by CCH to perform the proposed SEP.  CCH agrees to submit this plan to EPA for approval by July 1, 1995.

     4.  Upon approval of the plan, CCH agrees to implement the SEP in accordance with the approved plan and schedule.

   F.   Alternative SEPs

     1.  If, after making all good faith efforts necessary, CCH determines that it is infeasible to achieve the maximum commitment for sludge reuse or effluent reuse required by Paragraphs D.2 or D.4 or E.2 above, but that reuse below the required volume is feasible, the amount of sludge or effluent reuse may be reduced upon mutual concurrence.  Unless EPA agrees otherwise, CCH agrees to implement an alternative SEP.

     2.  If, after making all good faith efforts necessary, CCH determines that the sludge reuse or effluent reuse SEP is wholly infeasible, CCH may petition EPA to implement an alternative SEP upon concurrence by EPA.

     3.  In developing an alternative SEP, CCH agrees to describe the efforts it has made to implement the initial SEP and the basis for the determination that the specified reuse levels or the SEP cannot be feasibly met.  Within 60 days of EPA's written concurrence that it is infeasible for CCH to achieve the reuse schedule set forth in Paragraphs D.2 or D.4 or E.2 above, or that the initial SEP is infeasible altogether, CCH agrees to submit a detailed proposal for one or more alternative SEP(s) to EPA unless EPA agrees otherwise.

          a.  CCH agrees to propose alternative SEP(s) that

37

cost at least as much as the cost avoided by CCH being unable to fully implement the original SEP.

b.  The alternative SEP(s) must satisfy the criteria for such projects set forth in EPA's SEP policy ("Policy on the Use of Supplemental Enforcement Projects in EPA Settlements," February 2, 1991) and/or other applicable policy or guidance documents identified by EPA.

4.  CCH agrees that the proposal for each alternative SEP will include:  (a) a conceptual technical description of the proposed SEP, together with any relevant documents to explain the SEP; (b) a statement of the specific objectives of the proposed SEP and how such project will satisfy the requirements of EPA's SEP policy; (c) a preliminary budget for both completion and operation of the SEP; and (d) a conceptual implementation plan and schedule for completion of the proposed SEP.

5.  EPA agrees to review any alternative SEP proposal(s) submitted pursuant to this Subsection of the Decree and inform CCH in writing of its approval, conditional approval (subject to modification by CCH of the proposal in accordance with EPA's comments), or disapproval of the SEP.  If EPA disapproves or conditionally approves an alternative SEP subject to modification by CCH, CCH agrees to either modify the alternative SEP in accordance with EPA's comments and resubmit it for EPA approval, or propose a substitute alternative SEP in place of the disapproved alternative SEP within sixty (60) days from its receipt of EPA's written disapproval or conditional

approval.  If CCH's resubmittal of the alternative SEP or new
proposal for a substitute alternative SEP is not approved as
submitted, EPA may allow CCH to make a resubmittal or reproposal.
Upon receipt of notice that the original resubmittal or
reproposal (or subsequent resubmittal or proposal, if allowed)
has also been disapproved, CCH agrees to pay the penalty(ies) set
forth in Subsection I.2, below.

6.   CCH agrees that EPA's decision to approve,
disapprove, or to conditionally approve (subject to modification
by CCH in accordance with EPA's comments) a proposed alternative
SEP shall not be subject to Section XIV (Dispute Resolution) of
this Consent Decree and shall not be subject to judicial review.

7.   Upon receipt of written notice of EPA's approval
of any proposed alternative SEP(s), CCH agrees to implement the
approved SEP in accordance with the schedule in the approved SEP.

8.   Each alternative SEP proposed by CCH and approved
by EPA shall be set forth by the parties in a proposed agreed
order modifying this Consent Decree which shall be submitted for
approval by the Court and thereupon will become enforceable under
this Consent Decree.

G.   Reporting Requirements

In order to keep EPA informed of CCH's progress on each
SEP, CCH agrees to include in each quarterly progress report that
it submits pursuant to Section IX.B of this Decree the following
information about each SEP: (a) a description of the actions
taken to commence, complete and operate the SEP during the

previous quarter, and of the actions planned for the next six months; (b) an itemized summary of all expenditures that were incurred during the previous quarter in performing the SEP; (c) information regarding percentage of completion, unresolved delays encountered or anticipated that may affect the schedule for implementation of the SEP, and efforts made to mitigate any actual or anticipated delays; and (d) any modifications to the approved SEP that CCH has proposed to EPA or that have been approved by EPA.

H.  Completion of SEP

1.  When CCH has fully completed a reuse SEP, including completion of the requirements set forth in Paragraphs D.2.C or D.4 and E.2.C of this Section, or has fully completed an alternative approved SEP, CCH agrees to submit to EPA a written Notification of SEP Completion, which will consist of a written report, including appropriate supporting documentation, that summarizes the work done to complete the SEP, the amount of reuse achieved (if applicable), and a detailed accounting of the costs incurred to complete the SEP.  This provision applies separately to each SEP performed by CCH to fulfill its commitments as stated in this Consent Decree.

2.  Upon receipt of the Notification of SEP Completion, EPA agrees to review the report and supporting documentation and may conduct an on-site inspection of the work completed to perform the SEP.  Upon EPA's concurrence that the SEP has been completed as agreed, and that CCH has incurred the costs to

40

commence and complete the SEP, EPA shall issue a Certification of SEP Completion to-CCH.  EPA and CCH agree that the level of detail submitted in the report to support costs incurred and the review by EPA of such cost accounting shall not necessarily be of the level of detail required for EPA's Construction Grants Program audits.  EPA and CCH agree that the objectives of the cost accounting in the Notification of SEP Completion shall be to assure EPA that CCH has incurred the stated project costs in a good faith effort to commence and complete the SEP.

3.  If EPA's review reveals that CCH has not fully completed the SEP, EPA shall inform CCH in writing of whatever additional work must be performed to complete the SEP.  CCH agrees to expeditiously perform this work and, upon completion, agrees to resubmit a Notification of Completion to EPA.

4.  If EPA disagrees with CCH's cost accounting, EPA shall inform CCH of its disagreement and the required correc-tions.  Within 30 days of receipt of EPA's comments, CCH agrees to amend its Notification of Completion in accordance with EPA's comments and agrees to resubmit it to EPA.

5.  Until final approval of a SEP, CCH agrees to retain, and upon request make available to EPA, all documentation relating to the reports, work, and expenditures applicable thereto.  Prior to the destruction or long-term storage of any documentation relating to the SEP(s), CCH shall give EPA the opportunity to take custody of the documentation without charge.

I.  <u>Failure to Implement SEPs</u>

41

1.  In the event CCH fails to achieve beneficial reuse as required by Paragraphs D.2 or D.4 or E.2 above, or otherwise fails to implement an initial or approved alternative SEP in accordance with its approved plan and schedule, CCH will comply with the requirements set forth in Section XI.A.3 of this Decree, unless CCH is excused under Section XIII (Force Majeure) of this Decree.

2.  In the event CCH informs EPA and United States Department of Justice (DOJ) in writing that it will abandon a SEP (either one of the initial reuse SEPs or an approved alternative SEP) and that it will not submit an alternative SEP, CCH agrees to be liable for an additional civil penalty as follows:

a.  If CCH abandons the sludge reuse SEP or a SEP that was proposed and approved as an alternative to the sludge reuse SEP, pursuant to Paragraph F above, CCH agrees to pay the difference between One Million Two Hundred Thousand Dollars ($1,200,000) and an amount equal to one-half the money already spent (if any) implementing the abandoned SEP, provided, however, that EPA finds the money was spent in reasonable and good faith efforts to implement the SEP in conformance with EPA's SEP policy.

b.  If CCH abandons the wastewater effluent reuse SEP or a SEP that was proposed and approved as an alternative to the wastewater effluent reuse SEP, pursuant to Paragraph F above, CCH agrees to pay the difference between Two Million Four Hundred Thousand Dollars ($2,400,000) and an amount equal to one-half the

money already spent (if any) implementing the abandoned SEP, provided, however, that EPA finds the money was spent in reasonable and good faith efforts to implement the SEP in conformance with EPA's SEP policy.

      c.  In its notice of its intention to abandon a SEP, CCH agrees to include an accounting of the amounts it has spent to date to implement the SEP and its analysis of the additional civil penalty that it must pay, calculated in accordance with Subparagraphs a and/or b, above.

      d.  EPA shall review the submittal and shall notify CCH of the appropriate civil penalty figure, if any. Within 30 days of receipt of EPA's notice, CCH agrees to pay any additional civil penalty by warrant payable to the "Treasurer of the United States" to the United States Attorney for the District of Hawaii, together with a letter explaining what the warrant is for. A copy of the warrant and the letter tendering such warrant shall be mailed to EPA and DOJ.

IX.  <u>PROGRAM MANAGEMENT AND PROGRESS REPORTS</u>

    A.  PROGRAM MANAGEMENT - CCH and EPA agree that a coordinated effort among all of the programs described in this Consent Decree is necessary to meet the objectives outlined in the Consent Decree.  To this end, CCH agrees to develop and implement a Consent Decree Program Management System to coordinate all the various tasks and activities required under this Consent Decree.  CCH agrees to maintain the Program Management System until the termination of the Consent Decree.

At a minimum, the Program Management System will perform the following activities:

1.  Coordinate the efforts of CCH's contract management staff to ensure that the various consultant and construction contracts that may be let for the activities within the Consent Decree are in conformance with approved schedules and program objectives;

2.  Develop, monitor and maintain a Master Schedule for the completion of the Consent Decree programs;

3.  Ensure communication among the various consultants and contractors involved in the projects, and ensure communication between EPA/DOH and CCH;

4.  Maintain program and project documentation to support the City's compliance with the Consent Decree;

5.  Develop and implement engineering and construction standards for the rehabilitation of the wastewater collection system;

6.  Develop and implement construction and project management procedures for construction contracts and consultant contracts under the Consent Decree programs;

7.  Develop and implement a "Conflict Resolution Process" within CCH to minimize any contractual and program conflicts that may occur within or between the Consent Decree programs; and

8.  Coordinate CCH's submittals to meet the reporting requirements outlined in this Section.

B.    PROGRESS REPORTS - Beginning with the first full calendar quarter after entry of this Decree, and for every calendar quarter thereafter, CCH shall submit in writing to EPA Region 9 a report containing the following information:

1.    The status and progress of projects under this Decree, including but not limited to:

a. Progress of the development and implementation of the SRAP, including a description of the interim preventive maintenance activities in the previous quarter;

b. Progress of the development and implementation of the Sewer I/I Plan, including information on the assessment of I&I for each Collection System Basin; the sewer collection line rehabilitation projects CCH has completed and is planning to undertake; hydraulic capacity rehabilitation projects CCH has completed and is planning to undertake; corrosion rehabilitation projects CCH has completed and is planning to undertake; quantitative descriptions of reductions in I&I that have resulted from completed sewer rehabilitation projects and expected reductions in I&I from ongoing and planned rehabilitation projects;

2.    Information as to compliance or noncompliance with the requirements of this Decree (including any plans that are enforceable through this Decree) and any reasons for noncompliance;

3.    A projection of the work to be performed pursuant to this Decree during the following twelve month period.

C.    Notification to EPA pursuant to this Section of any

45

anticipated delay shall not, by itself, excuse the delay.

D.   The reports shall be submitted no later than the twentieth day of the next quarter. These reports need not be subject to EPA's approval. The full report shall be made available for inspection by any person at CCH's offices.

E.   In addition, unless CCH has already given notice of noncompliance pursuant to paragraph A, Section XIII, within ten (10) days immediately following the deadline date of any requirement contained in Sections VI, VII, or VIII of this Decree, or in approved plans under those Sections, CCH shall notify EPA in writing of compliance or noncompliance with said requirement, the reason(s) for any noncompliance, and a plan for preventing such noncompliance in the future.

X.   PENALTY FOR PAST VIOLATIONS

A.   Within 60 days after the date of entry of the Decree, CCH shall pay a civil penalty in the amount of One Million Two Hundred Thousand Dollars ($1,200,000) plus interest at the rate established by the Secretary of the Treasury pursuant to 31 U.S.C. § 3717, calculated from the date of entry of the Decree until the date of payment.

B.   CCH shall pay Nine Hundred Fifty Thousand Dollars ($950,000) of this $1,200,000 plus interest to the United States by delivering a warrant in the sum stated above payable to the "Treasurer of the United States" to the United States Attorney for the District of Hawaii. A copy of the warrant and the letter tendering such warrant shall be mailed to EPA and to the United

46

States Department of Justice.

C.  CCH shall pay Two Hundred Fifty Thousand Dollars ($250,000) of the $1,200,000, plus interest, into a separate interest earning escrow account to be established in an independent financial institution by CCH.  The funds in the escrow account shall be paid pursuant to a separate escrow agreement between CCH and the State.

XI.  <u>STIPULATED PENALTIES</u>

A.  Failure by CCH to fully and timely comply with any requirement in this Consent Decree shall require CCH to pay stipulated penalties as follows

1.  <u>Pretreatment Program</u>

a.  For the following violations of the Pretreatment Program requirements, CCH shall pay the following stipulated penalties:

| Pretreatment Program Requirement | Stipulated Penalty Per Day, Per Violation |
|---|---|
| Failure to submit SIU list (Section VI.B.1) | $2000 |
| Failure to submit maximum allowable headwork loading report (Section VI.E.5) | $2000 |
| Failure to submit proposed revisions to local limits (Section VI.E.7) | $2000 |
| Failure to meet certification requirements in Section VI.I. | $2000 |
| Failure to enact amended Sewer Ordinance (Section VI.G.2) | $2000 |

b.  CCH shall pay a stipulated penalty of $1000

47

per day for each violation of any other pretreatment requirement of this Decree that is not specifically covered by the stipulated penalties in Subparagraph a above.

2.  **Collection System Compliance Program**

a.  For the following violations of the Collection System requirements, CCH shall pay the following stipulated penalties:

| Collection System Requirement | Stipulated Penalty Per Day, Per Violation |
|---|---|
| Failure to submit SRAP (Section VII.A.4) | $2000 |
| Failure to meet any requirement in the SRAP (Section VII.A.4) | $2000 |
| Failure to submit Sewer I/I Plan Deliverables (Section VII.E.3) | $2000 |
| Failure to meet any requirements in the Sewer I/I Plan (Section VII.E.3.(a)(iii) and (c)) | $2000 |

b.  CCH shall pay a stipulated penalty of $1000 per day for each violation of any other Collection System requirement in Section VII of this Consent Decree that is not specifically covered by the stipulated penalties in Subparagraph a above.

3.  **Supplemental Environmental Projects**.  For failure to meet the schedules set forth in Paragraphs VIII.D.2 or D.4 or E.2 for the Supplemental Environmental Projects that CCH is required to implement under Section VIII of this Decree, CCH agrees to pay a stipulated penalty of $1000 per day for each calendar day the failure continues for the first sixty (60) days of any such failure; thereafter, CCH agrees to pay a stipulated

48

penalty of $2000 per day for each calendar day the failure continues; provided, however, that if CCH informs EPA and DOJ in writing of its intent to abandon the SEP(s), the stipulated penalties set forth in this Paragraph shall stop accruing as of the date that EPA and DOJ receive notice.  CCH agrees to pay any stipulated penalties that had accrued up to this date, and in addition, CCH agrees to pay the additional civil penalty(ies) set forth in Section VIII.I.2.

    4.   CCH shall pay a stipulated penalty of $200 per day for each violation of Section IX.B (Reporting) of this Decree.

B.  The stipulated penalties herein shall be in addition to other remedies or sanctions available to the United States by reason of CCH's failure to comply with the requirements of this Decree, the NPDES Permit, or the Clean Water Act.  The payment of such stipulated penalties shall not be construed so as to relieve CCH from specific compliance with this Decree or federal or State law, or limit the authority of EPA or DOH to require compliance with such laws.

C.  Any stipulated penalties incurred by CCH shall be paid by a warrant payable to "Treasurer of the United States," and are to be tendered to the United States Attorney for the District of Hawaii by the 15th day of the month following the month in which the violations occurred, together with a letter describing the basis for the penalties.  A copy of the letter and the warrant shall be sent to the United States Department of Justice and EPA.

D.  CCH shall pay interest, at the rate established by the

Secretary of the Treasury pursuant to 31 U.S.C. § 3717, for any delinquent payments of a civil or stipulated penalty.

E. In any dispute over the applicability of stipulated penalties, CCH shall bear the burden of proving that it is not subject to stipulated penalties.

XII.  <u>Procedure for Submittals and Approvals of Plans</u>

Unless otherwise specified, where the Decree requires CCH to submit a plan or report or other submittal to EPA for its review, comments, approval, and/or concurrence, EPA shall, as expeditiously as possible, review and approve or comment on the plan.  If EPA cannot complete its review of the plan or submittal within 60 days of receipt of the plan or submittal, EPA shall so notify CCH.  Such notice shall be given within the 60-day period following receipt of the plan or submittal, and EPA shall identify a schedule for completion of its review and/or approval. In response to any comments by EPA, CCH shall make appropriate revisions to the plan and resubmit it to EPA within 60 days. Upon approval of the plan by EPA, the plan is incorporated by reference as an enforceable part of this Decree and CCH shall implement the plan.  Disputes between EPA and CCH about the plan or portions of the plan shall be resolved by the Dispute Resolution provisions of this Decree.

XIII.  <u>FORCE MAJEURE</u>

A.  If any event occurs which causes or which CCH reasonably believes may cause CCH to violate any provision of this Decree, CCH shall notify in writing the Department of Justice and EPA

50

within ten working days of the event. In the notice, CCH shall specifically reference this Section of the Decree and describe in detail the anticipated length of time the violation may persist, the precise cause or causes of the violation as is reasonably determinable at the time of notice, the measures taken or to be taken by CCH to prevent or minimize the violation as well as to try to prevent future violations, and when possible, the schedule by which those measures will be implemented. If an implementation schedule cannot reasonably be determined at the time of notification, CCH shall include an estimate of the date by which the implementation schedule shall be submitted. CCH shall adopt all reasonable measures to avoid or minimize any such violation. In the notice, CCH shall also assert whether it is claiming that the violation should be excused due to <u>force majeure</u> circumstances, as set forth in paragraph B., below.

B.  If CCH asserts in its notice, or in a subsequent notice sent to EPA within ten (10) days of discovery of the cause of the violation reported pursuant to subsection A, that the violation has been or will be caused entirely by circumstances beyond the reasonable control of CCH or any entity controlled by CCH, including CCH's consultants and contractors, and that CCH could not have reasonably foreseen or reasonably prevented such violation, and EPA agrees with such assertion, the time for performance of such requirement may be extended for a period not to exceed the actual delay resulting from such circumstance, and stipulated penalties shall not be due for said delay. In the

51

event EPA does not so agree, CCH may submit the matter to the Court for resolution pursuant to Section XIV of this Decree. EPA shall notify CCH in writing of EPA's agreement or disagreement with CCH's claim of a delay or impediment to performance within 45 days of receipt of CCH's notice under paragraph A of this section. If CCH submits the matter to the Court for resolution and the Court determines that the violation was caused entirely by circumstances beyond the reasonable control of CCH or any entity controlled by CCH, including CCH's consultants and contractors, CCH shall be excused, and no stipulated penalties shall be due as to that violation, but only for the period of time the violation continues due to such circumstances.

C. Failure by CCH to comply with the notice requirements of this Section, except if notice is impossible due to catastrophic circumstances, shall render this Section void and of no effect as to the particular incident involved, and shall constitute a waiver of CCH's right to obtain an extension of time for its obligations under this Section based on such incident.

D. CCH shall bear the burden of proving that any delay or violation of any requirement of this Consent Decree was caused entirely by circumstances beyond the reasonable control of CCH or any entity controlled by CCH, including CCH's consultants and contractors. CCH shall also bear the burden of proving the duration and extent of any delay or violation attributable to such circumstances.

E. Unanticipated or increased costs or expenses associated

52

with the implementation of this Decree, changed financial circum-
stances, or technical infeasibility of meeting NPDES effluent
limitations shall not, in any event, serve as a basis for
modifications to this Decree or extensions of time under this
Decree.  Upon EPA's concurrence, this provision shall not apply
to changed financial circumstances of any contractor or
consultant hired by CCH.

F.   Compliance with any requirement of this Decree by itself
shall not constitute compliance with any other requirement.  An
extension of one compliance date based on a particular incident
does not necessarily result in an extension of a subsequent
compliance date or dates.  CCH must make an individual showing of
proof regarding each delayed incremental step or other require-
ment for which an extension is sought.

XIV. DISPUTE RESOLUTION

A.   If the parties are unable to agree upon any plan,
procedure, schedule, extension of time, requirement, or other
matter described herein, or in the event a dispute should arise
among the parties regarding the implementation of the require-
ments of this Decree, such dispute shall be in the first instance
the subject of informal negotiations for a fifteen day period, or
for a longer period mutually agreed upon by the parties.

B.   If the parties are not in agreement at the end of this
informal negotiations period, the position of the United States
shall be controlling unless CCH files a petition with the Court
for resolution of the dispute within 30 days of receipt of the

United States' final position.  The petition shall set out the nature of the dispute with a proposal for its resolution.  The United States shall have 30 days to file a response with an alternate proposal for resolution.  In any such dispute, CCH shall have the burden of proving that the United States' proposal is arbitrary and capricious and that CCH's position will achieve compliance with the terms and conditions of its permit and the Act in an expeditious manner. During the informal negotiation period, to the extent CCH provides the information, EPA may consider reasonable industry practices as demonstrated by other municipalities of similar size or geography as that of CCH.

XV.  <u>CERTIFICATION</u>

Any report, plan or other submission required by this Decree shall be signed by an official or authorized agent of CCH and shall include the following certification:

> I certify under penalty of law that the document and all attachments were prepared under my direction or supervision in accordance with a system designed to assure that qualified personnel properly gathered and evaluated the information submitted.  Based on my inquiry of the person or persons who manage the system, or those persons directly responsible for gathering the information, the information submitted is, to the best of my knowledge and belief, true, accurate and complete.  I am aware that there are significant penalties for submitting false information, including the possibility of fine and imprisonment for knowing violations.

XVI.  <u>RIGHT OF ENTRY</u>

Until termination of this Consent Decree, EPA and its

54

representatives, contractors, consultants, and attorneys shall
have the authority to enter any facility covered by this Decree,
at all reasonable times, upon proper presentation of credentials,
for the purposes of:

1.  monitoring the progress of activities required by this
    Decree;

2.  verifying any data or information submitted to EPA in
    accordance with the terms of the Decree;

3.  obtaining samples, and, upon request, splits of any
    samples taken by CCH or its consultants; and

4.  otherwise assessing CCH's compliance with this Decree.

This provision in no way limits any rights of entry or
inspection that the United States otherwise has under any federal
law or regulation.

## XVII. EFFECT OF DECREE AND NONWAIVER PROVISIONS

A.  This Consent Decree is neither an NPDES permit nor a
modification of any existing permit issued pursuant to Section
402 of the Act, 33 U.S.C. § 1342, nor shall it be interpreted to
be such. The pendency or outcome of any proceeding concerning
the issuance, reissuance, or modification of an NPDES permit
shall neither affect nor postpone CCH's duties and obligations as
set forth in this Consent Decree.

B.  This Consent Decree in no way affects or relieves CCH
of its responsibility to comply with any federal, State, or local
law, regulation, or permit. The parties agree that CCH is
responsible for achieving and maintaining complete compliance
with all applicable federal and State laws, regulations, and
permits, and that compliance with this Decree shall be no defense

to any actions commenced pursuant to said laws, regulations, or permits. Except as expressly provided herein, CCH's complete performance of all obligations established pursuant to this Consent Decree, including payment of all penalties hereunder, shall be in full satisfaction of all civil claims of the United States and the State alleged in their complaint through the date of lodging of this Consent Decree.

C.   The United States and the State expressly reserve all remedies available to it for all violations of the Act not specifically pled in the Complaint filed in this matter.

D.   Nothing herein shall be construed to limit the authority of the United States or the State to undertake any action against any person, including CCH, in response to conditions that may present an imminent and substantial endangerment to the public health, welfare, or the environment.

E.   Nothing herein shall be construed to limit the authority of the United States to act under Section 308 of the Act, 33 U.S.C. § 1318.

F.   The United States and the State reserve any and all legal and equitable remedies available to enforce the provisions of this Decree.

G.   This Consent Decree does not limit or affect the rights of CCH, the State, or the United States as against any third parties, nor does it limit the rights of third parties, not parties to this Consent Decree, against CCH.

H.   Upon entry of this Decree, Administrative Order CWA-IX-

56

FY91-19 issued by EPA on September 17, 1991 concerning

pretreatment violations, and Administrative Order CWA-IX-FY92-03

issued by EPA on November 22, 1991 concerning Spills from its

Collection System, shall be considered terminated and no longer

in effect.

XVIII.  <u>FAILURE OF COMPLIANCE</u>

The United States does not, by its consent to the entry of

this Decree, warrant or aver in any manner that CCH's compliance

with this Decree will result in compliance with the provisions of

the Act, or its NPDES permits.  Notwithstanding EPA's review and

approval of any plans formulated pursuant to this Consent Decree,

CCH shall remain solely responsible for compliance with the terms

of the Act, applicable regulations, this Decree, and CCH's NPDES

permits.

XIX.  <u>COSTS OF SUIT</u>

Each party shall bear its own costs and attorney's fees in

this action.  Should CCH subsequently be determined to have

violated the terms and conditions of this Decree, then CCH shall

be liable to the United States for any costs and attorney's fees

incurred by the United States in any actions against CCH for

noncompliance with this Decree, as approved by the Court.

XX.  <u>CONTINGENT LIABILITY OF STATE OF HAWAII</u>

This Decree does not resolve the contingent liability of the

State of Hawaii under Section 309(e) of the Act, 33 U.S.C.

§ 1319(e).  The United States specifically reserves its claims

against the State, and the State reserves its defenses.

XXI.   <u>FORM OF NOTICE</u>

Except as specified otherwise, when written notification to or communication with the United States EPA, DOJ, U.S. Attorney, the State, or the Defendant is required by the terms of this Consent Decree, it shall be addressed as follows:

<u>As to the United States Department of Justice</u>:

Chief, Environmental Enforcement Section
Environment and Natural Resources Division
U.S. Department of Justice
Post Office Box 7611
Washington, D.C.  20044-7611
Reference Case No. 90-5-1-1-3825

<u>As to the United States Attorney</u>:

Mike Chun
Assistant United States Attorney
Room 6100, PJKK Federal Building
300 Ala Moana Blvd., Box 50183
Honolulu, Hawaii  96850

<u>As to EPA </u>:

Chief, Permits and Compliance Branch
Water Management Division
Attn:  Steve Fuller, W-5-3
U.S. Environmental Protection Agency, Region 9
75 Hawthorne Street
San Francisco, California 94105

Thelma Estrada
Assistant Regional Counsel
Office of Regional Counsel, RC-2-4
U.S. Environmental Protection Agency, Region 9
75 Hawthorne Street
San Francisco, California 94105

<u>As to the State</u>:

Thomas Arizumi
Chief, Environmental Management Division

58

P.O.Box 3378
Honolulu, Hawaii 96801

<u>As to CCH</u>:

Director
Department of Wastewater Management
650 S. King Street, 3rd Floor
Honolulu, HI 96813

Corporation Counsel
City and County of Honolulu
530 S. King Street, 1st Floor
Honolulu, HI 96813

Notifications to or communications with EPA, DOJ, the
U.S. Attorney, or the State shall be deemed submitted on the date
they are postmarked and sent by certified mail, return receipt
requested.

XXII.  <u>MODIFICATION</u>

Except for minor modifications of the SRAP and the Sewer I/I
Plan, which the parties determine do not warrant formal modifica-
tion, there shall be no modification of this Consent Decree
without written approval of all of the parties to this Consent
Decree and the Court.

XXIII. <u>PUBLIC COMMENT</u>

A.    The parties agree and acknowledge that final approval
by the United States and entry of this Decree is subject to the
requirements of 28 C.F.R. § 50.7 which provides for notice of the
lodging of this Consent Decree in the Federal Register, an
opportunity for public comment, and consideration of any com-
ments.

B.    CCH shall not withdraw its consent to this Decree

59

during the period of governmental and judicial review between lodging and entry of this Decree, and hereby consents to entry of this Decree without further notice.

XXIV.  <u>CONTINUING JURISDICTION OF THE COURT</u>

The Court shall retain jurisdiction to enforce the terms and conditions of this Decree and to resolve disputes arising hereunder as may be necessary or appropriate for the construction or execution of this Decree.

XXV.  <u>EFFECTIVE AND TERMINATION DATES</u>

A.  The effective date of this Consent Decree shall be the date upon which the Decree is signed by the court.

B.  CCH's obligations under Sections VI (Pretreatment Compliance Program) and X (Penalty for Past Violations) shall terminate when CCH has paid all penalties due (including any stipulated penalties due pursuant to Section XI), has completed all requirements specified therein, and EPA and DOH have determined that CCH has satisfactorily achieved compliance with its Pretreatment Program and the requirements of Section VI of this Decree for a period of one year.  (Assuming that CCH achieves and maintains compliance with Section VI of this Decree, one year of compliance should occur on or about December 31, 1995, one year following EPA's and DOH's receipt of the certifications required by Section VI.I.

C.  All other provisions of this Decree shall terminate when CCH has completed all requirements specified in Sections VII (Collection System Compliance Program) and VIII (Supplemental

60

Environmental Projects), has paid any and all stipulated penalties due pursuant to Section XI, and EPA has determined that CCH has satisfactorily complied with the requirements of its approved SRAP and Sewer I/I Plan and completed the sewer rehabilitation and I&I minimization work required in the Sewer I/I Plan. (Assuming CCH complies with the schedules in the Sewer I/I Plan and in Section VIII (Supplemental Environmental Projects), this should occur on or about the year 2019.) However, the requirement that CCH continue to implement and comply with its approved SRAP and Sewer I/I Plan shall remain in effect as an order of this Court.

D.    Upon EPA's determination that CCH has satisfied the terms of the Decree, the United States will file a motion for the termination of the Consent Decree.

Dated and entered this ____ day of _____, 1994.

_____
UNITED STATES DISTRICT JUDGE

WE HEREBY CONSENT to the entry of this Decree, subject to the public notice requirements of 28 C.F.R. § 50.7.

FOR THE UNITED STATES OF AMERICA:

_____
DATE

_____
LOIS J. SCHIFFER
Acting Assistant Attorney General
Environment and Natural Resources
    Division

61

United States Department of Justice

*Leslie allen*

__8/28/94__
DATE

LESLIE ALLEN
Senior Attorney
Environmental Enforcement Section
Environment and Natural Resources
    Division
United States Department of Justice
P.O. Box 7611
Washington, D.C.   20044-7611
(202) 514-4114


ELLIOT ENOKI
United States Attorney
District of Hawaii

By:

_____
DATE

MIKE CHUN
Assistant United States Attorney
Room 6100, PJKK Federal Building
300 Ala Moana Blvd., Box 50183
Honolulu, Hawaii  96850

__7/25/94__
DATE

STEVEN A. HERMAN
Assistant Administrator for
Enforcement
U.S. Environmental Protection
    Agency
Washington, D.C.

6/29/94
_____
DATE

_____
FELICIA MARCUS
Regional Administrator
U.S. Environmental Protection
   Agency, Region IX
San Francisco, CA


OF COUNSEL:

THELMA ESTRADA
Assistant Regional Counsel
U.S. Environmental Protection Agency, Region 9
75 Hawthorne Street
San Francisco, California 94105

JOSEPH THEIS
Attorney Advisor
Office of Enforcement
U.S. Environmental Protection Agency
401 M Street, S.W.
Washington, D.C.  20460

FOR THE STATE OF HAWAII

_____
JUN 1 6 1994
DATE

ROBERT A. MARKS
Attorney General of Hawaii

_____
JUN 1 4 1994
DATE

SONIA FAUST        627
LAURENCE K. LAU    1466
Deputy Attorneys General
State of Hawaii
Kekuanao'a Building, Room 200
465 South King Street
Honolulu, Hawaii 96813
(808) 587-3050

_____
JUN 3 0 1994
DATE

PETER A. SYBINSKY, Ph.D.
Director of Health
State of Hawaii

64

FOR CITY AND COUNTY OF HONOLULU

7.6.94
**DATE**

FRANK F. FASI
Mayor, City and County of Honolulu

7/5/94
**DATE**

FELIX B. LIMTIACO
Acting Director
Department of Wastewater Management
City and County of Honolulu

7/5/94
**DATE**

CHERYL K. OKUMA-SEPE
Deputy Corporation Counsel
Department of Corporation Counsel
City and County of Honolulu

65



EXHIBIT A

Revised 2/15/94

EXHIBIT 3

Proposed    WIM. SEF Schedule

| ID | Name | Schedule |
|----|------|----------|
| 1 | Develop Spill Reduction Action Plan (SRAP) | |
| 2 | Preventive Maintenance Plan | 7/1/92-12/31/95 |
| 3 | Evaluation of CCR's Collection System Staff | 7/1/92-12/31/95 |
| 4 | Available Spare Parts Inventory Monitoring System | 7/1/92-12/31/94 |
| 5 | Two Year Spill Data Analysis | 7/1/92-8/30/95 |
| 6 | Interim Preventive Maintenance Activities | |
| 7 | Inspection, Flushing/Cleaning | 7/1/94-12/31/00 |
| 8 | Grease Trap Inspection/Reporting | 7/1/94-12/31/00 |
| 9 | Collection System & Pump Station Personnel Training | |
| 10 | Develop Wastewater Information Management System | 7/1/95 Thereafter |
| 11 | Staffing: SIMS, CSMS, & GA Modules | 6/1/92-8/31/94 |
| 12 | Sewer Connection Application system (SCAS) | 7/1/94-12/31/95 |
| 13 | Sewer Flow Analysis | 10/1/94-12/31/95 |
| 14 | Pump Station Operation Status (Reporting) | |
| 15 | Sewer Rehabilitation and UI Plan | 7/1/94-12/31/19 |
| 16 | UI Assessment | |
| 17 | Interim UI Assessment | 12/1/92-10/31/94 |
| 18 | Preliminary Cost Effectiveness Assessment | 12/1/92-12/31/95 |
| 19 | Final Sewer UI Plan | |
| 20 | Pilot Study | 9/1/96-12/31/98 |
| 21 | Rehabilitation Program | 10/1/96-12/31/99 |
| 22 | Quarterly Spill & Bypass Reports | 7/1/99-12/31/19 |
| 23 | Dry Weather | 7/1/92-12/31/99 |
| 24 | Wet Weather | 7/1/92-12/31/19 |
| 25 | Supplemental Environmental Projects (SEPs) | |
| 26 | Beneficial Sludge Reuse | 7/1/93-12/31/95 |
| 27 | 2.5 TONS (Dry) | |

"In Progress" or Future Tasks    Completed Task    Total Time Extent



Exhibit 3

## CONFIDENTIALITY AGREEMENT

1.     This Agreement reflects the mutual understanding among the State of Hawaii ("the State"); Sierra Club, Hawaii Chapter ("Sierra Club"); Hawaii's Thousand Friends ("HTF"); Our Children's Earth Foundation ("OCEF"); and the United States with respect to privileges that may be asserted in existing and potential civil enforcement actions (including actions brought pursuant to the citizen suit provisions of the Clean Water Act), whether administrative or judicial, arising from violations of federal and state law at or from the City and County of Honolulu's ("CCH") publicly owned treatment works ("POTW") and/or its collection system.

2.     The United States, Sierra Club, HTF, OCEF, and the State share close and common interests in the enforcement of federal and state environmental laws at and from CCH's POTW and/or its collection system. The United States, Sierra Club, HTF, OCEF, and the State accordingly agree that the sharing of information by their employees, consultants, agents, and counsel will further their common enforcement goals.

3.     In 1995, the United States and the State filed an action pursuant to the Clean Water Act, 33 U.S.C. § 1319, alleging violations of federal law relating to CCH's POTW and collection system. United States and State of Hawaii v. City and County of Honolulu, Civ. No. 94-00765DAE (D. Hawaii). On May 15, 1995, the court entered a Consent Decree that resolved the claims brought in the complaint filed in that action.

4.     In July 2004, Sierra Club, HTF, and OCEF filed an action pursuant to the citizen suit provisions of the Clean Water Act, 33 U.S.C. § 1365, alleging violations of federal law relating to CCH's POTW and/or its collection system.

5.     The United States and the State anticipate that they will file an action against CCH under the Clean Water Act and similar state law relating to CCH's POTW and/or its collection system. Some of the claims in the governments' action are likely to call for determination of similar questions of law and fact as the claims in the citizen suit filed by Sierra Club, HTF, and OCEF.

6.     The United States, Sierra Club, HTF, OCEF, and the State have been consulting with one another in anticipation of a potential enforcement action against CCH for violations of federal and state laws relating to CCH's POTW and/or its collection system and expect to consult throughout the enforcement process.

7.     The United States, Sierra Club, HTF, OCEF, and the State expect that this consultation may lead to a joint prosecution of at least some claims against CCH relating to CCH's POTW and/or its collection system.

8.     The United States, Sierra Club, HTF, OCEF, and the State recognize and agree that all written and oral communications related to any investigations regarding violations at CCH's POTW and/or its collection system, litigation and settlement strategy related to any such violations, or any other matters related to potential judicial or administrative enforcement actions

against CCH or related to CCH's POTW and/or its collection system are being made in anticipation of litigation.

9.    The United States, Sierra Club, HTF, OCEF, and the State (including their respective agencies) do not intend through their consultations, either before or after the initiation of litigation, to waive any privileges, such as (but not limited to) attorney-client and work product privileges, which would otherwise attach to any information, documents, or communications shared among them. The United States, Sierra Club, HTF, OCEF, and the State specifically intend that all such privileges shall be preserved, and that privileged information shall be protected from disclosure to CCH or to any third party, except with respect to mutually agreed upon disclosures.

10.    The United States, Sierra Club, HTF, OCEF, and the State further agree to consult with each other before producing documents relating to CCH's POTW and/or its collection system and/or CCH, whether such production is made voluntarily, in response to any discovery request, or pursuant to any other law or regulation.

11.    The United States, Sierra Club, HTF, OCEF, and the State agree and acknowledge that the common interest privilege and confidentiality established by this Agreement is held jointly by all parties and that no party to this Agreement is authorized to unilaterally waive the privilege with respect to any information or documents shared pursuant to this Agreement.

12.    Nothing herein shall prevent the parties from disclosing documents, communications, or information to non-parties with the express, written permission of the authorized representative of the party who provided the information and the consent of the other parties, or as required by court order, or as otherwise required by law.

13.    The United States, Sierra Club, HTF, OCEF, and the State shall each take all necessary and appropriate measures to ensure that any person who is granted access to any confidential information or documents shared pursuant to this Agreement is familiar with the terms of this Agreement and complies with such terms as they relate to the duties of such person.

14.    Any disclosure by a party that is inconsistent with this Agreement shall not waive the confidentiality of such documents or communications.

15.    The confidentiality obligations established by this Agreement shall remain in full force and effect, without regard to whether the Agreement is terminated pursuant to Paragraph 16 and without regard to whether the claims are terminated by final judgment or settlement. This Agreement applies to communications and information and documents exchanged among the parties prior to the effective date of this Agreement.

16.    Any party may terminate its participation in this Agreement, subject to Paragraph 15, by providing written notice to the other parties at least 30 days prior to the date of termination

2

of its participation in this Agreement.  In the event of termination, this Agreement shall remain in full force as to all communications and documents/information exchanges prior to the termination date.  The terminating party shall return all copies of privileged documents provided pursuant to this Agreement upon request by the party who provided the document.

17.    This Agreement may be executed in counterparts.

18.    The undersigned representatives of each of the parties certifies that he or she is fully authorized to enter into the terms and conditions of the Agreement and to legally bind such party to all terms and conditions of this Agreement.


_____            Dated:_____
Christopher Sproul
Lea Hong
Attorneys for Sierra Club, Hawaii Chapter, Hawaii's Thousand Friends, and Our Children's
Earth Foundation


_____            Dated:_____
William F. Cooper
Deputy Attorney General
Attorney for the State of Hawaii Department of Health


_____            Dated: 12 - 12 - 05
Robert D. Mullaney
Matthew A. Fogelson
Attorneys for the United States


3

termination date. The terminating party shall return all copies of privileged documents provided pursuant to this Agreement upon request by the party who provided the document.

17.     This Agreement may be executed in counterparts.

18.     The undersigned representatives of each of the parties certifies that he or she is fully authorized to enter into the terms and conditions of the Agreement and to legally bind such party to all terms and conditions of this Agreement.


_Christopher A. Sproul_

_____          Dated: December 7, 2005
Christopher Sproul
Lea Hong
Attorneys for Sierra Club, Hawaii Chapter, Hawaii's Thousand Friends, and Our Children's
Earth Foundation



_____          Dated:_____
William F. Cooper
Deputy Attorney General
Attorney for the State of Hawaii Department of Health



_____          Dated:_____
Robert D. Mullaney
Matthew A. Fogelson
Attorneys for the United States

termination date. The terminating party shall return all copies of privileged documents provided pursuant to this Agreement upon request by the party who provided the document.

17.     This Agreement may be executed in counterparts.

18.     The undersigned representatives of each of the parties certifies that he or she is fully authorized to enter into the terms and conditions of the Agreement and to legally bind such party to all terms and conditions of this Agreement.

_____                    Dated: _____
Christopher Sproul
Lea Hong
Attorneys for Sierra Club, Hawaii Chapter, Hawaii's Thousand Friends, and Our Children's Earth Foundation

_____                    Dated: 12 - 7 - 06
William P. Cooper
Deputy Attorney General
Attorney for the State of Hawaii Department of Health

_____                    Dated: _____
Robert D. Mullaney
Matthew A. Fogelson
Attorneys for the United States

Exhibit 4

MATTHEW J. McKEOWN
Acting Assistant Attorney General
Environment and Natural Resources Division
U.S. Department Of Justice
ROBERT D. MULLANEY
J. THOMAS BOER
Trial Attorneys
Environmental Enforcement Section
U.S. Department of Justice
301 Howard Street, Suite 1050
San Francisco, California 94105
Tel: (415) 744-6491
Fax: (415) 744-6476
E-mail: Robert.Mullaney@usdoj.gov
         Tom.Boer@usdoj.gov

FILED IN THE
UNITED STATES DISTRICT COURT
DISTRICT OF HAWAII

OCT 1 0 2007

at 12 o'clock and 25 min. P M
SUE BEITIA, CLERK

EDWARD H. KUBO, JR. (Hawaii Bar no. 2499)
United States Attorney
District of Hawaii
R. MICHAEL BURKE (Hawaii Bar no. 1902)
Assistant United States Attorney
Room 6-100, PJKK Federal Building
300 Ala Moana Boulevard
Honolulu, Hawaii 96850
Tel: (808) 541-2850
Fax: (808) 541-2958

Attorneys for Plaintiff United States of America

[Attorneys for the State of Hawaii on next page]

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF HAWAII

| | |
|---|---|
| UNITED STATES OF AMERICA, et. al., <br>            Plaintiffs, <br><br>     v. <br><br> CITY AND COUNTY OF HONOLULU, <br><br>            Defendant. | Civil No. CV 07-00235 HG-KSC <br><br> STIPULATED ORDER |

MARK J. BENNETT  (Hawaii Bar no. 2672)
Attorney General of Hawaii

KATHLEEN S. Y. HO  (Hawaii Bar no. 3424)
EDWARD G. BOHLEN  (Hawaii Bar no. 8333)
Deputy Attorneys General
Department of the Attorney General,
State of Hawaii
465 South King Street, Room 200
Honolulu, Hawaii  96813
Tel:  (808) 587-3050
Fax:  (808) 587-3077
E-mail:  Kathleen.S.Ho@hawaii.gov
           Edward.G.Bohlen@hawaii.gov

# TABLE OF CONTENTS

I. JURISDICTION AND VENUE .................................... -3-

II. APPLICABILITY ............................................. -3-

III. OBJECTIVES ................................................ -3-

IV. DEFINITIONS ............................................... -4-

V. COMPLIANCE REQUIREMENTS ............................ -6-

VI. ANNUAL AND COMPLIANCE REPORTS .................... -16-

VII. REVIEW AND APPROVAL OF DELIVERABLES ............ -18-

VIII. STIPULATED PENALTIES ................................. -19-

IX. FORCE MAJEURE ......................................... -22-

X. DISPUTE RESOLUTION .................................... -24-

XI. INFORMATION COLLECTION AND RETENTION ............. -26-

XII. EFFECT OF SETTLEMENT/RESERVATION OF RIGHTS ........ -27-

XIII. COSTS ................................................... -28-

XIV. NOTICES ................................................. -29-

XV. EFFECTIVE DATE ......................................... -30-

XVI. RETENTION OF JURISDICTION .......................... -30-

XVII. MODIFICATION ......................................... -30-

XVIII. TERMINATION ......................................... -30-

XIX. PUBLIC PARTICIPATION .................................. -31-

XX. SIGNATORIES/SERVICE ................................... -31-

XXI. INTEGRATION ........................................... -32-

WHEREAS:

Plaintiff, the United States of America, by the authority of the Attorney General of the United States and through its undersigned counsel, acting at the request of and on behalf of the Administrator of the United States Environmental Protection Agency ("EPA"), and Plaintiff State of Hawaii, acting at the request of and on behalf of the State of Hawaii Department of Health ("DOH") (collectively the United States and the State are referred to herein as the "Governments"), have filed a Complaint in this action against Defendant City and County of Honolulu ("CCH"),  seeking injunctive relief pursuant to the Clean Water Act ("CWA" or the "Act") and State law.  The Complaint alleges that CCH is violating the Act and State law by discharging untreated sewage from its Wastewater Collection System without a permit.

CCH, a county in the State of Hawaii, owns and operates a publicly owned treatment works ("POTW") that collects, treats, and disposes of sanitary sewage for a large portion of the island of Oahu within the District of Hawaii.

CCH owns and operates the 42-inch Beachwalk Force Main that conveys untreated wastewater containing raw sewage from Manoa, Mo'ili'ili, and Waikiki to the Sand Island Treatment Plant (the "Beachwalk Force Main").

The Beachwalk Force Main suffered a failure on March 24, 2006 that resulted in a significant release of wastewater (estimated by CCH to total 48.7 million gallons) into the Ala Wai Canal, which flows into the Pacific Ocean.

CCH does not admit any liability to the United States or the State for the transactions or occurrences alleged in the Complaint.

As part of their oversight of CCH's Collection System Compliance Program pursuant to the 1995 Consent Decree, the Governments have identified deficiencies with respect to certain other force mains in CCH's Wastewater Collection System.

CCH has agreed to take certain actions to evaluate, repair, rehabilitate or

replace certain force mains in its Wastewater Collection System and the
Beachwalk Pump Station to address the Governments' concerns. The Parties have
agreed to stipulate to an Order to provide for these actions and to add provisions to
facilitate the implementation of these additional actions. It is the position of CCH
that the work required to accomplish these actions is being undertaken on an
aggressive timetable which will require it to obtain the requisite goods and
services as expeditiously as possible. DOH acknowledges CCH's position and
supports the work being done on an aggressive timetable.

The Parties seek to avoid further litigation and to work cooperatively on
issues relating to CCH's Wastewater Collection System by entering into this
Stipulated Order as set forth herein. Nothing in this Stipulated Order shall be
deemed an admission by any party of any fact or of any liability with respect to
any issue addressed in the Stipulated Order.

The Parties expressly recognize that the filing of the Complaint limited to
these specific claims and the filing of this Stipulated Order do not resolve and are
without prejudice to other claims of the Governments regarding compliance with
the 1995 Consent Decree, the Act, or State law, including, but not limited to, the
Governments' claims for civil penalties with regard to the matters set forth in this
Complaint.

Following entry of this Stipulated Order, the Parties intend to negotiate in
good faith a comprehensive remedy addressing all compliance issues associated
with CCH's wastewater system.

The Parties recognize, and the Court by entering this Stipulated Order finds,
that this Stipulated Order has been negotiated by the Parties in good faith and will
avoid further litigation between the Parties, and that this Stipulated Order is fair,
reasonable, and in the public interest.

NOW, THEREFORE, IT IS HEREBY ADJUDGED, ORDERED, AND
DECREED as follows:

-2-

## I. JURISDICTION AND VENUE

1.    This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. §§ 1331, 1345, and 1367, and the Act, and the Court has jurisdiction over the Parties. Venue lies in this District pursuant to the Act, and 28 U.S.C. § 1391(b) because this is the District in which CCH is located.

## II. APPLICABILITY

2.    The provisions of this Stipulated Order shall apply to and be binding upon the United States, the State of Hawaii, CCH, and any successors or other entities or persons otherwise bound by law.

3.    CCH shall provide a copy of this Stipulated Order to all managers whose responsibilities include the management of the implementation of the material components of the work required to be performed under this Stipulated Order. CCH shall make copies of the Stipulated Order available to any contractor retained to perform work required under this Stipulated Order.

4.    In any action to enforce this Stipulated Order, CCH shall not raise as a defense the failure by any of its officers, directors, employees, agents, or contractors to take any actions necessary to comply with the provisions of this Stipulated Order.

5.    CCH shall provide a copy of this Stipulated Order to any successor in interest at least thirty (30) days prior to transfer of that interest, and simultaneously shall verify in writing to EPA that such notice has been given. Absent agreement of the Parties or order of the Court, any sale or transfer of CCH's interests in, or operating role with respect to, CCH's "treatment works" or "POTW," as those terms are defined in 33 U.S.C. § 1292(2)(A) and 40 C.F.R. § 403.3(o), shall not in any manner relieve CCH of its responsibilities for meeting the terms and conditions of this Stipulated Order.

## III. OBJECTIVES

6.    In entering into this Stipulated Order, the Parties intend to further the

objectives set forth in the CWA, and to set out measures that CCH will implement
with respect to certain force mains in the Wastewater Collection System to reduce
Sanitary Sewer Overflows from specified force mains to the maximum extent
feasible.

## IV.  DEFINITIONS

7.    Unless otherwise defined herein, terms used in this Stipulated Order
shall have the meaning given to those terms in the Act, 33 U.S.C. §§ 1251-1387,
and the regulations promulgated thereunder.  Whenever terms set forth below are
used in this Stipulated Order, the following definitions shall apply:

"Act" or "CWA" shall mean the Clean Water Act, 33 U.S.C. §§ 1251-1387.

"CCH" shall mean the City and County of Honolulu.

"Complaint" shall mean the Complaint filed by the United States and the
State in this action seeking injunctive relief to address specific issues in CCH's
Wastewater Collection System, in particular with regard to certain force mains and
the Beachwalk Pump Station.

"Complete Construction" shall mean:  (i) all equipment testing has been
satisfactorily performed under normal operating range; (ii) CCH personnel have
been trained in proper operation; (iii) beneficial occupancy has occurred and CCH
is able to use all necessary equipment; and (iv) the contractor has delivered a
complete operations and maintenance manual to CCH.

"Day" shall mean a calendar day unless expressly stated to be a working
day.  In computing any period of time under this Stipulated Order, where the last
day would fall on a Saturday, Sunday, or federal or State holiday, the period shall
run until the close of business of the next working day.

"Defendant" shall mean CCH.

"Deliverable" shall mean any written report or other document required to
be prepared and/or submitted pursuant to this Stipulated Order.

"DOH" shall mean the State of Hawaii Department of Health.

-4-

"EPA" shall mean the United States Environmental Protection Agency and any successor departments or agencies of the United States.

"Force Main Condition Assessment" shall mean an inspection and evaluation program that includes, but is not limited to, all of the elements of the program listed in Appendix A to this Stipulated Order.

"1995 Consent Decree" shall mean the Consent Decree entered on May 15, 1995, by this Court in United States of America, et al. v. City and County of Honolulu, Case No. Civil 94-00765 DAE.

"Paragraph" shall mean a portion of this Stipulated Order identified by an Arabic numeral.

"Parties" shall mean the United States, the State, and CCH.

"Plaintiffs" shall mean the United States and the State.

"Pump Station Condition Assessment" shall mean an inspection and evaluation program that includes, but is not limited to, all of the elements of the program listed in Appendix B to this Stipulated Order.

"Sanitary Sewer Overflow" shall mean an overflow, spill, diversion, or release of wastewater from or caused by CCH's Wastewater Collection System, except that the term "Sanitary Sewer Overflow" does not include wastewater backups into buildings caused solely by a blockage or other malfunction in a building lateral that is privately owned.

"Section" shall mean a portion of this Stipulated Order identified by an uppercase Roman numeral.

"Spill Contingency Plan" shall mean a site-specific plan designed to minimize the volume of spills from a force main that includes, but is not limited to, all of the elements of the plan listed in Appendix C to this Stipulated Order.

"State" shall mean the State of Hawaii.

"United States" shall mean the United States of America, acting on behalf of EPA.

"Wastewater Collection System" shall mean all parts of the wastewater

collection system owned or operated by CCH that are intended to convey domestic or industrial wastewater to CCH's wastewater treatment plants, including, without limitation, sewers, pipes, pump stations, lift stations, manholes or maintenance holes, and force mains.

## V. COMPLIANCE REQUIREMENTS

8.    Beachwalk Projects

a.    Construction of Temporary Force Main:  By the compliance milestone of June 30, 2007 or the date of entry of this Interim Order (whichever is later), CCH shall Complete Construction of the Beachwalk temporary force main to serve as a back up force main in the event of a failure of the force main currently in operation.

b.    Construction of Permanent Force Main:  CCH shall design and Complete Construction of a new and permanent Beachwalk force main by the compliance milestone of December 31, 2012, and shall meet the following interim compliance milestones:

i.  By December 31, 2008, CCH shall execute a design contract and issue a notice to proceed with the design.

ii.  By December 31, 2010, CCH shall execute a construction contract and issue a notice to proceed with construction.

To the extent these compliance milestones conflict with any compliance milestones provided for by the 1995 Consent Decree or Deliverables approved thereunder, the compliance milestones set forth in this Paragraph shall control.

c.    Condition Assessment of Existing Force Main:  CCH shall conduct a Condition Assessment of the existing Beachwalk Force Main to determine the work appropriate so that:  (1) the force main can effectively function as the primary force main until the new, permanent Beachwalk force main is in operation, and (2) unless CCH's new Beachwalk Force Main is constructed to include both a new primary and back up force main, the force main shall remain in good operating condition to serve as a back up force main.  At a minimum, the

-6-

Condition Assessment shall contain all of the elements for a force main condition assessment listed in Appendix A to this Stipulated Order. CCH shall conduct the Condition Assessment of the existing Beachwalk force main according to the following compliance milestones:

      i. By July 31, 2008, CCH shall submit to EPA and DOH, for review and approval, a copy of the Condition Assessment (including a follow-up action plan). The schedule submitted by CCH for approval in the follow-up action plan shall provide for the expeditious completion of the work provided for in the follow-up action plan consistent with sound engineering practices. The schedule for completion of all work required by the follow-up action plan shall extend no later than December 31, 2016.

      ii. EPA's and DOH's review and approval of CCH's Condition Assessment (including the follow-up action plan) shall be conducted in accordance with Section VII (Review and Approval of Deliverables) of this Stipulated Order.

      iii. The approved follow-up action plan shall be incorporated by reference into this Stipulated Order, and its design interim compliance milestones and construction compliance milestones shall become enforceable pursuant to this Stipulated Order.

      d.   <u>Maintenance of Existing Force Main</u>: CCH presently intends to use the existing Beachwalk force main as a back up force main after it has completed construction of a new and permanent Beachwalk Force Main. When the new, permanent force main is constructed, CCH shall retain, connect, and maintain the existing force main in good operating condition for use as a back up force main unless and until CCH has achieved Complete Construction of an alternate back up force main.

      e.   <u>Condition Assessment of Existing Pump Station</u>: CCH shall conduct a Pump Station Condition Assessment of the existing Beachwalk pump

station in accordance with Appendix B to this Stipulated Order. CCH shall conduct the Pump Station Condition Assessment according to the following Deliverable schedule:

    i. By January 31, 2008, CCH shall submit to EPA and DOH, for review and approval, a copy of the Pump Station Condition Assessment (including a follow-up action plan). The schedule submitted by CCH for approval in the follow-up action plan shall provide for the expeditious completion of the work provided for in the follow-up action plan consistent with sound engineering practices. The schedule for completion of all work required by the follow-up action plan shall extend no later than December 31, 2012.

    ii. EPA's and DOH's review and approval of CCH's Pump Station Condition Assessment (including the follow-up action plan) shall be conducted in accordance with Section VII (Review and Approval of Deliverables) of this Stipulated Order.

    iii. The approved follow-up action plan shall be incorporated by reference into this Stipulated Order, and its design interim compliance milestones and construction milestones shall become enforceable compliance milestones pursuant to this Stipulated Order.

9.    Ala Moana Force Main Projects

    a.    Condition Assessment of Ala Moana Force Main No. 2:  CCH shall conduct a Condition Assessment of Ala Moana Force Main No. 2 to determine the work appropriate so that:  (1) the force main can effectively function as the primary force main until Ala Moana Force Main No. 3 is in operation, and (2) unless CCH's Ala Moana Force Main No. 3 is constructed to include both a new primary and back up force main, the force main shall remain in good operating condition to serve as a back up line.  At a minimum, the Condition Assessment shall contain all of the elements for a force main condition assessment listed in Appendix A to this Stipulated Order.  CCH shall conduct the Condition

-8-

Assessment according to the following Deliverable schedule:

     i. By June 30, 2008, CCH shall submit to EPA and DOH, for review and approval, a copy of the Condition Assessment (including a follow-up action plan). The schedule submitted by CCH for approval with the follow-up action plan shall provide for the expeditious completion of the work provided for in the follow-up action plan consistent with sound engineering practices. The schedule for completion of all work required by the follow-up action plan shall extend no later than December 31, 2018.

     ii. EPA's and DOH's review and approval of CCH's Condition Assessment (including the follow-up action plan) shall be conducted in accordance with Section VII (Review and Approval of Deliverables) of this Stipulated Order.

     iii. The approved follow-up action plan shall be incorporated by reference into this Stipulated Order, and its design interim compliance milestones and construction compliance milestones shall become enforceable pursuant to this Stipulated Order.

     b.    Additional Condition Assessment of Ala Moana Force Main No. 2: CCH shall conduct an additional Condition Assessment of Ala Moana Force Main No. 2 in accordance with this subparagraph. The additional Condition Assessment shall be conducted in the same manner as in subparagraph a except that it will focus only on problem areas identified in the first Condition Assessment. This additional Condition Assessment (including a follow-up action plan) shall be submitted to EPA and DOH for review and approval by June 30, 2011.

     c.    Construction of Ala Moana Force Main No. 3: CCH shall design and Complete Construction of a new Ala Moana Force Main No. 3 by the compliance milestone of December 31, 2014, and shall meet the following interim compliance milestones:

-9-

  i. By December 31, 2009, CCH shall execute a design contract and

  issue a notice to proceed with the design.

  ii. By July 31, 2012, CCH shall execute a construction contract and

  issue a notice to proceed with construction.

To the extent these compliance milestones conflict with any compliance

milestones provided for by the 1995 Consent Decree or Deliverables approved

thereunder, the compliance milestones set forth in this Paragraph shall control.

  d. <u>Maintenance of Ala Moana Force Main No. 2 as Back Up Line</u>:

CCH presently intends to use Ala Moana Force Main No. 2 as a back up force

main after it has completed construction of Ala Moana Force Main No. 3.  When

Ala Moana Force Main No. 3 is constructed, CCH shall retain, connect, and

maintain Ala Moana Force Main No. 2 in good operating condition for use as a

back up force main unless and until CCH has achieved Complete Construction of

an alternate back up force main.

  10. <u>Hart Street Force Main Project</u>

  a. <u>Force Main Connection</u>:  CCH completed construction of a

new Hart Street Force Main in May 2001 and left the old Hart Street Force Main

in place.  By January 31, 2008, CCH shall connect the old Force Main, in its

current condition, to the new Hart Street Pump Station for use as a back up force

main to handle emergency flows to the extent possible.

  b. <u>Condition Assessment</u>:  CCH shall conduct a Condition

Assessment of the old Hart Street Force Main to determine the work appropriate

so that the force main can remain in good operating condition to serve as a back up

line.  At a minimum, the Condition Assessment shall contain all of the elements

for a force main condition assessment listed in Appendix A to this Stipulated

Order.  CCH shall conduct the Condition Assessment according to the following

Deliverable schedule:

  i. By January 31, 2009, CCH shall submit to EPA and DOH, for

  review and approval, a copy of the Condition Assessment (including

a follow-up action plan).  The schedule submitted by CCH for approval with the follow-up action plan shall provide for the expeditious completion of the work provided for in the follow-up action plan consistent with sound engineering practices.  The schedule for completion of all work required by the follow-up action plan shall extend no later than December 31, 2016.

ii.  EPA's and DOH's review and approval of CCH's Condition Assessment (including the follow-up action plan) shall be conducted in accordance with Section VII (Review and Approval of Deliverables) of this Stipulated Order.

iii.  The approved follow-up action plan shall be incorporated by reference into this Stipulated Order, and its design interim compliance milestones and construction compliance milestones shall become enforceable pursuant to this Stipulated Order.

c.    Maintenance of old Hart Street Force Main:  CCH intends to use the old Hart Street force main as a back up force main.  CCH shall retain, connect, and maintain the old Hart Street force main in good operating condition for use as a back up force main to handle emergency flows to the extent possible.

11.  Kaneohe/Kailua Force Main Project

a.    Condition Assessment:  CCH shall conduct a Condition Assessment of the Kaneohe/Kailua Force Main to determine the work appropriate so that:  (1) the force main can effectively function as the primary force main until the replacement line is in operation, and (2)  unless CCH's new Kaneohe/Kailua Force Main is constructed to include both a new primary and back up force main, the force main shall remain in good operating condition to serve as a back up line. At a minimum, the Condition Assessment shall contain all of the elements for a force main condition assessment listed in Appendix A to this Stipulated Order. CCH shall conduct the Condition Assessment according to the following Deliverable schedule:

-11-

i. By January 31, 2009, CCH shall submit to EPA and DOH, for review and approval, a copy of the Condition Assessment (including a follow-up action plan). The schedule submitted by CCH for approval with the follow-up action plan shall provide for the expeditious completion of the work provided for in the follow-up action plan consistent with sound engineering practices. The schedule for completion of all work required by the follow-up action plan shall extend no later than December 31, 2018.

ii. EPA's and DOH's review and approval of CCH's Condition Assessment (including the follow-up action plan) shall be conducted in accordance with Section VII (Review and Approval of Deliverables) of this Stipulated Order.

iii. The approved follow-up action plan shall be incorporated by reference into this Stipulated Order, and its design interim compliance milestones and construction compliance milestones shall become enforceable pursuant to this Stipulated Order.

b.    Construction of New Force Main:  CCH shall design and Complete Construction of a new Kaneohe/Kailua Force Main by the compliance milestone of December 31, 2014, and shall meet the following interim compliance milestones:

i.    By December 31, 2009, CCH shall execute a design contract and issue a notice to proceed with the design.

ii.    By July 31, 2012, CCH shall execute a construction contract and issue a notice to proceed with construction.

c.    Maintenance of Old Force Main as Back Up Line:  CCH presently intends to use the old Kaneohe/Kailua Force Main as a back up force main after it has completed construction of the new force main. When the new force main is constructed, CCH shall retain, connect, and maintain the old force main in good operating condition for use as a back up force main, unless, in

constructing the replacement Force Main, CCH also constructs a back up Force
Main.

12.    Waimalu Force Main Project

a.    Condition Assessment:  CCH shall conduct a Condition
Assessment of the Waimalu Force Main to determine whether to repair,
rehabilitate or replace the force main.  At a minimum, the Condition Assessment
shall contain all of the elements for a force main condition assessment listed in
Appendix A to this Stipulated Order.  CCH shall conduct the Condition
Assessment according to the following Deliverable schedule:

i. By January 31, 2009, CCH shall submit to EPA and DOH, for
review and approval, a copy of the Condition Assessment (including
a follow-up action plan).  If, as a result of the Condition Assessment,
CCH determines that it is appropriate to replace the force main, then,
in the follow-up action plan, CCH shall submit:  (1) a proposed work
plan with a schedule for the design and construction of the
replacement force main, and (2) a proposed work plan with a
schedule to enable the existing force main to effectively function as
the primary force main until the replacement line is in operation, and,
unless, in constructing the replacement Force Main, CCH also
constructs a back up force main, the force main shall remain in good
operating condition to serve as a back up line.  The schedule
submitted by CCH for approval with the work plan shall provide for
the expeditious completion of the work provided for in the work plan
consistent with sound engineering practices.  The schedule for
completion of all work required by the follow-up action plan shall
extend no later than December 31, 2016, unless the follow-up action
plan requires the replacement of the force main.  If replacement of the
force main is required, the schedule for completion of all work
required by the follow-up action plan shall extend no later than

-13-

December 31, 2018.

ii. EPA's and DOH's review and approval of CCH's Condition
Assessment (including the follow-up action plan) shall be conducted
in accordance with Section VII (Review and Approval of
Deliverables) of this Stipulated Order.

iii. The approved follow-up action plan shall be incorporated by
reference into this Stipulated Order, and its design interim compliance
milestones and construction compliance milestones shall become
enforceable pursuant to this Stipulated Order.

13. <u>Kahala Force Main Project</u>

a.    <u>Condition Assessment</u>: CCH shall conduct a Condition
Assessment of the Kahala Force Main to determine whether to repair, rehabilitate
or replace the Force Main. At a minimum, the Condition Assessment shall contain
all of the elements for a force main condition assessment listed in Appendix A to
this Stipulated Order. CCH shall conduct the Condition Assessment according to
the following Deliverable schedule:

i. By January 31, 2009, CCH shall submit to EPA and DOH, for
review and approval, a copy of the Condition Assessment (including
a follow-up action plan). If, as a result of the Condition Assessment,
CCH determines that it is appropriate to replace the force main, then,
in the follow-up action plan, CCH shall submit: (1) a proposed work
plan with a schedule for the design and construction of the
replacement force main, and (2) a proposed work plan with a
schedule to enable the existing force main to effectively function as
the primary force main until the replacement line is in operation, and,
unless, in constructing the replacement force main, CCH also
constructs a back up force main, the force main shall remain in good
operating condition to serve as a back up line. The schedule
submitted by CCH for approval with the work plan shall provide for

-14-

the expeditious completion of the work provided for in the work plan
consistent with sound engineering practices.  The schedule for
completion of all work required by the follow-up action plan shall
extend no later than December 31, 2016, unless the follow-up action
plan requires the replacement of the force main.  If replacement of the
force main is required, the schedule for completion of all work
required by the follow-up action plan shall extend no later than
December 31, 2018.

ii.  EPA's and DOH's review and approval of CCH's Condition
Assessment (including the follow-up action plan) shall be conducted
in accordance with Section VII (Review and Approval of
Deliverables) of this Stipulated Order.

iii.  The approved follow-up action plan shall be incorporated by
reference into this Stipulated Order, and its design interim compliance
milestones  and construction compliance milestones shall become
enforceable pursuant to this Stipulated Order.

14.    CCH reserves the right to take immediate action at its discretion to
address conditions identified during the Condition Assessments as necessary to
protect public health and the environment.  Such actions shall not be subject to the
Governments' approval or dispute resolution under the 1995 Consent Decree or
this Stipulated Order.  Provided, however, CCH's decision to take such action
shall be without prejudice to the Governments' right to determine whether to
approve the Condition Assessments (including follow-up action plans).

15.    Spill Contingency Plans.  By January 31, 2008, CCH shall prepare a
site-specific Spill Contingency Plan designed to minimize the volume of any spills
from the following force mains: Beachwalk, Ala Moana No. 2, Hart Street,
Kaneohe/Kailua, Waimalu, and Kahala.  At a minimum, each Spill Contingency
Plan shall contain all of the elements for a Spill Contingency Plan listed in
Appendix C to this Stipulated Order.  CCH shall prepare and submit to the

Governments each Spill Contingency Plan according to the following Deliverable schedule:

      a. By January 31, 2008, CCH shall submit to EPA and DOH, for review and approval, a copy of each site-specific Spill Contingency Plan as a Deliverable.

      b. EPA's and DOH's review and approval of CCH's Spill Contingency Plans shall be conducted in accordance with Section VII (Review and Approval of Deliverables) of this Stipulated Order.

      c. CCH shall implement the Spill Contingency Plans as approved. CCH's responsibility to implement the pertinent Spill Contingency Plan in response to a force main spill is a compliance milestone for purposes of this Stipulated Order. CCH's responsibility to annually update its Spill Contingency Plans as required by Appendix C is an interim compliance milestone for purposes of this Stipulated Order.

## VI. ANNUAL AND COMPLIANCE REPORTS

16.    Reporting Requirements.

      a. Annual Reports: For each project required by Paragraphs 8 through 13 and Paragraph 15 of Section V (Compliance Requirements) of this Stipulated Order, CCH shall submit an Annual Report ("Annual Report") to EPA and DOH for their review. The Annual Report shall be due on January 30 (covering the previous January 1 to December 31).[1] Each Annual Report shall report the status of each project required by Paragraphs 8 through 13 and Paragraph 15. For projects that are completed, the Annual Report shall state whether the project was completed by the applicable deadline. For projects that have not been completed, the Annual Report shall briefly describe the status of the

---

[1]   The first Annual Report, due on January 30, may cover a portion of the year after the Effective Date of the Stipulated Order. For example, if the Stipulated Order is entered on February 1, the first Annual Report shall cover the period of February 1 through December 31.

project including whether the project remains on schedule for completion by the applicable deadline. If any projects identified in Paragraphs 8 through 13 and Paragraph 15 are not completed by the applicable deadline, subsequent Annual Reports shall continue to set forth the status of these uncompleted projects until each project is completed. The Annual Reports shall not be subject to approval pursuant to Section VII (Review and Approval of Deliverables) below.

        b.  <u>Compliance Milestone Reports</u>:  Within 30 days of a compliance milestone (including interim compliance milestone), CCH shall submit a brief report noting whether the work called for in the compliance milestone or interim compliance milestone is complete. If the work is completed at a date later than the compliance milestone or the interim compliance milestone, within 30 days of completion, CCH shall submit a follow-up report documenting when the work called for by the milestone is complete. These compliance milestone reports shall not be subject to approval pursuant to Section VII (Review and Approval of Deliverables) below.

        17.    All Deliverables shall be submitted to the persons designated in Section XIV (Notices) of this Stipulated Order.

        18.    Each Deliverable submitted by CCH under this Stipulated Order shall be signed by an official of the submitting party and include the following certification:

> I certify under penalty of law that this document and its attachments were prepared either by me personally or under my direction or supervision in a manner designed to ensure that qualified and knowledgeable personnel properly gathered and presented the information contained therein. I further certify, based on my personal knowledge or on my inquiry of those individuals immediately responsible for obtaining the information, that to the best of my knowledge and belief the information is true, accurate and complete. I am aware that there are significant penalties for submitting false information, including the possibility of fines and imprisonment for knowing and willful submission of a materially false statement.

This certification requirement does not apply to emergency or similar notifications where compliance would be impractical.

        19.    The reporting requirements of this Stipulated Order do not relieve

-17-

CCH of any reporting obligations required by the Act or its implementing regulations, or by any other federal, State, or local law, regulation, permit, or other requirement.

VII.  REVIEW AND APPROVAL OF DELIVERABLES

20.     After review of the Deliverables submitted pursuant to Paragraphs 8 through 13 and Paragraph 15, EPA, after consultation with DOH, shall in writing within 90 days of submission of these Deliverables:  (a) approve the submission; (b) approve the submission upon specified conditions; (c) approve part of the submission and disapprove the remainder; or (d) disapprove the submission.  If EPA does not submit a decision in writing within the time specified, CCH shall have the right to invoke the procedures set forth in Section X (Dispute Resolution) of this Stipulated Order.

21.     If the submission is approved pursuant to Paragraph 20, CCH shall take all actions required by the Deliverable, in accordance with the schedules and requirements of the Deliverable as approved.  If the submission is conditionally approved or approved only in part, pursuant to Paragraph 20(b) or (c), CCH shall, upon written direction of EPA, take all actions required by the approved Deliverable that EPA determines are technically severable from any disapproved portions, subject to CCH's right to dispute only the specified conditions or the disapproved portions, under Section X (Dispute Resolution) of this Stipulated Order.

22.     If the submission is disapproved in whole or in part pursuant to Paragraph 20(c) or (d), CCH shall, within 60 days or such other time as the Parties agree to in writing, correct all deficiencies and resubmit the Deliverable, or disapproved portion thereof, for approval, in accordance with the preceding Paragraphs.  Alternatively, CCH may invoke Section X (Dispute Resolution) of this Stipulated Order.

23.     If a resubmitted Deliverable, or portion thereof, is disapproved in whole or in part, EPA may itself correct the deficiencies and approve the

-18-

Deliverable upon specified conditions. CCH shall, upon written direction of EPA, take all actions required by the conditionally approved Deliverable, subject to CCH's right to invoke Dispute Resolution and the right of EPA and the State to seek stipulated penalties.

24.    <u>Permits</u>.  Where any compliance obligation under this Stipulated Order requires CCH to obtain a federal, State, or local permit or approval, CCH shall submit timely and complete applications and take all other actions necessary to obtain all such permits or approvals.  CCH may seek relief under the provisions of Section IX (Force Majeure) of this Stipulated Order for any delay in the performance of any such obligation resulting from a failure to obtain, or a delay in obtaining, any permit or approval required to fulfill such obligation, if CCH has submitted timely and complete applications and has taken all other actions necessary to obtain all such permits or approvals.

VIII.  <u>STIPULATED PENALTIES</u>

25.    CCH shall be liable for stipulated penalties to the United States and the State for violations of this Stipulated Order as specified below, unless excused under Section IX (Force Majeure).  A violation includes failing to perform any obligation required by the terms of this Stipulated Order, including any follow-up action plan or schedule approved under this Stipulated Order, according to all applicable requirements of this Stipulated Order within the time schedules established or approved under this Stipulated Order.

26.    <u>Work Projects' Compliance Milestones</u>.

a.    For each violation of a compliance milestone identified in, or incorporated by reference pursuant to, Paragraphs 8 through 13 and Paragraph 15 of this Stipulated Order, CCH shall be liable for stipulated penalties per day for each violation as set forth below:

-19-

| Period of Noncompliance | Penalty Per Violation Per Day |
|---|---|
| Days 1-30 | $1,000 |
| Days 31-60 | $2,000 |
| Days over 60 | $3,000 |

27.    Work Projects' Interim Compliance Milestones.

For each violation of an interim compliance milestone identified in, or incorporated by reference pursuant to, Paragraphs 8 through 13 and Paragraph 15 of this Stipulated Order, CCH shall be liable for stipulated penalties per day for each violation as set forth below:

| Period of Noncompliance | Penalty Per Violation Per Day |
|---|---|
| Days 1-60 | $250 |
| Days over 60 | $500 |

28.    Delays in Submission of Deliverables or Annual Reports.  CCH shall be liable for the following stipulated penalties for each failure to timely submit to EPA and DOH a Deliverable or an Annual Report subject to a deadline under this Stipulated Order:

| Period of Noncompliance | Penalty Per Violation Per Day |
|---|---|
| Days 1-30 | $250 |
| Days 31-60 | $500 |
| Days over 61 | $2,000 |

29.    Stipulated penalties under this Section shall begin to accrue on the day after performance is due or on the day a violation occurs, whichever is applicable, and shall continue to accrue until performance is satisfactorily completed or until the violation ceases.  Stipulated penalties shall accrue simultaneously for separate violations of this Stipulated Order.  Defendant shall pay any stipulated penalty within 30 days of receiving the United States' written demand.

30.    The United States or the State may, in the unreviewable exercise of its discretion, reduce or waive stipulated penalties otherwise due that sovereign under

this Stipulated Order. The determination by one sovereign to reduce or waive stipulated penalties shall not preclude the other sovereign from seeking stipulated penalties. In exercising their discretion under this Paragraph, the United States and the State will take into consideration the amount of time that has elapsed since they received notice of the underlying violation.

31.    Fifty percent (50%) of each payment of stipulated penalties made pursuant to this Section shall be made to the United States, and fifty percent (50%) of each payment shall be made to the State, using the penalty payment procedures set forth in Paragraphs 32 and 33. EPA and DOH may modify these payment procedures through written notice to CCH.

32.    CCH shall pay stipulated penalties owing to the United States by certified or cashier's check in the amount due payable to the "U.S. Department of Justice," referencing DOJ No. 90-5-1-1-3825/1 and delivered to the office of the United States Attorney, District of Hawaii, Financial Litigation Unit, 300 Ala Moana Boulevard, Honolulu, Hawaii 96850, *unless* the United States directs CCH to pay by FedWire Electronic Funds Transfer ("EFT") in accordance with instructions provided by the Financial Litigation Office of the U.S. Attorney's Office of the District of Hawaii. If the United States directs payment by EFT, CCH shall, at the time of payment, send written notice of payment and a copy of any transmittal documentation (which should reference DOJ case number 90-5-1-1-3825/1) to the United States in accordance with Section XIV (Notices) of this Stipulated Order.

33.    CCH shall pay stipulated penalties owing to the State by sending a certified or cashier's check made payable to the State of Hawaii. At the time of each payment, CCH shall simultaneously send written notice of payment and a copy of any transmittal documentation (which should reference the civil action number of this case) to the State in accordance with Section XIV (Notices) of this Stipulated Order.

34.    If CCH fails to pay stipulated penalties according to the terms of this Stipulated Order, CCH shall be liable for interest on such penalties, as provided for in 28 U.S.C. § 1961, accruing as of the date payment became due, subject to the following Paragraph.

35.    Upon receipt of EPA's or DOH's written demand for payment of a stipulated penalty, CCH may dispute its liability for such stipulated penalty pursuant to the dispute resolution provisions of Section X (Dispute Resolution). Pending resolution of any such dispute, stipulated penalties continue to accrue if the obligation at issue has not been met and interest on any unpaid penalties accrue pursuant to the terms of Paragraph 34, provided, however, that the City may argue to the Court that stipulated penalties and interest should not run after the matter has been fully briefed and submitted to the Court, and provided that the Governments can argue the contrary. Upon the completion of dispute resolution, any stipulated penalties that are ultimately determined to be due, plus interest as applicable, shall be paid within twenty (20) days of the date of EPA's written decision or, if applicable, any Court order.

36.    The payment of stipulated penalties shall not alter in any way CCH's obligation to complete the performance of all activities required under this Stipulated Order.

37.    Payment of stipulated penalties as set forth above shall be in addition to any other rights or remedies that may be available to EPA or DOH by reason of CCH's failure to comply with requirements of this Stipulated Order or any applicable federal, State, or local laws, regulations, National Pollutant Discharge Elimination System permits, and all other applicable permits.

## IX.  FORCE MAJEURE

38.    A "Force Majeure event" is any event beyond the control of CCH, its contractors, or any entity controlled by CCH that delays the performance of any obligation under this Stipulated Order despite CCH's best efforts to fulfill the

obligation. "Best efforts" includes anticipating reasonably foreseeable force
majeure events and taking appropriate preventive actions before a Force Majeure
event occurs. "Best efforts" also includes addressing the effects of any Force
Majeure event (a) as it is occurring and (b) after it has occurred, to prevent or
minimize any resulting delay to the extent reasonably practicable. "Force
Majeure" does not include CCH's financial inability to perform any obligation
under this Stipulated Order.

39.    CCH shall provide written notice, as provided in Section XIV
(Notices) of this Stipulated Order, within 30 days of the time CCH first knew of,
or by the exercise of due diligence, should have known of, a claimed Force
Majeure event. The notice shall state the anticipated duration of any delay, its
cause(s), CCH's past and proposed actions to prevent or minimize any delay, a
schedule for carrying out those actions, and CCH's rationale for attributing any
delay to a Force Majeure event. Failure to provide written notice as required by
this Paragraph shall preclude CCH from asserting any claim of Force Majeure.

40.    If the United States agrees that a Force Majeure event has occurred, it
may agree to extend the time for CCH to perform the affected requirements for the
time necessary to complete those obligations. An extension of time to perform the
obligations affected by a Force Majeure event shall not, by itself, extend the time
to perform any other obligation. When the United States agrees to an extension of
time, the appropriate modification shall be made pursuant to Section XVII
(Modification) of this Stipulated Order, and the modified dates shall be the basis
for determining compliance with this Stipulated Order, including for purposes of
Section VIII (Stipulated Penalties).

41.    If the United States does not agree that a Force Majeure event has
occurred, or does not agree to the extension of time sought by CCH, the United
States' position shall be binding, unless CCH invokes Dispute Resolution under
Section X of this Stipulated Order. In any such dispute, CCH bears the burden of

proving, by a preponderance of the evidence, that each claimed force majeure event is a Force Majeure event, that CCH gave the notice required by Paragraph 39, that the Force Majeure event caused any delay CCH claims was attributable to that event, and that CCH exercised best efforts to prevent or minimize any delay caused by the event. If the Court agrees that the event was a Force Majeure event, the dates for performance shall be adjusted to reflect the time the Court determines to be appropriate pursuant to the Dispute Resolution process, and the modified dates shall be the basis for determining compliance with this Stipulated Order, including for purposes of Section VIII (Stipulated Penalties).

## X.  DISPUTE RESOLUTION

42.    Unless otherwise expressly provided for in this Stipulated Order, all disputes under this Stipulated Order are subject to dispute resolution and the dispute resolution procedures of this Section shall be the exclusive mechanism to resolve disputes arising under or with respect to this Stipulated Order. However, such procedures shall not apply to actions by the United States or the State to enforce obligations of CCH that have not been disputed in accordance with this Section.

43.    Informal Dispute Resolution. Any dispute subject to dispute resolution under this Stipulated Order shall first be the subject of informal negotiations. The dispute shall be considered to have arisen when CCH sends the United States and the State a written Notice of Dispute. Such Notice of Dispute shall state clearly the matter in dispute. The period of informal negotiations shall not exceed 20 days from the date the dispute arises, unless that period is modified by written agreement. If the Parties cannot resolve a dispute by informal negotiations, then the position advanced by the United States shall be considered binding unless, within 30 days after the conclusion of the informal negotiation period, CCH invokes the dispute resolution procedures as set forth in Paragraphs 44 to 48 below.

44.    Formal Dispute Resolution. CCH shall invoke the dispute resolution procedures of these Paragraphs 44 to 48 within the time period provided in Paragraph 43 above by serving on the United States and the State a written Statement of Position regarding the matter in dispute. The Statement of Position shall include, but may not necessarily be limited to, any factual data, analysis, or opinion supporting the position and any supporting documentation relied upon by CCH when invoking formal dispute resolution.

45.    The United States, after consultation with the State, shall serve its Statement of Position within 45 days after service of CCH's Statement of Position. The United States' Statement of Position shall include, but may not necessarily be limited to, any factual data, analysis, or opinion supporting that position and all supporting documentation relied upon by the United States. The United States' Statement of Position shall be binding unless CCH files a motion for judicial review of the dispute in accordance with the following Paragraphs.

46.    Judicial Dispute Resolution. CCH may seek judicial review of the dispute against the United States by filing with the Court and serving on the United States, in accordance with Section XIV (Notices) of this Stipulated Order, a motion requesting judicial resolution of the dispute. The motion must be filed within 60 days after service of the United States' Statement of Position pursuant to Paragraph 45. The motion shall contain a written statement of CCH's position on the matter in dispute, including any supporting factual data, analysis, opinion, or documentation, and shall set forth the relief requested and any schedule within which the dispute must be resolved for orderly implementation of this Stipulated Order.

47.    The United States shall have at least 60 days in which to respond to CCH's motion. CCH may file a reply memorandum to the extent permitted by the Local Rules.

48.    In any dispute in District Court under these Paragraphs 44 to 48, CCH

shall bear the burden of demonstrating by a preponderance of the evidence that CCH's position on the issues in dispute should prevail over the United States' position.

49.    Effect on Stipulated Order Obligations.  The invocation of dispute resolution procedures under this Section shall not, by itself, extend, postpone, or affect in any way any obligation of CCH under this Stipulated Order, unless and until the final resolution of the dispute so provides.  Stipulated penalties with respect to the disputed matter shall continue to accrue from the first day of noncompliance, but payment shall be stayed pending resolution of the dispute as provided in Paragraph 35, above.  If CCH does not prevail on the disputed issue, stipulated penalties shall be assessed and paid as provided in Section VIII (Stipulated Penalties).

## XI.  INFORMATION COLLECTION AND RETENTION

50.    EPA, DOH, and their representatives, including attorneys, contractors, and consultants, shall have the right of entry on CCH's property at all reasonable times, upon presentation of credentials, to:

a.    monitor the progress of activities required under this Stipulated Order;

b.    verify any data or information submitted to EPA in accordance with the terms of this Stipulated Order;

c.    obtain samples and, upon request, splits of any samples taken by CCH or its representative, contractors, or consultants;

d.    obtain documentary evidence, including photographs and similar data; and

e.    assess CCH's compliance with this Stipulated Order.

51.    Upon request, CCH shall provide EPA, DOH, or their authorized representatives splits of any samples taken by CCH.  Upon request, EPA and DOH shall provide CCH splits of any samples taken by EPA or DOH.

52.    Until the termination of this Stipulated Order, CCH shall retain, and shall instruct its contractors and agents to preserve, all non-identical copies of all records and documents (including records or documents in electronic form) in its or its contractors' or agents' possession or control, or that come into its or its contractors' or agents' possession or control, that document CCH's performance of its obligations under this Stipulated Order. This record retention requirement shall apply regardless of any CCH, corporate, or institutional document-retention policy to the contrary. At any time during this record-retention period, EPA or DOH may request copies of any documents or records required to be maintained under this Paragraph.

53.    This Stipulated Order in no way limits or affects any right of entry and inspection, or any right to obtain information, held by EPA or DOH pursuant to applicable federal or State laws, regulations, or permits, nor does it limit or affect any duty or obligation of CCH to maintain records or information imposed by applicable federal or State laws, regulations, or permits.

## XII. EFFECT OF SETTLEMENT/RESERVATION OF RIGHTS

54.    The United States and the State reserve all legal and equitable remedies available to enforce the provisions of this Stipulated Order, except as expressly stated herein. This Stipulated Order shall not be construed to prevent or limit the rights of the United States or the State to obtain penalties or injunctive relief under the Act or implementing regulations, or under other federal laws, regulations, or permit conditions, or under State law, except as expressly specified herein.

55.    The United States and the State further reserve all legal and equitable remedies to address any imminent and substantial endangerment to the public health or welfare or the environment arising at, or posed by, CCH's POTW, whether related to the violations addressed in this Stipulated Order or otherwise.

56.    In any subsequent administrative or judicial proceeding initiated by

the United States or the State for injunctive relief, civil penalties, or other
appropriate relief relating to CCH's POTW, CCH shall not assert, and may not
maintain, any defense or claim based upon the principles of waiver, res judicata,
collateral estoppel, issue preclusion, claim-splitting, or other defenses based upon
any contention that the claims raised by the United States or the State in the
subsequent proceeding were or should have been brought in the Complaint or
resolved in this Stipulated Order.

57.     Except as specifically set forth herein, entry of this Stipulated Order
in no way affects or relieves CCH of its responsibility to comply with the 1995
Consent Decree. This Court shall retain jurisdiction to enforce the terms and
conditions of the 1995 Consent Decree.

58.     This Stipulated Order is not a permit, or a modification of any permit,
under any federal, State, or local laws or regulations. CCH is responsible for
achieving and maintaining complete compliance with all applicable federal, State,
and local laws, regulations, and permits. The United States and the State do not,
by their consent to the entry of this Stipulated Order, warrant or aver in any
manner that CCH's compliance with any aspect of this Stipulated Order will result
in compliance with provisions of the CWA or applicable State law.

59.     This Stipulated Order does not limit or affect the rights of Defendant
or of the Plaintiffs against any third parties not party to this Stipulated Order, nor
does it limit the rights of third parties not party to this Stipulated Order against
CCH, except as otherwise provided by law.

60.     This Stipulated Order shall not be construed to create rights in, or
grant any cause of action to, any third party not party to this Stipulated Order.

### XIII.  COSTS

61.     The Parties shall bear their own costs of this action, including
attorneys' fees, except that the United States and the State shall be entitled to
collect the costs (including attorneys' fees) incurred in any action necessary to

collect any stipulated penalties due but not paid by CCH.

## XIV. NOTICES

62.    Unless otherwise specified herein, whenever notifications, submissions, or communications are required by this Stipulated Order, they shall be made in writing and sent by certified mail, return receipt requested, or deposited with an overnight mail/delivery service, and addressed as follows:

a.    To EPA:

Chief, Clean Water Act Compliance Office (WTR-7)
Water Division
Attn: JoAnn Cola
U.S. Environmental Protection Agency, Region 9
75 Hawthorne Street
San Francisco, CA 94105

b.    To the United States:

Chief, Clean Water Act Compliance Office (WTR-7)
Water Division
Attn: JoAnn Cola
U.S. Environmental Protection Agency, Region 9
75 Hawthorne Street
San Francisco, CA 94105

and

Chief, Environmental Enforcement Section
Attn: Robert Mullaney
U.S. Department of Justice
301 Howard Street, Suite 1050
San Francisco, CA 94105
Re: DOJ No. 90-5-1-1-3825/1

c.    To State of Hawaii:

Kathleen S. Y. Ho
Edward G. Bohlen
Deputy Attorneys General
Department of the Attorney General, State of Hawaii
465 South King Street, Room 200
Honolulu, Hawaii 96813

d.    To CCH:

Carrie K.S. Okinaga, Esq.
Corporation Counsel
Dept. of the Corporation Counsel
City and County of Honolulu
530 South King Street, Room 10
Honolulu, HI 96813

and

James J. Dragna, Esq.
Bingham McCutchen LLP
355 South Grand Avenue, Suite 4400
Los Angeles, California 90071

63.    Any Party may, by written notice to the other Parties, change its designated notice recipient(s) or notice address(es) provided above.

64.    Notices submitted in accordance with this Section shall be deemed submitted on the date they are postmarked.

## XV.  EFFECTIVE DATE

65.    The Effective Date of this Stipulated Order shall be the date upon which this Stipulated Order is entered by the Court.

## XVI.  RETENTION OF JURISDICTION

66.    The Court shall retain jurisdiction over this case until termination of this Stipulated Order for the purpose of resolving disputes arising under this Stipulated Order pursuant to Section X (Dispute Resolution), entering orders modifying this Stipulated Order pursuant to Section XVII (Modification), or effectuating or enforcing compliance with the terms of this Stipulated Order.

## XVII.  MODIFICATION

67.    The terms of this Stipulated Order may be modified only by a subsequent written agreement signed by all the Parties.  When the modification constitutes a material change to any term of this Stipulated Order, it shall be effective only upon approval by the Court.

## XVIII.  TERMINATION

68.    After CCH has complied with all requirements of Paragraphs 8 through 13 and Paragraph 15 of this Stipulated Order, including any construction schedules incorporated by reference into this Stipulated Order pursuant to those Paragraphs, CCH may serve upon the United States and the State a Request for Termination, stating that CCH has satisfied those requirements, together with all necessary supporting documentation.

-30-

69.    Following receipt by the United States and the State of CCH's Request for Termination, the Parties shall confer informally concerning the Request and any disagreement that the Parties may have as to whether CCH has satisfactorily complied with the requirements for termination of this Stipulated Order. If the United States, after consultation with the State, agrees that the Stipulated Order may be terminated, the Parties shall submit, for the Court's approval, a joint stipulation terminating the Stipulated Order.

70.    If the United States, after consultation with the State, does not agree that the Decree may be terminated, CCH may invoke Dispute Resolution under Section X of this Stipulated Order. However, CCH shall not seek Dispute Resolution under Section X of any dispute regarding termination until 60 days after service of its Request for Termination.

## XIX. PUBLIC PARTICIPATION

71.    This Stipulated Order shall be lodged with the Court for a period of not less than 30 days for public notice and comment in accordance with 28 C.F.R. § 50.7. The United States reserves the right to withdraw or withhold its consent if comments regarding this Stipulated Order disclose facts or considerations indicating that this Stipulated Order is inappropriate, improper, or inadequate. CCH consents to entry of this Stipulated Order without further notice.

## XX. SIGNATORIES/SERVICE

72.    Each undersigned representative of CCH, the State, and the Assistant Attorney General for the Environment and Natural Resources Division of the Department of Justice certifies that he or she is fully authorized to enter into the terms and conditions of this Stipulated Order and to execute and legally bind the Party he or she represents to this document.

73.    This Stipulated Order may be signed in counterparts, and its validity shall not be challenged on that basis.

74.    CCH agrees not to oppose entry of this Stipulated Order by the Court

or to challenge any provision of this Stipulated Order, unless the United States notifies CCH in writing that it no longer supports entry of this Stipulated Order.

## XXI. INTEGRATION

75.    This Stipulated Order constitutes the final, complete, and exclusive agreement and understanding among the Parties with respect to the settlement embodied in this Stipulated Order, and this Stipulated Order supersedes all prior agreements and understandings, whether oral or written, concerning the settlement embodied herein.  Other than Deliverables that are subsequently submitted pursuant to this Stipulated Order, no other document and no other representation, inducement, agreement, understanding, or promise constitutes any part of this Stipulated Order or the settlement it represents, nor shall they be used in construing the terms of this Stipulated Order.


Dated and entered this _____ day of _____, 2007.



_____

DAVID A. EZRA
UNITED STATES DISTRICT JUDGE

THE UNDERSIGNED PARTY enters into this Stipulated Order in the matter of
<u>United States v. City and County of Honolulu</u>.

For Plaintiff the United States of America:


Dated: _5/2/07_


MATTHEW J. McKEOWN
Acting Assistant Attorney General
Environment and Natural Resources
    Division
United States Department of Justice
Washington, DC  20530


Dated: _May 8, 2007_


ROBERT D. MULLANEY
J. THOMAS BOER
Trial Attorneys
Environmental Enforcement Section
Environment and Natural Resources
    Division
U.S. Department of Justice
301 Howard Street, Suite 1050
San Francisco, California  94105
Tel:  (415) 744-6491
Fax:  (415) 744-6476

For Plaintiff the United States of America (con't):

Dated: __5|7|2007__

GRANTA Y. NAKAYAMA
Assistant Administrator
Office of Enforcement and Compliance
    Assurance
U.S. Environmental Protection Agency

-34-

For Plaintiff the United States of America (con't):


Dated: 02 MAY 2007

WAYNE NASTRI
Regional Administrator
U.S. Environmental Protection Agency
Region 9


Of Counsel:

HUGH BARROLL
Assistant Regional Counsel
U.S. Environmental Protection Agency
Region 9

-35-

THE UNDERSIGNED PARTY enters into this Stipulated Order in the matter of United States v. City and County of Honolulu.

For Plaintiff the State of Hawaii:

Dated:  May 7, 2007        _____

DR. CHIYOME LEINAALA FUKINO, M.D.
Director of Health

Dated:  May 7, 2007        _____

MARK J. BENNETT
Attorney General
Department of the Attorney General
State of Hawaii
425 Queen Street
Honolulu, Hawaii  96813
Tel:  (808) 586-1282
Fax:  (808) 586-1239

-36-

THE UNDERSIGNED PARTY enters into this Stipulated Order in the matter of <u>United States v. City and County of Honolulu</u>.

For Defendant the City and County of Honolulu:

CITY AND COUNTY OF HONOLULU

Mayor, Mufi Hannemann _____ 5/7/07
                                                Date

APPROVED:

Dr. Eric S. Takamura, P.E.          5/7/07
Director                              Date
Department of Environmental Services

APPROVED:

Eugene C. Lee, P.E.               5/04/07
Director                              Date
Department of Design and Construction

APPROVED:

Mary Patricia Waterhouse          5/2/07
Director                              Date
Budget and Fiscal Services

APPROVED AS TO FORM AND LEGALITY:

Carrie K.S. Okinaga               5/4/07
Corporation Counsel                   Date

-37-

# APPENDIX A

## FORCE MAIN CONDITION ASSESSMENT

## I. AFFECTED FORCE MAINS (AFMs)

The following force mains shall be included in the condition assessment:

| Force Main | Predominant Material(s) | Year Installed | Diameter, inches | Length, feet |
|---|---|---|---|---|
| Ala Moana No. 2[1,2,3] | RCP/Steel | 1979 | 78/66 | 8,993 |
| Kaneohe/Kailua[4] | CCP | 1976 | 42 | 15,878 |
| Kahala | DIP/CCP | 1987 | 24 | 6,247 |
| Old Beachwalk | RCP | 1964 | 42 | 6,611 |
| Old Hart Street[5] | RCP/CIP | 1948 | 48/42 | 5,236 |
| Waimalu | CIP | 1964 | 30 | 2,756 |

Notes:
1. Ala Moana No. 2 and Old Hart Street force mains cross under Honolulu Harbor.
2. The interior of the Ala Moana No. 2 force main was partially inspected by a diver in 2004.
3. The Ala Moana No. 2 has a reinforced concrete jacket on the exterior of the steel pipe.
4. Approximately 2,300 linear feet at the end of the Kaneohe/Kailua force main (from the H-3 interchange to the Kailua Regional Wastewater Treatment Plant) was slip-lined with 30-inch HDPE in 1989.
5. Approximately 45 linear feet near the Hart Street Wastewater Pump Station is 42-inch CIP.

## II. OBJECTIVES

A. Conduct assessments of AFM pipes for the purpose of locating conditions that may cause pipe leakage, failure or interruption of service. In determining the appropriate assessment methods, cost alone is not a basis for rejecting or selecting an assessment method, but is a factor to be considered in selecting from among appropriate assessment methods.

B. Conduct inspections of all accessible valves, fittings, and appurtenances associated with each AFM for the purpose of locating conditions that may cause pipe leakage, failure or interruption of service.

C. For each inspection, document the findings of each condition discovered.

1

D.  Assess the risk of pipe failure associated with each condition discovered.

E.  Gather sufficient information on each AFM to determine the appropriate course of action so that each AFM can continue to function (either as a primary or back-up force main) without a material risk of failure.

F.  Provide a plan with schedules for addressing each condition that poses a material risk of pipe failure or service interruption.  Follow-up actions may include monitoring the situation, preventive maintenance, repair, rehabilitation or replacement.

## III.  SCREENING/PRELIMINARY RISK ASSESSMENT

**A.  Evaluate Previous Failures** – Evaluate past force main failures, determine the likelihood of repeat failures, and identify portions of the AFM at risk for a repeat failure.

**B.  Prior Condition Assessments** – Evaluate past condition assessments and identify portions of the AFMs at risk of failure or in need of further assessment.

**C.  High Risk Pipe Configuration** – Review force main plans to identify piping configurations at increased risk of failure including connections, joints and bends for each AFM.

**D.  Identify Corrosion Risks** – Identify locations along each pipeline that are at risk for corrosion of the internal or external pipe walls.  CCH shall employ the best available screening methods suitable for each AFM including, but not limited to, the following:

1.  Identification of pipeline high points.

2.  Identification of locations with failed cathodic protection, if installed.

3.  Measurements of pipe-to-soil electrical potential.

4.  Soil resistivity testing.

5.  Examination of force main discharge manholes for signs of corrosion indicating corrosive wastewater.

2

**E. Right-Of-Way Inspection** – Inspect pipeline right-of-ways to look for signs of pipe damage or physical changes that may affect the condition of each AFM. Right-of-way inspections shall include, but not be limited to, the following:

    1. Examination of soils adjacent to pipelines to look for wet spots, unusual vegetation growth or other indications of leakage.

    2. Observations of recent construction or road repairs that may have affected the structural integrity of the AFM pipe.

    3. Observations of land movements (slides, rock falls, sink holes, settling) that may have affected the structural integrity of the AFM pipe.

    4. Observations of other conditions, such as unusual surface loads, that may have affected the structural integrity of the AFM pipe.

**F. Meet and Confer** – Following completion of the Screening/Preliminary Assessment Phase of the Force Main Condition Assessment Process, CCH shall meet with EPA and DOH to discuss the results of CCH's work to date and CCH's plans for the completion of the Force Main Condition Assessment.

## IV. ASSESSMENTS

**A. Valves, Fittings and Appurtenances** – Inspect and conduct functional analyses of, to the extent practicable, all valves, air-relief valves, drains, connections, fittings and appurtenances associated with each AFM. Identify each valve, fitting or appurtenance that is not fully functional or functioning as intended. Identify conditions that present a material risk of pipe failure or interruption of service for each AFM.

**B. Cathodic Protection** – Evaluate the integrity and adequacy of all installed cathodic protection systems. Identify each location where the protection has failed or where protection is inadequate. If cathodic protection is not installed on an AFM pipe, evaluate whether conditions warrant the installation of cathodic protection.

**C. External Pipe Inspections**

    1. Locations – The exterior of each AFM shall be inspected at:

        a) Each location where the pipe is exposed; and

b) Each location determined to present a material risk of failure or interruption of service based on the screening analyses pursuant to section III (excavation may be necessary to reach these locations).

2. Inspection Methods

a) At each location identified pursuant to section IV.C.1 above, the pipe exterior shall be visually inspected for structural damage and the integrity of protective coatings.

b) Additional inspections shall be conducted as needed to locate and assess pipe conditions that present a material risk of pipe failure or interruption of service. Special attention shall be focused on locations determined, pursuant to section III.D above, to present a material risk of pipe corrosion.

c) The exterior of each force main shall be inspected using visual inspection and/or the best proven technology that is suitable to the particular pipe to identify conditions such as cracks, corrosion, erosion, or coating damage/delamination that pose a material risk of pipe failure or interruption of service. Best proven technology may include ultrasonic examination of pipe walls or pipe wall samples, or other methods for determining the extent of pipe corrosion.

**D. Internal Pipe Inspections** – Internal pipe inspections shall utilize the best proven inspection technology that is suitable to the particular pipe to identify conditions, such as cracks, corrosion, erosion, coating delamination, joint deflections, pipe deformation and debris accumulation, that pose a material risk of pipe failure or interruption of service. Internal force main inspections shall be conducted on the length of pipe that is practically accessible with the selected inspection method. At a minimum, CCH shall inspect the portions of pipe necessary to identify or characterize conditions that pose a material risk of pipe failure or interruption of service, including, but not limited to, all high points in the pipes, to the extent practicable. Where practicable, CCH shall conduct evaluations in the vicinity of all access points (air relief valves, discharge manholes and other valves and fittings that provide access). If any portion of an AFM is not subjected to complete internal inspection, CCH shall provide an explanation in the final assessment report. With regard to the Old Beachwalk Force Main, CCH shall conduct some form of internal inspection to the extent practicable. This shall consist of manned entry if

4

practicable. If not, CCTV or some other form of remote sensing shall be attempted to the extent practicable.

**E. Operating Pressure Evaluations** – The City shall evaluate the operating and transient pressure for each AFM. The purpose of the evaluation is to determine if the design, construction, and materials are sufficient to withstand the maximum predicted transient pressures that may be expected to occur under normal, peak flow and emergency (shut-down and start-up) conditions. This evaluation shall include, but not necessarily be limited to, a review of available pressure sensor data (SCADA and strip chart) to evaluate normal operating pressures, and an evaluation, using transient pressure models or actual pressure measurements, of the transient pressures that occur during the range of anticipated operating conditions. Any actual pressure measurements shall be limited to the range of operating conditions that is both prudent and practicable.

**F. Leak Detection** - The City shall follow up on observed conditions that are likely to be the source of leakage. The methodologies employed will be appropriate to the type of condition and location of the suspected leakage.

## V. CONDITION ASSESSMENT REPORTS AND ACTION PLANS

**A. Assessment Methods** – Describe the method and extent of each assessment conducted under section IV, including valve, fitting and appurtenance inspections; cathodic protection evaluations; external and internal pipe inspections; operating pressure evaluations and leak detection tests. Describe each external and internal pipe inspection method utilized and the locations, including the length of pipe, where each method was employed. Provide justifications for the selection of inspection methods and locations. In an appendix to the report, provide copies of the original field data.

**B. Assessment Results and Findings**

1. Assessment Results

   a) Describe the results of the screening/preliminary risk assessments conducted pursuant to section III, including a listing of the pipe segments identified as having a material risk of pipe failure or interruption of service based on corrosion potential or other factors.

   b) Describe the results of each assessment conducted under section IV, including valve, fitting and appurtenance

inspections; cathodic protection evaluations; external and internal pipe inspections; operating pressure evaluations and/or leak detection tests.

2. Findings of Conditions - Identify and quantify (where practicable) observed or measured conditions that constitute a material risk of pipe failure or service interruption. In describing such conditions, characterize the nature of the risk of failure associated with the condition, the likelihood and imminence (to the extent practicable) of the failure risk and the consequences should such a failure occur. The conditions to be addressed in this report may include:

a) Pipe conditions: cracks, holes, corrosion, erosion, coating de-lamination, joint deflections, pipe deformation and debris accumulation;

b) Valve, fitting and appurtenance conditions;

c) Cathodic protection system conditions; and

d) Leaks.

C. **Follow-up Action Plan** – For each AFM, provide a proposed action plan to address conditions that constitute a material risk of pipe failure or service interruption as a primary or back-up force main. The action plan shall include, but not be limited to: 1) maintenance plan, 2) schedule for future assessments, and 3) schedule for design and construction of repairs, rehabilitation, improvements or replacement as applicable. In developing the action plan, CCH shall consider the actions necessary to achieve the objectives set forth above in Section II.

## APPENDIX B

### Beachwalk Pump Station Condition Assessment

CCH shall assess the condition of the Beachwalk Pump Station in order to identify any condition-related issues that may impact its reliability in the interim period between completion of the condition assessment and upgrade or replacement of the pump station. The condition assessment shall include visual inspection, functional testing, and non-destructive testing where appropriate. The condition assessment shall take into account both the current condition and the performance history of individual components over the past five years. The condition assessment shall include consideration of the following pump station facilities.

- Structures
  - Pump station building
  - Emergency generator building
  - Wet well
- Main Mechanical Equipment
  - Pumps (including changes to pump curves)
  - Valves (including surge protection devices)
  - Piping
- Main Electrical and Control Equipment
  - Switchgear
  - Motor control center
  - Instrumentation
  - Control system
  - Pump speed controllers
  - Pump drive motors
  - SCADA
  - Standby Generator
- Instrumentation System Components
  - Flowmeter
  - Level sensors
  - Pressure sensors
  - Other instrumentation
- Safety Security Features
- Spare/Replacement Parts Inventory
- Support Systems
  - Lighting
  - Water
  - HVAC
  - Fuel storage and transfer
  - Sump pump
  - Portable pump connections and portable pumps (if present)
  - Overhead crane

The results of the condition assessment shall be summarized in a written report that identifies issues related to conditions that may impact the reliability of the pump station and the actions recommended to provide an appropriate level of reliability.

## APPENDIX C

### Force Main Spill Contingency Plans

CCH shall prepare and implement spill contingency plans for the Beachwalk, Ala Moana #2, Hart Street, Kaneohe-Kailua, Waimalu, and Kahala force mains (collectively, the "Spill Contingency Plans" or "Plans"). A separate Spill Contingency Plan shall be prepared that is tailored to each force main. The purpose of the Spill Contingency Plans is to establish measures and procedures to respond to a force main spill event in order to minimize discharges to surface waters, to prevent public exposure to the spilled wastewater, and to return the force main to full service as rapidly as possible. The Spill Contingency Plans must be: (1) specific to the location; (2) prepared in accordance with good engineering practices; and (3) readily accessible so that it is a source of usable information for employees or response personnel during an actual emergency.

The contents of the Spill Contingency Plans shall include: Force Main Information; Response Procedures; Equipment, Parts, and Supplies; and Plan Updates. The contents are described as follows:

### Force Main Information

This section of the Spill Contingency Plans shall contain salient information about the force main, including location, diameter, length, material, elevations, design flows and pressures, fittings, parallel force mains, location of storm drain inlets and waterways, and a vicinity map of the force main, including nearby gravity sewers and pump stations that may be used for diversion of flows in the event the force main is damaged.

Schematic diagrams shall be included, depicting all valves, access points, and fittings that may be used in an emergency response to contain or divert sewage from the damaged force main.

This section of the Plans shall also describe monitoring and/or alarms at the force main (or its associated pump station) including, but not limited to, SCADA that could serve to notify CCH of a potential spill.

### Spill Response

This section of the Spill Contingency Plans shall include a list of the actions that CCH anticipates taking in the event of a force main spill -- including tankering and diversion of flows within the system using parallel force mains or other facilities. This section shall describe the personnel CCH will have available to deploy in the event of a force main spill, the staff notification procedures, and anticipated response times.

This section of the Plans shall include a list of steps that CCH anticipates taking to minimize discharges from force mains to surface waters including, but not limited to, procedures

1

for shutting down pumps, diversion of sewage to parallel force mains or nearby gravity sewers, spill containment, tankering, emergency discharge locations (to be used only if no other practicable contingencies exist), and notification to industrial/ commercial dischargers and residential customers in the service area to minimize water usage.

This section of the Plans shall include the steps that CCH anticipates taking to notify impacted agencies and the public of the location and size of the force main spill. It shall also include plans for warning members of the public in order to prevent public exposure to spilled wastewater, including, but not limited to, posting procedures.

This section of the Plans shall include the methods CCH anticipates using to clean up and mitigate the impacts of the spill. Procedures for the decontamination of spill sites and disposal of contaminated water, soil, equipment, and supplies shall be included.

In the event of a force main spill, CCH shall implement the Spill Response section of the Spill Contingency Plan applicable to the force main from which the spill occurred.

## Equipment, Parts and Supplies

This section of each Spill Contingency Plan shall include a list of the equipment, parts and supplies needed to support the Spill Contingency Plan including response and repair equipment, spare parts, and supplies that can be used in the event of a force main failure. The response equipment shall include portable pumps, hose or piping, sand bags (or equivalent barrier/diversion devices) and pipe plugs. The supplies shall include replacement pipe, valves, and repair kits. The list shall identify the location of all such equipment, parts, and supplies.

## Practice Drills

For each Plan, CCH shall practice the Spill Contingency Plan procedures, including response and notification drills, and make adjustments to the Plan as needed based on the results of the practice events. The practice drills shall be conducted at least annually for each Plan. The location of the practice drill and the scenario will be selected by CCH on a rotating basis.

## Plan Updates

CCH shall review the Spill Contingency Plans following the annual practice drill and Plan evaluations, and shall revise the Spill Contingency Plans as necessary to address any pertinent changed conditions and to ensure the functionality of the key components of the Plans; provided however, such revisions shall not eliminate any element of the Spill Contingency Plan required by this Appendix.

CCH shall provide a copy of any revised spill contingency plans to EPA and DOH.

Exhibit 5

MAY-25-2007 09:31 DEPT OF JUSTICE P.02

Case 4:08-cv-01461-SBA   Document 12-6   Filed 06/13/2008   Page 2 of 24
Case 1:94-cv-00765-DAE-KSC   Document 91   Filed 05/24/2007   Page 1 of 2

## IN THE UNITED STATES DISTRICT COURT

## FOR THE DISTRICT OF HAWAII

| | |
|---|---|
| UNITED STATES OF AMERICA, and STATE OF HAWAI'I, etc., et al.,<br><br>Plaintiffs,<br><br>vs.<br><br>CITY AND COUNTY OF HONOLULU, et al.,<br><br>Defendants. | ) CIVIL 94-00765DAE-KSC<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>) |

## ORDER ADOPTING MAGISTRATE'S FINDINGS AND RECOMMENDATION

Findings and Recommendation having been filed and served on all parties on May 4, 2007, and no objections having been filed by any party,

IT IS HEREBY ORDERED AND ADJUDGED that, pursuant to Title 28, United States Code, Section 636(b)(1)(C) and Local Rule 74.2, the "Findings and Recommendation to Grant Sierra Club, Hawai'i Chapter, Hawai'i's Thousand

Friends and Our Children's Earth Foundation's Motion to Intervene" are adopted

as the opinion and order of this Court.

IT IS SO ORDERED.

DATED: Honolulu, Hawaii, May 24, 2007.



David Alan Ezra
United States District Judge

United States of America, et al. vs. City and County of Honolulu, et al., Civil No.
94-00765 DAE-KSC; ORDER ADOPTING MAGISTRATE'S FINDINGS AND
RECOMMENDATIONS

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF HAWAII

UNITED STATES OF AMERICA, )
                        )
and                    )
                        )
STATE OF HAWAI`I, by      )
Margery S. Bronster, Its  )
Attorney General, and     )
LAWRENCE MIIKE, M.D.,      )
Director of Health, State )
of Hawai`i,             )
                        )
          Plaintiffs,  )
                        )
    vs.                )
                        )
                        )
CITY AND COUNTY OF        )
HONOLULU, et al.,         )
                        )
          Defendants.  )
_____ )

CIV. NO. 94-00765 DAE-KSC

FINDINGS AND
RECOMMENDATION TO GRANT
SIERRA CLUB, HAWAI`I
CHAPTER, HAWAI`I'S
THOUSAND FRIENDS AND OUR
CHILDREN'S EARTH
FOUNDATION'S MOTION TO
INTERVENE

FINDINGS AND RECOMMENDATION TO GRANT SIERRA CLUB,
HAWAI`I CHAPTER, HAWAI`I'S THOUSAND FRIENDS AND OUR
<u>CHILDREN'S EARTH FOUNDATION'S MOTION TO INTERVENE</u>

      On March 6, 2007, Sierra Club, Hawai`i Chapter,

Hawai`i's Thousand Friends and Our Children's Earth

Foundation ("Applicants") filed a Motion to Intervene

("Motion").[1]  On March 27, 2007, Defendant City and

_____

     [1]Applicants first filed their Motion to Intervene
in this case on January 25, 2006.  Applicants and the

County of Honolulu ("Defendant") filed its Opposition.
On March 30, 2007, Plaintiff United States of America
("United States") filed a Statement of Conditional Non-
Opposition and Plaintiff State of Hawaii ("the State")
filed a Joinder to the Statement of Conditional Non-
Opposition on the same date.  On April 5, 2007,
Applicants filed their Reply.

The matter came on for hearing on April 17,
2007.  Attorneys Christopher Sproul and William Tam
appeared on behalf of Applicants; Attorney Edward
Bohlen appeared on behalf of the State; Attorney Robert
Mullaney appeared by phone on behalf of the United
States; and Attorneys Maile R. Chun, Carrie K.S.
Okinaga, and James J. Dragna appeared on behalf of
Defendant.

---

parties entered into a stipulation to stay litigation
in this case to allow time to pursue settlement
discussions.  On August 30, 2006, Applicants gave
thirty days written notice of the termination of the
stay in accordance with the terms of the Stipulation.
After the parties and Applicants reached an impasse in
the settlement discussions, Applicants refiled their
Motion to Intervene.

2

After considering the Motion, the supporting and opposing memoranda, the record herein, and the comments of counsel, the Court FINDS and RECOMMENDS that Applicants' Motion be GRANTED as follows.

Background

On October 3, 1994, the United States and the State filed a Complaint alleging, among other things, that Defendant violated certain provisions of the Clean Water Act ("CWA").  On May 15, 1995, United States District Judge David Alan Ezra issued an Order for Entry of Consent Decree; Consent Decree as Modified by Stipulation ("Consent Decree").  The Consent Decree required Defendant to meet certain objectives related to the Clean Water Act.  See Consent Decree attached as Exhibit A to Applicants' Motion.  Under the terms of the Consent Decree, this Court retains jurisdiction to enforce the terms of the Consent Decree until on or about the year 2019. Id. at 61.

On July 29, 2004, Applicants filed a separate, related action against Defendant. See Sierra Club, et

3

al. v. City and County of Honolulu, et al., Civil No.
04-463 DAE/BMK ("2004 lawsuit").  On September 30,
2005, Judge Ezra issued an Order Granting Defendants'
Motion to Dismiss Plaintiffs' First, Second, Ninth,
Eleventh, and Twelfth Claims for Relief; Denying as
Moot Defendants' Motion to Dismiss Claims That Are
Time-Barred; Granting Defendants' Motion to Dismiss the
Amended Complaint as to Frank Doyle; Granting
Defendants' Motion for a More Definite Statement;
Denying Defendants' Motion to Stay the Action; Denying
Plaintiffs' Counter Motion for Summary Judgment on
Plaintiffs' Twelfth Claim; and Denying Plaintiffs'
Motion for Partial Summary Judgment on Plaintiffs'
Third, Fourth, Eighth, and Twelfth Claims ("September
30, 2005 Order").  In pertinent part, Judge Ezra held
that Applicants' First and Second Claims were precluded
by res judicata because Applicants' "First and Second
Claims in the current action [the 2004 lawsuit] and the
Third Claim in the EPA lawsuit [the instant lawsuit],
are based on spills from the Collection system and are

4

substantially identical claims." September 30, 2005
Order at 16.[2]

<u>Analysis</u>

Applicants maintain that they have an
unconditional statutory right to intervene pursuant to
Federal Rule of Civil Procedure ("FRCP") 24(a)(1) and
Section 505(b)(1)(B), 33 U.S.C. 1365(b) as amended, of
the CWA.

FRCP 24(a) allows for non-parties to intervene
as a matter of right and provides:

> Upon timely application anyone shall
> be permitted to intervene in an
> action: (1) when a statute of the
> United States confers an unconditional
> right to intervene; or (2) when the
> applicant claims an interest relating
> to the property or transaction which
> is the subject of the action and the
> applicant is so situated that the
> disposition of the action may as a
> practical matter impair or impede the
> applicant's ability to protect that

---

[2]On April 16, 2007, Judge Ezra issued an Order
Granting Plaintiffs' Motion for Reconsideration of the
September 30, 2005 Order. However, Applicants only
requested that the Court reconsider its decision as to
their Third and Fourth Claims, which are not relevant
to the instant Motion to Intervene.

5

interest, unless the applicant's
interest is adequately represented by
existing parties.

Fed. R. Civ. P. 24(a).

The CWA, 33 U.S.C. § 1365(b)(formerly Section

505(b)) provides in pertinent part that no action may

be commenced "if the Administrator or State has

commenced and is diligently prosecuting a civil or

criminal action in a court of the United States, or a

State to require compliance with the standard,

limitation, or order, but in any such action in a court

of the United States any citizen may intervene as a

matter of right." 33 U.S.C. § 1365(b)(1)(B).

As a threshold matter, the Court must determine

whether § 1365(b)(1)(B) provides Applicants with an

unconditional statutory right to intervene.

I.    Judge Ezra's September 30, 2005 Order

In Judge Ezra's September 30, 2005 Order, he

noted that the Third Claim in this lawsuit and the

First and Second Claims in the 2004 lawsuit are both

based on spills from the Collection system and are

6

substantially identical claims.  September 30, 2005

Order at 16.  Accordingly, Judge Ezra found that

Applicants' First and Second Claims in the 2004 lawsuit

were barred by res judicata.  Id.

Applicants argue that the September 30, 2005

Order dismissing their post-1995 sewage spill claims on

res judicata grounds is predicated on a finding that

Applicants are in privity with the EPA and that the EPA

is diligently prosecuting Defendant's post-1995 Consent

Decree sewage spill violations.  Reply at 6.  Thus,

Applicants maintain that § 1365(b)(1)(B) provides them

the right to intervene.  Id.  Defendant asserts that

since Judge Ezra barred Applicants' claims under the

doctrine of res judicata rather than pursuant to §

1365(b)(1)(B), Applicants cannot avail themselves of

the corresponding right to intervention in that

section.  Opposition at 12-13.

"In order for a judgment in a prior suit to

create a res judicata bar of a subsequent suit, the

second suit must involve the 'same parties or their

7

privies based on the same cause of action.'" <u>Alaska</u>
<u>Sport Fishing Ass'n V. Exxon Corp.</u>, 34 F.3d 769, 773
(9th Cir. 1994)(citing <u>Parklane Hosiery Co. v. Shore</u>,
439 U.S. 322, 326 n. 5 (1979)).  In <u>Alaska Sport</u>, the
Ninth Circuit held that sportfishers suing Exxon
Corporation for damages that had already been recovered
by the governments of Alaska and the United States
through a consent decree "were in privity with these
governments, as members of the public, and because
plaintiffs seek to recover for the very same damages
the governments have recovered for, plaintiffs' claims
are barred by res judicata." <u>Id.</u>

The Court finds that implicit in the September
30, 2005 Order is a finding that Applicants are in
privity with the EPA and that the EPA is already
diligently prosecuting the First and Second Claim
raised by Applicants in their 2004 lawsuit.
Accordingly, the Court finds that § 1365(b)(1)(B)
applies and Applicants are entitled to an unconditional

8

right to intervene in this case, provided that the
Court finds that their application was timely filed.

II.   Timeliness

        "Timeliness is a flexible concept; its
determination is left to the district court's
discretion." U.S. v. Alisal Water Corp., 370 F.3d 915,
921 (9th Cir. 2004)(citing Dilks v. Aloha Airlines, 642
F.2d 1155, 1156 (9th Cir.1981).  "[T]he timeliness
requirement for intervention as a matter of right
should be treated more leniently than for permissive
intervention because of the likelihood of more serious
harm." U.S. v. Oregon, 745 F.2d 550, 552 (9th Cir.
1984)(citation omitted).  The Ninth Circuit considers
three factors in determining whether a motion for
intervention is timely: "(1) the stage of the
proceeding at which an applicant seeks to intervene;
(2) the prejudice to other parties; and (3) the reason
for and length of the delay." County of Orange v. Air
California, 799 F.2d 535, 537 (9th Cir. 1986).

        A.   Stage of the Proceeding

9

Courts have allowed intervention at late stages of litigation. See e.g., Oregon, 745 F.2d at 552 (district court found that the application for intervention was timely based on a change of circumstances that suggested that the litigation was entering a new stage)((citing Hodgson v. United Mine Workers of America, 473 F.2d 118 (D.C. Cir. 1972) (request to intervene as of right after the trial stage allowed where applicants sought to participate in the remedial and appellate phases of the case and agreed not to reopen matters previously litigated); Natural Resources Defense Council v. Costle, 561 F.2d 904, 906-07 (D.C. Cir. 1977) (in assessing timeliness, the district court should consider the reason intervention is sought and court abused its discretion in denying application where applicants sought to participate in settlement agreement's application); Janusziewicz v. Sun Shipbuilding & Dry Dock Co., 677 F.2d 286, 293 (3d Cir. 1982) (intervention should have been granted where applicant sought to participate in a new phase of

10

litigation)); see also Forest Conservation Council v.
U.S. Forest Reserve, 66 F.3d 1489, 1495 (9th Cir.
1995)(stating that "third parties have been granted
leave to intervene only in the remedial phase of a
case").

However, the Ninth Circuit has refused to allow
intervention where a significant amount of time has
passed and a settlement has been reached. See County of
Orange v. Air California, 799 F.2d 535, 538 (9th Cir.
1986)(finding motion to intervene untimely where a
proposed final settlement had been reached after five
years of litigation).  In addition, "a party's seeking
to intervene merely to attack or thwart a remedy rather
than participate in the future administration of the
remedy is disfavored." Alisal Water Corp., 370 F.3d at
921 (citing United States v. Oregon, 913 F.2d 576, 588
(9th Cir. 1990).

Applicants assert that the case is entering a
new phase of negotiations to implement the 1995 Consent
Decree and therefore intervention is appropriate at

11

this time.  Reply at 10.  Defendant argues that the lawsuit is not entering a new phase and that the enforcement of the Consent Decree "stage" has been ongoing for 11 years.  Opposition at 19.

While this case has been ongoing for over 12 years, the Court takes due consideration of the fact that the Consent Decree remains effective until 2019. In addition, at the hearing, the parties represented to the Court that the parties intended to supplement the 1995 Consent Decree in the near future.  Based on the record and the representations made to the Court at the hearing, the Court finds that the case is entering a new phase of litigation related to the enforcement and implementation of the Consent Decree and any potential supplemental measures and that it is appropriate for Applicants to file their Motion at this time.

B.  Prejudice

Prejudice to the existing parties is one of the most important factors in determining timeliness. Oregon, 745 F.2d at 553.  In evaluating prejudice,

courts consider whether "relief from long-standing inequities is delayed." Alaniz v. Tillie Lewis Foods, 572 F.2d 657, 659 (9th Cir. 1978). The Ninth Circuit has affirmed the denial of motions to intervene in cases where granting intervention might have compromised long-litigated settlement agreements or consent decrees. See County of Orange, 799 F.2d at 538 (9th Cir. 1986). However, the Ninth Circuit is hesitant to find a motion to intervene untimely unless there is serious prejudice. See Natural Resources Defense Council, 561 F.2d at 980 (no prejudice resulting from timing of intervention because proposed intervenors sought to assist in implementing the settlement); Hodgson, 473 F.2d at 129 (no prejudice where proposed intervenors stated they had no intention of reopening any previously-litigated question and only sought to participate in implementation of the remedy).

Applicants contend that there is no serious prejudice to Defendant because Defendant itself admits that Applicants have a role in the ongoing enforcement

of the Consent Decree and has welcomed Applicants' involvement in the enforcement of the Consent Decree. Motion at 23.  In addition, Applicants argue that the parties to the Consent Decree will benefit from Applicants' participation because they will bring greatly needed public input, oversight, and diligence toward achieving the goals of the Consent Decree. Id. Defendant argues that it would be seriously prejudiced if intervention were permitted at this time because it is well on its way to implementing the 25-year program that was designed to address Collection system claims. Opposition at 20. In addition, Defendant argues that Applicants, if permitted to intervene, would derail the settlement negotiations between the parties that have been ongoing for a year. Id. at 23.

For the past year, Defendant has welcomed Applicants to participate in settlement discussions. Applicants withdrew from settlement discussions and filed the instant Motion after determining that they had arrived at an impasse.  Applicants have represented

14

that they do not intend to relitigate any matters resolved by the 1995 Consent Decree, nor do they seek to have the Consent Decree set aside.  Reply at 18. Rather, Applicants state that "their sole intent in intervening is to ensure that the Consent Decree is implemented and that they have a meaningful role in fashioning any future supplemental relief that emerges from settlement discussions now taking place and/or further proceedings."  Id.  Based upon the record and the representations made by Applicants, the Court cannot say that the parties will suffer substantial or undue prejudice if Applicants are allowed to intervene in this action.

     C.  Reason for Delay

    "A party must intervene when he 'knows or has reason to know that his interests might be adversely affected by the outcome of litigation.'" Alisal Water Corp., 370 F.3d at 923 (citing Oregon, 913 F.2d at 589).

Applicants assert that they waited to file their Motion to Intervene until there was clear evidence that Defendant was failing to decrease spills as prescribed by the Consent Decree. Reply at 10. Defendant argues that Applicants have not provided any authority to support their contention that it is appropriate for them to assess the relative success of an ongoing injunctive program and then determine whether the program is effective and whether intervention is necessary. Opposition at 20. Moreover, Defendant asserts that the sole reason Applicants seek to intervene is because this Court dismissed their near-identical claims in the 2004 lawsuit. Id. at 25.

In their Motion and Reply, Applicants refer to numerous instances of recent sewage spills occurring on Oahu within the past five years. Applicants were barred from bringing certain sewage spill claims in the 2004 lawsuit due to the existence of this lawsuit. The parties have represented to the Court that they have

16

recently been considering supplementing the 1995
Consent Decree to more effectively address the sewage
spill problem.  Based the circumstances presented in
this case, the Court finds that Applicants' delay in
filing the instant Motion is reasonable and justified.

Accordingly, the Court finds that Applicants'
Motion is timely and that they are entitled to an
unconditional statutory right to intervene in this
action pursuant to FRCP 24(a)(1) and § 1365(b)(1)(B).


III. Conditions of Intervention

Under the plain language of FRCP 24(a)(1),
Applicants have an unconditional right to intervene in
this action.  In League of United Latin American
Citizens v. Wilson, 131 F.3d 1297 (9th Cir. 1997), the
Ninth Circuit stated that "[a]s a general rule,
intervenors are permitted to litigate fully once
admitted to suit."

The Court is not aware of any Ninth Circuit
authority specifically permitting it to impose

conditions on intervention permitted pursuant to FRCP
24(a)(1).  However, the Advisory Committee note to the
1966 Amendment to FRCP 24 provides that "[a]n
intervention of right under the amended rule may be
subject to appropriate conditions or restrictions
responsive among other things to the requirements of
efficient conduct of the proceedings."  In addition, in
U.S. v. Duke Energy Corp., 171 F. Supp. 2d 560, 565
(M.D.N.C. 2001), the Middle District of North Carolina
held that a magistrate may impose conditions, such as
imposing limitations on discovery, on intervention
allowed under FRCP 24(a)(1).

     The United States does not oppose Applicants'
Motion, but requests that the following conditions be
imposed in the event that the Court permits
intervention: "(1) clarify that the United States and
the State of Hawaii shall retain enforcement authority
under the 1995 Consent Decree to ensure that
[Defendant] complies with its obligations under the
Decree; and (2) state that Applicants' role in this

18

case shall not extend to enforcement of the 1995
Consent Decree; (3) stay any litigation in this matter
to allow negotiations to proceed; and (4) schedule a
telephonic status conference every two months for the
parties to discuss settlement issues." United States'
Statement of Conditional Non-Opposition at 2.

Applicants have voluntarily agreed to the
following conditions and agree that the Court may
order: (1) the Applicants not to seek redetermination
of any issue already settled in this case nor to seek
to set aside any provision of the 1995 Consent Decree;
and (2) a stay of litigation for four months to allow
for settlement negotiations. Applicants' Reply to
United States' Statement of Conditional Non-Opposition
at 3.

In order to promote the efficient conduct of
the proceedings and the orderly administration of
justice, the Court imposes the following conditions on
intervention: (1) Applicants shall not seek
redetermination of any issue already settled in this

19

case nor shall they seek to set aside any provision of the 1995 Consent Decree; (2) Applicants must seek leave of the Court before filing any motion to enforce the 1995 Consent Decree; (3) any party may file a motion seeking to stay the litigation for a reasonable period of time to allow the parties to further engage in good faith settlement discussions; and (4) the Court will assist and facilitate compliance and/or settlement by scheduling telephonic or in-person status conferences on a periodic basis. These limited conditions are intended to assist the parties going forward and the Court remains available to work with the parties on an as needed basis.

## Conclusion

Based on the foregoing, the Court FINDS and RECOMMENDS that Applicants' Motion be GRANTED and that Applicants shall be given an right to intervene in this action subject to the limited conditions stated above herein.

IT IS SO FOUND AND RECOMMENDED.

DATED:   Honolulu, Hawaii, May 3, 2007.

    

Kevin S.C. Chang
United States Magistrate Judge

CV 94-00765 DAE-KSC; <u>United States of America, et al. v. City and County of Honolulu, et al.</u>, FINDINGS AND RECOMMENDATION TO GRANT SIERRA CLUB, HAWAI'I CHAPTER, HAWAI'I'S THOUSAND FRIENDS AND OUR CHILDREN'S EARTH FOUNDATION'S MOTION TO INTERVENE

Exhibit 6

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF HAWAII

| | |
|---|---|
| UNITED STATES OF AMERICA; ) | CIVIL 07-00235DAE-KSC |
| STATE OF HAWAI'I, ) | |
| ) | |
| Plaintiffs, ) | |
| ) | |
| and ) | |
| ) | |
| SIERRA CLUB, HAWAI'I ) | |
| CHAPTER; HAWAI'I'S ) | |
| THOUSAND FRIENDS; OUR ) | |
| CHILDREN'S EARTH ) | |
| FOUNDATION, ) | |
| ) | |
| Intervenors ) | |
| ) | |
| vs. ) | |
| ) | |
| CITY AND COUNTY OF ) | |
| HONOLULU, ) | |
| ) | |
| Defendant. ) | |
| _____ ) | |

AMENDED ORDER
ADOPTING MAGISTRATE'S
FINDINGS AND RECOMMENDATION

Findings and Recommendation having been filed and served on all parties

on November 21, 2007, and no objections having been filed by any party,

IT IS HEREBY ORDERED AND ADJUDGED that,  pursuant to Title 28,

United States Code, Section 636(b)(1)(C) and Local Rule 74.2, the "Findings

and Recommendation to Impose Conditions of Intervention," are adopted as the

opinion and order of this Court.

IT IS SO ORDERED.

DATED: Honolulu, Hawaii, December 12, 2007.



_____
David Alan Ezra
United States District Judge

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF HAWAII

| | |
|---|---|
| UNITED STATES OF AMERICA; STATE OF HAWAI'I, | CIVIL NO. 07-00235 DAE-KSC |
| Plaintiffs, | FINDINGS AND RECOMMENDATION TO IMPOSE CONDITIONS OF INTERVENTION |
| and | |
| SIERRA CLUB, HAWAI'I CHAPTER; HAWAI'I'S THOUSAND FRIENDS; OUR CHILDREN'S EARTH FOUNDATION, | |
| Intervenors | |
| vs. | |
| CITY AND COUNTY OF HONOLULU, | |
| Defendant. | |

FINDINGS AND RECOMMENDATION TO
IMPOSE CONDITIONS OF INTERVENTION

At the November 2, 2007 status conference, the Court advised the parties that it intended to hold oral arguments regarding the issue of whether to impose conditions on Plaintiff Intervenors Sierra Club, Hawaii Chapter, Hawaii's Thousand Friends, and Our Children's Earth Foundation (collectively "Intervenors"). The

Court permitted the parties to file optional memoranda.
On November 13, 2007, Intervenors, Plaintiffs United
States of America ("USA") and the State of Hawaii
("State") (collectively "Plaintiffs"), and Defendant
City and County of Honolulu ("Defendant") filed
memoranda.

On November 20, 2007, the Court held oral
arguments.  Robert Mullaney, Esq., appeared by phone on
behalf of USA.  Deputy Attorney General Edward Bohlen,
appeared on behalf of the State.  Christopher Sproul,
Esq., appeared by phone, and William Tam, Esq.,
appeared on behalf of Intervenors.  Corporation Counsel
Carrie Okinaga and Deputy Corporation Counsel Kathleen
Kelly appeared, and James Dragna, Esq., appeared by
phone, on behalf of Defendant.  After careful
consideration of the parties' submissions and the
arguments of counsel, the Court finds that conditions
of intervention are appropriate.

<u>BACKGROUND</u>

On June 28, 2007, the Court issued a Findings

2

and Recommendation to Grant Intervenors' Amended Motion
to Intervene ("F&R").  United States District Judge
David A. Ezra adopted the F&R on July 26, 2007.  In the
F&R, the Court determined that Intervenors could
intervene as a matter of right pursuant to Federal Rule
of Civil Procedure ("FRCP") 24(a)(1) and 33 U.S.C. §
1365(b) of the Clean Water Act ("CWA").  At the time
the Court issued the F&R, it declined to impose
conditions due to the insufficiency of the record and
because Judge Ezra had yet to make a ruling on the
Stipulated Order.  However, this Court reserved the
right to address the issue of conditions following a
decision by Judge Ezra on the Stipulated Order, which
he issued on October 10, 2007.  <u>See</u> Order Approving
Entry of Stipulated Order (Docket No. 61).

DISCUSSION

USA, the State, and Defendant all agree that
conditions of intervention similar to those in <u>United
States of America, et al. v. City and County of
Honolulu</u>, CV 94-00765 DAE-KSC, should be imposed in

3

this action.  Defendant requests two additional

conditions:  1) limiting intervention to overseeing

Defendant's compliance with the Stipulated Order, which

would deem the Complaint in Intervention fully resolved

by the Stipulated Order and 2) recognition that

Intervenors' claim for declaratory relief is beyond the

scope of the underlying action and should be stricken.

Intervenors maintain that given their

unconditional right to intervene, they are in the same

position as USA to pursue their rights without preset

conditions.

This Court has previously acknowledged that

under the plain language of FRCP 24(a)(1), Intervenors'

right of intervention in this action is unconditional.

Generally, "intervenors are permitted to litigate fully

once admitted to suit." <u>League of United Latin

American Citizens v. Wilson</u>, 131 F.3d 1297 (9th Cir.

1997).  However, while intervenors as of right may

fully litigate the merits by raising additional claims

arising out of the same transactions as the main claims

4

"or are ancillary thereto, it is also well settled that an intervenor in equitable proceedings is bound by all prior orders and decrees as though he had been a party from the inception of the suit." Hall County Historical Soc'y, Inc. v. Georgia Dept. of Transp., 447 F. Supp. 741, 746 (D.C. Ga. 1978) (citing Galbreath v. Metro. Trust Co. of Cal., 134 F.2d 569 (10th Cir. 1943); Moore v. Tangipahoa Parish School Bd., 298 F. Supp. 288 (E.D. La. 1969)); see also Vinson v. Washington Gas Light Co., 321 U.S. 489, 498 (1944) ("[A]n intervenor is admitted to the proceeding as it stands, and in respect of the pending issues, but is not permitted to enlarge those issues or compel an alteration of the nature of the proceeding.").

Although the Court recognizes Intervenors' rights and limitations in litigating the instant action, the Court may, in its discretion, impose conditions on intervention.  Rule 24(a)(1) does not expressly provide for the imposition of conditions, but the Advisory Committee notes to the 1966 Amendment to

5

FRCP 24 provides that "[a]n intervention of right under the amended rule may be subject to appropriate conditions or restrictions responsive among other things to the requirements of efficient conduct of the proceedings." Fed. R. Civ. P. 24, 1966 advisory committee notes. Indeed, courts may impose reasonable limitations on the participation of intervenors as of right to <u>ensure the efficient adjudication of the litigation</u>. See <u>U.S. v. Duke Energy Corp.</u>, 171 F. Supp. 2d 560, 565 (M.D.N.C. 2001) (citing <u>Stringfellow v. Concerned Neighbors in Action</u>, 480 U.S. 370, 383 (1987) (Brennan, J., concurring) ("[R]estrictions on participation may . . . be placed on an intervenor of right and on an original party."); <u>United States v. South Florida Water Mgmt. Dist.</u>, 922 F.2d 704, 710 (11th Cir. 1991) (finding intervention of right but remanding to the district court "to condition . . . intervention in this case on such terms as will be consistent with the fair, prompt conduct of this litigation")). Thus, a court's discretion to impose

conditions is not without limitation.  The conditions imposed by the Court must be reasonable and of a housekeeping nature.  7C Charles Alan Wright, Arthur R. Miller & Mary Kay Kane, Federal Practice & Procedure § 1922 (It is doubtful "that the court has the right to make significant inroads on the standing of an intervenor of right; in particular, it should not be allowed to limit the intervenor in the assertion of counterclaims or other new claims" (footnotes omitted)).

Despite Intervenors' contention that they should not be subject to any conditions, the foregoing authority permits the Court to impose reasonable conditions to ensure the efficient adjudication of the litigation.  In order to promote the efficient conduct of the proceedings and the orderly administration of justice, the Court recommends imposition of the following conditions on intervention:  (1) Intervenors shall not seek redetermination of any issue already settled in this case nor shall they seek to set aside

any provision of the Stipulated Order; (2) Intervenors must seek leave of the Court before filing any motion to enforce the Stipulated Order; (3) any party may file a motion seeking to stay the litigation for a reasonable period of time to allow the parties to further engage in good faith settlement discussions; and (4) the Court will assist and facilitate compliance and/or settlement by scheduling telephonic or in-person status conferences on a periodic basis.

In an abundance of caution, the Court declines to impose the two additional conditions requested by Defendant, because the conditions may or would effectively dispose of the Complaint in Intervention. This Court does not have the authority to impose conditions that will preclude a determination of claims and issues on their merits. Nevertheless, the Court reserves the right to recommend imposition of additional conditions necessary for the efficient adjudication of litigation if the need should arise.

8

<u>CONCLUSION</u>

For the foregoing reasons, the Court FINDS and RECOMMENDS that the district court impose the conditions on intervention stated above herein.

IT IS SO FOUND AND RECOMMENDED.

DATED:  Honolulu, Hawaii, November 21, 2007.



_____
Kevin S.C. Chang
United States Magistrate Judge

<u>UNITED STATES OF AMERICA, ET AL. V. CITY AND COUNTY OF HONOLULU</u>, CV 07-00235 DAE-KSC; FINDINGS AND RECOMMENDATION TO IMPOSE CONDITIONS OF INTERVENTION

9

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF HAWAII

| | |
|---|---|
| UNITED STATES OF AMERICA, )<br><br>and                             )<br><br>STATE OF HAWAI`I, by         )<br>Margery S. Bronster, Its     )<br>Attorney General, and        )<br>LAWRENCE MIIKE, M.D.,        )<br>Director of Health, State    )<br>of Hawai`i,                  )<br><br> Plaintiffs,  )<br><br>     vs.                      )<br><br>CITY AND COUNTY OF           )<br>HONOLULU, et al.,            )<br><br> Defendants.  )<br>_____ ) | CIV. NO. 07-00235 DAE-KSC<br><br>FINDINGS AND<br>RECOMMENDATION TO GRANT<br>SIERRA CLUB, HAWAI`I<br>CHAPTER, HAWAI`I'S<br>THOUSAND FRIENDS AND OUR<br>CHILDREN'S EARTH<br>FOUNDATION'S AMENDED<br>MOTION TO INTERVENE |

FINDINGS AND RECOMMENDATION TO GRANT SIERRA CLUB,
HAWAI`I CHAPTER, HAWAI`I'S THOUSAND FRIENDS AND OUR
CHILDREN'S EARTH FOUNDATION'S AMENDED
MOTION TO INTERVENE

On May 26, 2007, Sierra Club, Hawai`i Chapter,

Hawai`i's Thousand Friends and Our Children's Earth

Foundation ("Applicants") filed an Amended Motion to

Intervene ("Motion").  On June 8, 2007, Defendant City

and County of Honolulu ("Defendant") filed its

84.    6/28/07

Opposition.  On June 8, 2007, Plaintiff United States
of America ("United States") filed a Statement of
Conditional Non-Opposition and Plaintiff State of
Hawaii ("the State") filed a Joinder to the Statement
of Conditional Non-Opposition on the same date.  On
June 15, 2007, Applicants filed their Reply to
Defendant's Opposition and their Reply to the United
States' Statement of Conditional Non-Opposition.

The matter came on for hearing on June 28,
2007.  Attorney Christopher Sproul appeared by phone on
behalf of Applicants; Attorney William Tam appeared on
behalf of Applicants; Attorney Edward Bohlen appeared
on behalf of the State; Attorney Robert Mullaney
appeared by phone on behalf of the United States;
Attorneys Maile R. Chun and Carrie K.S. Okinaga
appeared on behalf of Defendant; Attorney James J.
Dragna appeared by phone on behalf of Defendant.

Applicants maintain that they have an
unconditional statutory right to intervene pursuant to
Federal Rule of Civil Procedure ("FRCP")  24(a)(1) and

2

Section 505(b)(1)(B), 33 U.S.C. 1365(b) as amended, of

the Clean Water Act ("CWA").

FRCP 24(a) allows for non-parties to intervene

as a matter of right and provides:

> Upon timely application anyone shall
> be permitted to intervene in an
> action: (1) when a statute of the
> United States confers an unconditional
> right to intervene; or (2) when the
> applicant claims an interest relating
> to the property or transaction which
> is the subject of the action and the
> applicant is so situated that the
> disposition of the action may as a
> practical matter impair or impede the
> applicant's ability to protect that
> interest, unless the applicant's
> interest is adequately represented by
> existing parties.

Fed. R. Civ. P. 24(a).

The CWA, 33 U.S.C. § 1365(b)(formerly Section

505(b)) provides in pertinent part that no action may

be commenced "if the Administrator or State has

commenced and is diligently prosecuting a civil or

criminal action in a court of the United States, or a

State to require compliance with the standard,

limitation, or order, but in any such action in a court

3

of the United States any citizen may intervene as a matter of right." 33 U.S.C. § 1365(b)(1)(B).

Significantly, Plaintiffs and Defendant do not oppose Applicants' request to intervene in this action. Rather, the parties and Applicants disagree as to what, if any, conditions should be imposed upon Applicants' intervention. The parties place great emphasis upon the fact that a Stipulated Order was lodged in this action on May 8, 2007, and argue in part that Applicants should not be permitted to challenge or modify the Stipulated Order if it is adopted by the Court. Applicants maintain that they are entitled to unconditional intervention.

This Court has previously determined that § 1365(b)(1)(B) of the CWA provides Applicants with a statutory right to intervene in ongoing actions being prosecuted by the Environmental Protection Agency ("EPA"). See Civ. No. 94-765 DAE-KSC; Findings and Recommendation to Grant Sierra Club, Hawai`i Chapter, Hawai`i's Thousand Friends and Our Children's Earth

4

Foundation's Motion to Intervene filed on May 4, 2007
and Order Adopting Findings and Recommendation filed on
May 24, 2007.  Based on the foregoing, and there being
no opposition to Applicants' proposed intervention, the
Court FINDS and RECOMMENDS that Applicants should be
allowed to intervene in this case.  The remaining issue
before the Court is what, if any, conditions should be
imposed upon Applicants' intervention.

        Under the plain language of FRCP 24(a)(1),
Applicants have an unconditional right to intervene in
this action.  In <u>League of United Latin American
Citizens v. Wilson</u>, 131 F.3d 1297 (9th Cir. 1997), the
Ninth Circuit stated that "[a]s a general rule,
intervenors are permitted to litigate fully once
admitted to suit."  However, the Advisory Committee
note to the 1966 Amendment to FRCP 24 provides that
"[a]n intervention of right under the amended rule may
be subject to appropriate conditions or restrictions
responsive among other things to the requirements of
efficient conduct of the proceedings."

                            5

On June 26, 2007, United States District Judge
David Alan Ezra issued a Order Staying Decision on
Stipulated Order.  Judge Ezra stayed his decision
"until resolution of the Motion to Intervene to give
the Sierra Club an opportunity to challenge or to
concur in the Stipulated Order, if its Motion is
granted.  In the event that intervention is allowed,
Sierra Club shall have a reasonable time not to exceed
30 days within which to file an opposition or a
concurrence to the Stipulated Order."  Order Staying
Decision on Stipulated Order at 2.

The Court finds that it presently has an
insufficient record to determine what conditions, if
any, should be imposed upon Applicants' intervention in
this case.  The Court further finds that the imposition
of conditions upon Applicants' intervention at the
present time would be premature.  For example, in order
to properly address the issue of what conditions, if
any, should be imposed on intervention, the Court
should know Applicants' position with regard to the

Stipulated Order lodged by the parties on May 8, 2007, and/or whether this Stipulated Order is approved or rejected by Judge Ezra. The subject matter of this action appears to be related to Civil No. 94-765 DAE-KSC, and the imposition of certain conditions may be appropriate and necessary to promote and coordinate the efficient conduct of the proceedings in one or more cases.

Based on the foregoing, the Court FINDS and RECOMMENDS the following. First, the Court FINDS and RECOMMENDS that Applicants' Motion be GRANTED. Pursuant to Judge Ezra's Order Staying Decision on Stipulated Order, Applicants shall have 30 days in which to file an opposition or a concurrence to the Stipulated Order. Second, following Judge Ezra's approval or decision on the Stipulated Order, the Court RECOMMENDS that this matter be referred back to this Court to determine what, if any, conditions on Applicants' intervention are necessary in order to

promote the efficient conduct of the proceeding and the

orderly administration of justice.

IT IS SO FOUND AND RECOMMENDED.

DATED:  Honolulu, Hawaii, June 28, 2007.



_____
Kevin S.C. Chang
United States Magistrate Judge

CV 07-00235 DAE-KSC; <u>United States of America, et al. v. City and County of Honolulu, et al.</u>,
FINDINGS AND RECOMMENDATION TO GRANT SIERRA CLUB, HAWAI'I CHAPTER,
HAWAI'I'S THOUSAND FRIENDS AND OUR CHILDREN'S EARTH FOUNDATION'S
AMENDED MOTION TO INTERVENE

8

Exhibit 7

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF HAWAII

| | |
|---|---|
| UNITED STATES OF AMERICA, and STATE OF HAWAII,        ) | CV. NO. 07-00235 DAE-KSC |

UNITED STATES OF AMERICA, and )    CV. NO. 07-00235 DAE-KSC
STATE OF HAWAII,                )
                                )
          Plaintiffs,           )
     and                        )
                                )
SIERRA CLUB, HAWAI`I CHAPTER,    )
HAWAI`I'S THOUSAND FRIENDS AND   )
OUR CHILDREN'S EARTH            )
FOUNDATION                      )
          Intervenors,          )
                                )
     v.                         )
                                )
CITY AND COUNTY OF HONOLULU,     )
                                )
          Defendant.            )
_____ )

ORDER APPROVING ENTRY OF STIPULATED ORDER

On October 9, 2007, the Court held a hearing regarding the entry of

the proposed Stipulated Order, which had been lodged in this case by the United

States on May 8, 2007.  Robert D. Mullaney, U.S. Department of Justice attorney,

appeared at the hearing on behalf of Plaintiff United States; Edward G. Bohlen and

Kathleen S.Y. Ho, Deputy Attorneys General, appeared at the hearing on behalf of

Plaintiff State of Hawaii; William Tam, Esq., and Christopher Sproul, Esq.,

appeared at the hearing on behalf of Sierra Club, Hawai`i Chapter, Hawai`i's

Thousand Friends and Our Children's Earth Foundation (collectively, "Sierra

Club"); James J. Dragna, Esq., Bryan K. Brown, Esq., and Kathleen A. Kelly,

Deputy Corporation Counsel, appeared at the hearing on behalf of Defendant City

and County of Honolulu ("CCH"). After reviewing the proposed Stipulated Order,

Sierra Club's Opposition to Entry of EPA Stipulated Order, and the United States,

State of Hawaii, and CCH's reply briefs, the Court HEREBY APPROVES ENTRY

OF THE STIPULATED ORDER. The Stipulated Order shall be entered in this

case forthwith.

## BACKGROUND

The instant lawsuit is related to two other pending lawsuits, one filed

in 1994 by the United States and State of Hawaii against CCH, and the other filed

by Sierra Club in 2004 against CCH. All three lawsuits relate to spills from CCH's

sewers and/or the adequacy of the sewer systems and wastewater treatment plants.

A.    1994 Government Lawsuit

In October 1994, the United States Environmental Protection Agency

("EPA") and the State of Hawaii Department of Health ("DOH") filed suit against

CCH for spills from its wastewater collection and treatment system. See United

States, et al. v. City and County of Honolulu, CV No. 94-00765 DAE/KSC ("1994

Government Lawsuit"). The parties entered into a Consent Decree on May 15,

2

1995, proscribing a 25-year comprehensive injunctive relief program to address spills from the collection system (the "1995 Consent Decree"). This Court retained jurisdiction over that lawsuit pending completion of the work proscribed by the 1995 Consent Decree. Sierra Club intervened in the 1994 Government Lawsuit in May 2007.

Sierra Club claims that CCH has not complied with the 1995 Consent Decree by repeatedly exceeding the sewage spill reduction goals. Sierra Club complains that EPA has written letters complaining of the noncompliance, but has not returned to Court to enforce the 1995 Consent Decree.

B.    2004 Sierra Club Lawsuit

Sierra Club filed their own lawsuit against CCH in July 2004, pursuant to the citizen suit provision of the Clean Water Act ("CWA"). See Sierra Club, et al. v. City and County of Honolulu, CV No. 04-00463 DAE/BMK ("2004 Sierra Club Lawsuit"). This lawsuit originally involved spills from the collection system, as well as alleged violations of the Sand Island and Honouliuli National Pollution Discharge Elimination System ("NPDES") Permits. EPA and DOH have not intervened in the 2004 Sierra Club Lawsuit. Sierra Club has seven claims remaining in the 2004 Sierra Club Lawsuit, all which pertain to alleged violations

3

of NPDES Permits or the 1999 EPA Sand Island Order and the 2002 EPA Sand
Island Order.

On September 30, 2005, this Court granted CCH's motion to dismiss
Sierra Club's first and second claims, which related to sewage spills since 1999,
pursuant to *res judicata*, since those claims were substantially identical to the third
claim of the 1994 Government Lawsuit. This Court also denied Sierra Club's
motion for partial summary judgment on its third, fourth, eighth, and twelfth
claims. Sierra Club filed a motion for reconsideration regarding their third and
fourth causes of action. Before this Court ruled on Sierra Club's reconsideration
motion, the parties filed a Joint Stipulation Re Stay of Litigation. The Joint
Stipulation stated that the governments and Sierra Club intended to work toward a
mutually agreeable settlement that would obviate the need for further litigation.
Therefore, the parties agreed to stay all proceedings in the 2004 Sierra Club
Lawsuit.

After Sierra Club's reconsideration motion had been pending for
almost a year, this Court ordered the motion withdrawn, with the proviso that if the
parties could not reach a settlement agreement and subsequently lift the stay, Sierra
Club could refile their reconsideration motion. The parties were unable to reach a
settlement, and Sierra Club refiled their reconsideration motion on March 2, 2007.

4

On April 16, 2007, this Court granted Sierra Club's reconsideration motion,

resolving the legal methodology for counting CWA violations with respect to

Sierra Club's third and fourth claims. This Court reserved for later decision the

actual number of violations since Sierra Club's eighth claim was related to the

third and fourth claims, and this Court wanted to avoid any double counting of

violations.

On July 26, 2007, Sierra Club filed a motion for partial summary

judgment on its third, fourth, and eighth claims to provide this Court with a basis

for counting the number of CWA violations. CCH sought to stay the hearing of

that motion so that it would not have to expend limited resources on filing an

opposition to that motion, and could instead concentrate its efforts on settlement.

CCH's motion to stay was denied by this Court on September 11, 2007. Sierra

Club's motion for partial summary judgment is set for hearing on October 9, 2007,

simultaneous with this case.

C.    The Instant Lawsuit ("2007 Government Lawsuit")

In March 2006, while settlement negotiations were ongoing between

CCH, DOH, EPA, and Sierra Club with respect to deficiencies of CCH's sewage

collection system and wastewater treatment plants, the Beachwalk Force Main

sewer line in Waikiki ruptured spilling approximately 48 million gallons of sewage

5

into the Ala Wai Canal. The parties then agreed to refocus negotiations to work

out a stipulated preliminary injunction order related to the Beachwalk Force Main

for CCH to implement on an immediate and emergency basis, and then the parties

would discuss a global settlement of other sewer spills and treatment plant issues.

Sierra Club participated in some of these negotiations. Sierra Club asserts that it

has been excluded from additional settlement negotiations because CCH has

outright rejected any question as to whether they would be a party signatory to any

supplemental judicial relief with rights afforded a party. CCH claims that Sierra

Club withdrew from settlement discussions.

        After approximately 15 months of negotiations, DOH and the EPA

filed the instant lawsuit against CCH on May 8, 2007, for CWA violations related

to the Beachwalk Force Main spill, and simultaneously lodged a proposed

Stipulated Order. The proposed Stipulated Order provides that CCH must build

three new force mains and maintain back-up force mains at four locations. CCH

must also implement a condition assessment and repair program for six force mains

and one pump station. CCH is further required to implement a Spill Contingency

Plan to minimize adverse consequences of a spill from six force mains. CCH

values the cost of this at approximately $300,000,000. EPA and DOH expressly

reserved their claims for further injunctive relief and civil penalties. CCH, EPA,

and DOH also recognized in the Stipulated Order that following entry of the order,

they intend to negotiate in good faith a comprehensive remedy addressing all

compliance issues associated with CCH's wastewater system.

Sierra Club intervened into the instant lawsuit in July 2007. The

Magistrate Judge recommended that conditions, if any, to be imposed upon Sierra

Club's intervention, such as a stay of litigation of the 2004 Sierra Club case, would

be determined after the Stipulated Order was ruled upon.

The lodged Stipulated Order represents a settlement between EPA and

DOH on one side, and CCH on the other side. Sierra Club is not a party to the

Stipulated Order, although they are a party to this case as an intervenor. Sierra

Club filed an opposition to the Stipulated Order on August 24, 2007. Sierra Club

alleges that the Stipulated Order is inadequate on the merits and excludes them as a

party. EPA, DOH, and CCH each filed a reply brief.

## STANDARD OF REVIEW

Although not titled a consent decree, all parties agree that the

Stipulated Order is in essence a consent decree. A consent decree is a settlement

agreement that is subject to continued judicial oversight. United States v. Oregon,

913 F.2d 576, 580 (9th Cir. 1990). Approval of a proposed settlement or consent

decree is within the sound discretion of this Court. Id.

7

The court should enter a consent decree if it is fundamentally fair, adequate, reasonable, and equitable, and does not violate the law or public policy. Id.; see also Sierra Club v. Elec. Controls Design, Inc., 909 F.2d 1350, 1355 (9th Cir. 1990). Because the parties seek to incorporate their settlement into a court order and because public interests are at stake, the court must make an independent and searching inquiry, giving the agreement more scrutiny. United States v. Telluride Co., 849 F. Supp. 1400, 1402 (D. Colo. 1994). The court must be satisfied that the consent decree represents a "reasonable factual and legal determination." Oregon, 913 F.2d at 581. The court cannot, however, substitute its judgment for that of the parties or alter the terms of the contract. Telluride, 849 F. Supp. at 1402.

"The court's discretion is to be exercised in light of the strong policy favoring voluntary settlement of litigation. . . . The presumption in favor of settlement is particularly strong where a consent decree has been negotiated by a governmental agency specially equipped, trained, or oriented in the field." State of Cal. Dept. of Toxic Substances Control v. Waymire Drum Co., Inc., No. C-98-03834 PJH, 1999 WL 169536, *2 (N.D. Cal. March 19, 1999) (citations omitted). The court may not, however, "mechanically 'rubber stamp' a proposed consent decree." NE Iowa Citizens for Clean Water v. AgriProcessors, Inc., 469 F.

8

Supp. 2d 666, 673 (N.D. Iowa 2006); <u>Telluride</u>, 849 F. Supp. at 1402 (the court

may not "merely imprint [the parties'] decision as though possessed of a clerical

rubber stamp.").

<u>DISCUSSION</u>

A.     <u>Procedurally Fair Process</u>

Sierra Club argues that the Stipulated Order was not adopted through

a procedurally fair process because: (1) EPA has not provided sufficient evidence

from which this Court could conclude whether key terms reflect the EPA's

independent expertise or whether the EPA merely accepted CCH's point of view;

and (2) EPA had not responded to the Sierra Club's adverse public comments

before filing the Stipulated Order.

"To measure procedural fairness, a court should ordinarily look to the

negotiation process and attempt to gauge its candor, openness, and bargaining

balance." <u>United States v. Cannons Eng'g Corp.</u>, 899 F.2d 79, 86 (1st Cir. 1990).

In <u>Telluride,</u> the court was concerned with whether the consent decree was

developed in a procedurally or substantively fair manner because in that case the

decree was not a product of the parties' desire to settle long-running litigation. 849

F. Supp. at 1403. Instead, the decree was filed as a vehicle to get judicial approval

of the settlement agreement and the adversary process had yet to function. <u>Id.</u>

9

Sierra Club asserts that there is no record to evaluate whether the EPA deferred to CCH in fashioning the remedial action schedule or whether the EPA applied its own expertise since the EPA filed the complaint at the same time as the Stipulated Order. Although the Stipulated Order was filed simultaneously with the Complaint in this case, it was filed only after approximately 15 months of negotiation. Id. (noting that it is not per se improper to file an enforcement action coupled with a consent decree, and that it serves a laudable purpose where the negotiations were themselves adversarial). There is no allegation that the negotiations were not at arms length, were not adversarial, or that there were only a few meetings. In addition, Sierra Club participated in some of the negotiations that led to the Stipulated Order. Furthermore, the instant lawsuit is related to overarching concerns of the 1995 Consent Decree and the 2004 Sierra Club Lawsuit, which were in existence long before the filing of the instant lawsuit. The parties had engaged in reviews of the sewer system and had started negotiations of the issues prior to the filing of the Stipulated Order. Therefore, although the Stipulated Order was filed simultaneously with the Complaint, there was a previous adversarial process. See United States v. District of Columbia, 933 F. Supp. 42, 49 (D.D.C. 1996) (finding that the consent decree differed from the one in Telluride because although it "was not the result of long drawn out negotiations

10

arising from a hotly disputed adversarial process, the two parties to this dispute have been litigating Blue Plains issues since essentially 1984."); see NE Iowa Citizens for Clean Water, 469 F. Supp. 2d at 673 (affirming district court's finding that the consent decree was procedurally fair, because there was no evidence that the negotiations were not in good faith or at arms-length and the parties spent a considerable amount of time, effort and expense negotiating a settlement).

Sierra Club also claims that the time table for completing the projects set forth in the Stipulated Order is too long and therefore, reflects CCH's view and not that of the EPA. Although the time schedules do appear to be rather lengthy, and not necessarily "aggressive" and "expeditious," as stated in the Stipulated Order, this is insufficient to demonstrate that the EPA unquestionably accepted CCH's views. Indeed, the EPA and DOH state that they attended meetings with their own technical staff and counsel. The EPA and DOH also state that they carefully considered whether given the existing vulnerabilities of the force mains, it should allow CCH to forgo or truncate the planning and environmental review process in order to expedite completion of construction. (Stoddard Decl. ¶ 14.) Accordingly, there is evidence that the EPA did consider the remedial action schedule and applied their own expertise. Unlike the Telluride case, the EPA here appears to have relied on its own investigation and judgment to determine the relief

11

necessary, and did not merely rely on the defendant's own expert.  See Telluride,

849 F. Supp. at 1404 (noting that the EPA played only an oversight role and simply

reacted to the proposals made by the violator's expert, rather than constructing

some of the essential terms).  This Court has no reason to doubt the evidence and

therefore, does not find that the Stipulated Order was procedurally unfair on this

basis.

The thrust of Sierra Club's argument is that the Stipulated Order is

unfair because they were not included in some of the settlement negotiations and

are not signatories to the Stipulated Order.  However, not being a party to the

Stipulated Order, by itself, does not prevent the Stipulated Order from being

entered, or necessarily indicate that it was procedurally unfair.  Local No. 93, Int'l

Ass'n of Firefighters, AFL-CIO C.L.C. v. City of Cleveland, 478 U.S. 501, 529

(1986) ("It has never been supposed that one party-whether an original party, a

party that was joined later, or an intervenor-could preclude other parties from

settling their own disputes and thereby withdrawing from litigation. Thus, while an

intervenor is entitled to present evidence and have its objections heard at the

hearings on whether to approve a consent decree, it does not have power to block

the decree merely by withholding its consent."); S. Cal. Edison Co. v. Lynch, 307

F.3d 794, 806-07 (9th Cir. 2002) ("An intervenor does not have the right to prevent

12

other parties from entering into a settlement agreement."); <u>Oregon</u>, 913 F.2d at 580

(approving entry of a settlement plan, even though the State of Idaho, who was a

party in the case and participated in settlement negotiations, was not a party to the

plan and opposed it).

Sierra Club also asserts that the fact that the EPA did not respond to

public comments weighs against entering the Stipulated Order. In <u>Telluride</u>, the

court found that due to the important role that the public plays in the process, the

EPA's willingness to throughly consider all comments is "a key indicator of

whether the decree was negotiated in good faith and is fair. Moreover, without

consideration of these comments there is, essentially, no adversary presentation."

849 F. Supp. at 1404-05 (citation omitted). Although EPA did not respond to

comments prior to filing the Stipulated Order, it did respond to those comments in

the reply brief. Only two entities made comments, one of which was Sierra Club,

and Sierra Club repeated those comments as arguments in its opposition to the

Stipulated Order. EPA addressed Sierra Club's concerns in its reply brief and

supported entry of the proposed Stipulated Order without amendment.

Accordingly, the public comments have been addressed prior to entry of the

Stipulated Order.

13

B.    Substantive Fairness and Reasonableness

Sierra Club asserts that the Stipulated Order is substantively unfair,

unreasonable, inequitable, and not in accord with the CWA because it does not

require CCH to remedy the CWA violation by avoiding further sewage spills and

does not assess any civil penalty.  Specifically, Sierra Club argues that the

Stipulated Order is inadequate because it does not address many other force mains

or most of the causes of sewage spills, which are allegedly due to blockage in

gravity sewer main lines, pump station failures, and water runoff flowing into

leaky sewer lines.  Sierra Club asserts that ruptures of force mains constitute a

small amount of CCH's total spills.  Sierra Club, therefore, requests that this Court

not enter the Stipulated Order and instead, direct CCH to prepare a prioritized

remedial action plan addressing its most pressing sewage spill problems, which

will evaluate the true costs and benefits of certain repairs to the overall system.

Sierra Club also argues that the 1995 Consent Decree does not solve the spill

problems, especially since the EPA has never returned to Court to enforce its

terms.

In determining whether a consent decree is reasonable, the court

should consider: "(1) whether the decree is technically adequate to accomplish the

goal of cleaning the environment, (2) whether it will sufficiently compensate the

14

public for the costs of remedial measures, and (3) whether it reflects the relative

strength or weakness of the government's case against the environmental offender."

Telluride, 849 F. Supp. at 1402.  The court must also decide "whether the consent

decree is in the public interest and upholds the objectives of the Clean Water Act,

the primary of which is to restore and maintain the chemical, physical and

biological integrity of the Nation's waters."  Id. at 1403.

"To the extent that the process was fair and full of 'adversarial vigor,'

the results come before the court with a much greater assurance of substantive

fairness."  Cannons Eng'g, 899 F.2d at 87 n. 4 (citation omitted).  "[O]nce the court

is satisfied that the decree was the product of good faith, arms-length negotiations,

a negotiated decree is presumptively valid and the objecting party has a heavy

burden of demonstrating that the decree is unreasonable."  Oregon, 913 F.2d at 581

(noting that other circuits have placed a heavy burden on the party objecting to the

decree).

Sierra Club has not met their heavy burden.  Although the Stipulated

Order does not address all of CCH's sewage system problems or all of the force

mains, the Stipulated Order does reflect the claims brought in this enforcement

action.  The instant lawsuit was based on violations of the CWA from the March

2006 Beachwalk force main rupture.  The Stipulated Order requires CCH to build

15

and repair certain force mains, including the force main in the Beachwalk area, at a cost of approximately $300,000,000.

Sierra Club is essentially arguing that the EPA should have brought a broader lawsuit and that the Stipulated Order does not go far enough. This Court, however, cannot "reach beyond the complaint to evaluate claims that the government did not make and to inquire as to why they were not made." United States v. Microsoft Corp., 56 F.3d 1448, 1459 (D.C. Cir. 1995). This Court must not "impose its own judgments as to how it would prosecute and resolve a particular case." District of Columbia, 933 F. Supp. at 51. Sierra Club is also requesting that this Court fashion a remedy by requiring CCH to make a priority list. This Court, however, cannot substitute its judgment for that of the EPA. See United States v. Chevron U.S.A., Inc., 380 F. Supp. 2d 1104, 1111 (N.D. Cal. 2005) ("With respect to substantive fairness, it is not the duty of the court to determine whether the settlement is one which the court itself might have fashioned, or considers ideal.") (citation and internal quotation marks omitted).

The Stipulated Order requires CCH to conduct condition assessments of vulnerable force mains and prepare spill contingency plans. CCH must also build back-up force mains. Thus, the Stipulated Order protects the public interest, is consistent with the purpose of the CWA to restore and maintain the integrity of

our waters, and is technically adequate to clean the environment. Although it does

not address other sewer issues, "the court need not require that the decree be 'in the

public's best interest' if it is otherwise reasonable." Oregon, 913 F.2d at 581.

Furthermore, after the 2006 Beackwalk force main spill, all of the parties,

including the Sierra Club, agreed to focus negotiations to find a resolution for CCH

to implement related to the Beachwalk Force Main, and then the parties would

discuss a global settlement of other sewer spills and treatment plant issues. This

Court has been informed that those global settlement negotiations have continued,

and that CCH has already taken construction steps to implement the Stipulated

Order. Moreover, the parties to the Stipulated Order agreed that the EPA retained

the right to obtain civil penalties in a future enforcement action, and require

additional injunctive relief. Finally, Sierra Club has intervened into the 1994

Government Lawsuit and thus, could attempt to enforce the 1995 Consent Decree,

in addition to enforcing this Stipulated Order and any order in the 2004 Sierra Club

Lawsuit.

The force mains addressed in the Stipulated Order are either near the

end of their useful life or have demonstrated vulnerability through sewage spills

and they have such a large capacity that if one were to fail, CCH would not have an

effective back-up system in place. In order to avoid another catastrophic spill, like

17

that of March 2006, EPA and DOH determined that the public interest would not

be served by additional delay of broad negotiations of the overall sewer system.

This Court agrees.  Although the time deadlines for remedial action are lengthy,

due to the complexity of the overall sewer system, the complexity of the

construction required by the Stipulated Order, and the CWA, it was not

unreasonable for the EPA to conclude that the construction deadlines (e.g. 7 years

and 11 years) may result in environmental benefits earlier than negotiating a global

settlement of all the other sewer issues and implementing those remedies.  Chevron

U.S.A., Inc., 380 F. Supp. 2d at 1118 (" because of the complexity of Clean Air

Act litigation, it was reasonable for EPA to conclude that even a due date eight

years after the signing of the Consent Decree may create environmental benefits

earlier than litigating.").

The EPA's case is strong against CCH and the Stipulated Order

reflects this strength.  Indeed, CCH is required to make substantive improvements,

at a cost of approximately $300,000,000.  Accordingly, this Court finds that the

Stipulated Order is substantively fair.

C.    Request for Dismissal

Sierra Club requests that this case be dismissed.  This Court finds that

such argument is not appropriate in an objection to a Stipulated Order brief where

the moving party does not have an opportunity to file a reply brief. Thus, this

Court will not address this request and DENIES Sierra Club's request for dismissal

WITHOUT PREJUDICE.


<u>CONCLUSION</u>

For the reasons stated above, the Court APPROVES ENTRY OF THE

STIPULATED ORDER.

IT IS SO ORDERED.

DATED: Honolulu, Hawaii, October 10, 2007.




David Alan Ezra
United States District Judge


<u>United States of America, et al. vs. City and County of Honolulu,</u> Civil No. 07-
00235 DAE-KSC; ORDER APPROVING ENTRY OF STIPULATED ORDER

Exhibit 8

RONALD J. TENPAS
Acting Assistant Attorney General
Environment and Natural Resources Division
U.S. Department Of Justice
ROBERT D. MULLANEY
Trial Attorney
Environmental Enforcement Section
U.S. Department of Justice
301 Howard Street, Suite 1050
San Francisco, California 94105
Tel: (415) 744-6491
Fax: (415) 744-6476
E-mail: Robert.Mullaney@usdoj.gov

EDWARD H. KUBO, JR.
United States Attorney
District of Hawaii
R. MICHAEL BURKE
Assistant United States Attorney
Room 6-100, PJKK Federal Building
300 Ala Moana Boulevard
Honolulu, Hawaii 96850
Tel: (808) 541-2850
Fax: (808) 541-2958

Attorneys for Plaintiff United States of America

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF HAWAII

| | |
|---|---|
| UNITED STATES OF AMERICA, et al.,<br><br>Plaintiffs,<br><br>v.<br><br>CITY AND COUNTY OF HONOLULU,<br><br>Defendant. | Civil No. 1:07-00235 DAE-KSC<br><br>DECLARATION OF JOANN COLA IN SUPPORT OF UNITED STATES' REQUEST TO ENTER STIPULATED ORDER |

## DECLARATION OF JOANN COLA

I, JoAnn Cola, declare the following:

1.  I am an Environmental Engineer employed by the U.S. Environmental Protection Agency, Region 9 ("EPA Region 9") in San Francisco. I obtained a Bachelor of Science degree in Chemical Engineering from the University of California, Berkeley in 1988. Since 1989, I have been employed in EPA Region 9. From 1989 to 2001, I worked as a Remedial Project Manager in EPA Region 9's Superfund Program. In this job, I was involved in developing cleanup remedies for sites contaminated with hazardous waste. As part of this work, I directed contractors, and managed budgets and schedules for multi-million dollar and multi-year projects. Since 2001, I have worked in the Clean Water Act Compliance Office of EPA Region 9's Water Division. As part of this work, I have had responsibility for inspecting dischargers operating under Clean Water Act National Pollutant Discharge Elimination System ("NPDES") permits, providing technical support for Clean Water Act enforcement actions, and served as project officer for several municipal wastewater and infrastructure grants.

2.  I submit this declaration in support of the United States' Request to Enter the Stipulated Order.

3.  Since 2001, I have been assigned to the matter now known as <u>United States, et al., v. City and County of Honolulu</u>, Civil No. 1:07-00235 DAE-KSC.

4.  As part of these responsibilities, I have familiarized myself with records of EPA's oversight of the 1995 Consent Decree in <u>United States, et al., v. City and County of Honolulu</u>, Civil No. 94-00765 DAE-KSC, addressing the City and County of Honolulu's ("CCH") compliance with the Clean Water Act. I have on numerous occasions inspected CCH's wastewater treatment and collection system infrastructure. I have participated in the development of several administrative and judicial enforcement actions involving CCH's wastewater system. I was also involved in the negotiations that led to the lodging of the Stipulated Order.

5.  Following the entry of the 1995 Consent Decree, EPA devoted substantial resources to overseeing CCH's compliance. This oversight included

1

review of reports submitted by CCH, inspections of CCH's facilities, and correspondence addressing compliance issues associated with the 1995 Consent Decree.

6.    In 2004 and 2005, EPA and the State of Hawaii Department of Health ("DOH") conducted a comprehensive review of CCH's wastewater collection system. This process included an extensive review of CCH, EPA, and DOH records associated with the collection system, interviews of CCH wastewater staff, and inspections of numerous components of CCH's wastewater collection system. I participated as a member of the review team and also oversaw the work of contractors retained by EPA to assist in conducting this review.

7.    Concurrently with this review, EPA and DOH evaluated the compliance status of the Sand Island Treatment Plant and the Honouliuli Treatment Plant, two major wastewater treatment facilities owned and operated by CCH.

8.    As a result of these efforts, EPA and DOH identified a number of deficiencies with CCH's collection system and wastewater treatment plants and communicated these concerns to CCH. This led to a series of a series of settlement meetings beginning in March 2006 with CCH, DOH, and the Sierra Club, Hawaii Chapter, Hawaii's Thousand Friends, and Our Children's Earth Foundation (collectively, "Sierra Club").

9.    On March 24, 2006, the Beachwalk Force Main suffered a failure, resulting in CCH's discharge of approximately 48.7 millions gallons of raw sewage into the Ala Wai Canal, which flows into the Pacific Ocean. After this discharge, EPA and DOH conducted investigations into the causes and impacts of the event.

10.    EPA's 2004-05 review of CCH's compliance history had identified a significant number of compliance issues. However, after the March 2006 Beachwalk Force Main failure, EPA determined that it was appropriate to focus immediate attention on upgrades to CCH's most vulnerable force mains and the Beachwalk pump station.

11.    This shift in focus was communicated to CCH in April 2006 and

2

eventually led to the negotiation of the Stipulated Order. EPA, DOH, and CCH participated in an extensive series of negotiations in which all parties were represented by technical staff and counsel who approved the terms of the settlement. Attorneys for Sierra Club participated in many of these settlement meetings, received and reviewed drafts of the settlement proposals that culminated in the Stipulated Order, and were able to communicate their positions to the parties throughout the negotiations. EPA also provided copies of drafts of the proposed settlement to Sierra Club attorneys when Sierra Club was not present at the negotiations with CCH. EPA carefully considered the views of Sierra Club throughout the negotiations.

12.     The Stipulated Order will require construction of substantial wastewater infrastructure. CCH has informed EPA that it anticipates this work will cost approximately $300 million.

13.     The Stipulated Order provides near-term and longer term remedial action to address the Beachwalk Pump Station and six critical force mains in CCH's collection system: the Beachwalk Force Main, the Ala Moana Force Main, the Hart Street Force Main, the Kaneohe-Kailua Force Main, the Waimalu Force Main, and the Kahala Force Main.

14.     Most portions of wastewater collection systems are designed to transport wastewater by gravity. However, when wastewater reaches low points in the collection system, it needs to be pumped under pressure through force mains to a high point where it can again flow by gravity. Force mains are designed to convey wastewater being pumped under pressure.

15.     When a force main fails or needs to be taken out of service for maintenance, alternate means must be found for storing or transporting the wastewater delivered to the pump station while the force main is being repaired. For smaller force mains, common strategies to address this problem include storing wastewater at the pump station, storing it in the upgradient sewer lines, or transporting it with tanker trucks. For large force mains, sufficient storage or tanker transportation is generally not available either to handle wastewater flows during a force main failure or to allow the force main to be taken out of service for

3

maintenance. Such force mains must, as practical matter, operate continuously. A failure of a large force main will generally result in a substantial spill of untreated sewage until the force main is repaired and returned to service unless a back-up force main is available to carry the pumped wastewater. In addition, only very limited maintenance can be performed on such force mains since they cannot be taken out of service for any significant length of time.

16.    The March 2006 Beachwalk Force Main failure illustrates the problems that may result from the failure of a large force main. When the failure occurred, the Beachwalk Force Main was carrying well over 10 million gallons per day of untreated wastewater. That amount exceeded the wastewater volumes CCH could transport by tanker truck or store at the pump station or in the collection system. CCH was able to divert a small percentage of the flow that would normally go to the Beachwalk Pump Station and Beachwalk Force Main to another pump station at Fort DeRussy. Because CCH had no alternate means to transport the remaining wastewater, CCH discharged untreated wastewater to the Ala Wai Canal for four days while repairs were under way. As a result, CCH reported that it discharged 48.7 million gallons of untreated wastewater to the environment. This discharge resulted in economic disruption and significant environmental damage, and also put public health at risk by exposing the public to untreated sewage.

17.    In determining the force mains that most urgently required remedial action, EPA considered the age of the force mains, the history of spills associated with each force main, and CCH's ability to minimize the risk of spills to the environment from each force main. This investigation led to the identification of six force mains that are particularly vulnerable to a spill like the March 2006 Beachwalk spill. For each of these force mains (identified above in Paragraph 13), CCH does not have effective back-up systems in place to manage wastewater in the event the force main failed. Each of these force mains carries too much wastewater to make storage or tanker transport a viable back-up strategy. In addition, due to age and/or location, each of these force mains is particularly vulnerable to failure. With the partial exceptions of the Ala Moana Force Main

4

and the Beachwalk Force Main, CCH has no back-up force mains in place to transport wastewater if any of these force mains fail.

18.    The Ala Moana Force Main does have an old back-up force main that can be placed in service if the existing force main fails. This back-up force main successfully transported these flows during a failure in the existing Ala Moana Force Main on March 5, 2004. However, this back-up force main does not have sufficient capacity to handle peak wet weather flows for this portion of CCH's collection system.

19.    After the March 2006 Beachwalk spill, CCH installed a temporary back-up force main to provide back up in the event of another failure of the Beachwalk Force Main. While under construction, this back-up system effectively served to prevent a second major wastewater spill when the primary force main failed a second time. However, this temporary back-up force main is not a viable long-term solution for Beachwalk. The temporary back-up force main is located in the Ala Wai Canal and above ground in Ala Moana Park. This location not only interferes with the public's enjoyment of these resources, it also leaves the force main exposed and vulnerable to damage.

20.    The Stipulated Order provides for a two-track process for minimizing the risks of uncontrolled wastewater discharges from these six force mains and the Beachwalk Pump Station. First, the Stipulated Order requires CCH to conduct condition assessments of each of the six force mains and the Beachwalk Pump Station. After completing the condition assessments, CCH is required to develop a follow-up action plan to ensure that appropriate work is done to keep the force main functioning properly. This work must be conducted under a schedule providing for expeditious completion of the needed work consistent with sound engineering practices. The Stipulated Order also provides fixed deadlines for the completion of all work required in the follow-up action plan. These final deadlines range from 2016 to 2018 because of the likelihood that some of the needed work can be performed only after new force mains are built and the existing force mains can be taken out of service for maintenance. The condition assessments and follow-up action plans are subject to EPA's and DOH's review

5

and approval.

21.     In addition, the Stipulated Order requires CCH to put in place back-up force mains for four of the six force mains at issue: Beachwalk, Ala Moana, Hart Street, and Kaneohe-Kailua. As explained in more detail in Paragraphs 22 through 28 below, the specific schedules for ensuring that necessary back-up force mains are in place have been developed to reflect the particular circumstances associated with each force main.

22.     For the Beachwalk Force Main, the Stipulated Order requires near-term work to ensure that the installation of the temporary back-up force main is complete. Stipulated Order at ¶8.a. CCH is then required to complete construction of a new Beachwalk Force Main by no later than December 31, 2012. Stipulated Order at ¶8.b. In addition, CCH is required to maintain its existing force main in good operating condition as a back-up force main unless CCH elects to construct a new back-up force main when it builds its new primary Beachwalk Force Main. Stipulated Order at ¶8.d.

23.     For the Ala Moana Force Main, the Stipulated Order requires CCH to complete construction of a new force main by no later than December 31, 2014. Stipulated Order at ¶9.c. In addition, CCH is required to maintain its existing Ala Moana Force Main in good operating condition as a back-up force main unless CCH elects to construct a new back-up force main when it builds its new primary Ala Moana Force Main. Stipulated Order at ¶9.d.

24.     For the Hart Street Force Main, CCH completed construction of a new primary force main in 2001. However, given its location underneath Honolulu Harbor, this force main remains vulnerable to failure as a result of activities in the harbor. Therefore, the Stipulated Order requires CCH to reconnect its old Hart Street Force Main as a back-up force main by no later than December 31, 2008, and to maintain the old Hart Street Force Main in good operating condition as a back-up force main. Stipulated Order at ¶10.a., b.

25.     For the Kaneohe/Kailua Force Main, the Stipulated Order requires CCH to complete construction of a new force main by no later than December 31, 2014. Stipulated Order at ¶11.b. In addition, CCH is required to maintain its

existing force main in good operating condition as a back-up force main unless
CCH elects to construct a new back-up force main when it builds its new primary
Kaneohe/Kailua Force Main.  Stipulated Order at ¶11.c.

26.    The schedules set in the Stipulated Order reflect a compromise
between ensuring prompt construction of necessary infrastructure and allowing
CCH the time to engage in orderly planning, budgeting, and construction
management for a substantial amount of complex and expensive infrastructure.
For example, construction of the new Kaneohe/Kailua Force Main will involve
either building a new force main along the same route as the existing force main,
or finding a new route through the affected areas.  While using the existing
right-of-way may represent the simplest path for planning purposes, use of this
route will present significant construction challenges and result in neighborhood
disruption because the existing right-of-way runs through a number of densely
populated areas and along narrow, heavily-used roadways.  CCH, after conferring
with the affected community, will first need to decide which route is preferable
through the environmental review process, and then address the attendant
construction challenges.

27.    If CCH were to construct the new force mains at issue on an
emergency basis, thereby forgoing the planning and environmental review process,
it could expedite the schedule for these projects.  EPA and DOH carefully
considered whether the existing vulnerabilities of these force mains warranted
taking these short cuts.  EPA and DOH concluded that, given CCH's commitment
to comprehensive condition assessments and follow-up action plans in the
Stipulated Order, it was reasonable to allow for the planning and construction
schedules set forth in the Stipulated Order.

28.    For the Kahala and Waimalu Force Mains, the Stipulated Order
requires completion of the condition assessments of these force mains before a
conclusion must be reached concerning construction of a new force main and
back-up force main.  Stipulated Order at ¶¶12.a, 13.a.  EPA and DOH recognize
that these force mains are sufficiently old for there to be legitimate concerns about
the risk of failure.  However, neither force main has caused a significant sewage

spill to date. Moreover, neither force main has been the subject of a detailed technical evaluation of its condition. Therefore, EPA and DOH concluded that CCH should conduct a detailed technical evaluation process of these force mains before deciding whether the substantial expense of building new force mains in these areas is warranted. As with the other condition assessment and follow-up action plans, the condition assessments and follow-up action plans for Waimalu and Kahala are subject to EPA's and DOH's review and approval.

29.   With regard to the other force mains in CCH's collection system, EPA and DOH do not have information to suggest that any of the remaining force mains require attention as urgently as the six force mains at issue in the Stipulated Order. For example, CCH recently constructed a new force main at Kamehameha. While CCH does not have a back-up force main in place for this force main, it does not appear to be as vulnerable to failure as the force mains at issue in the Stipulated Order. Similarly, CCH replaced the Kailua Heights Force Main in 1998. While CCH does not have a back-up force main in place for this force main, it does not appear to be as vulnerable to failure as the force mains at issue in the Stipulated Order. The Lualualei Force Main presents a more significant spill risk than Kamehameha or Kailua Heights, since it is approximately 20 years old. However, it is substantially smaller than most of the force mains at issue in the Stipulated Order, and is in a relatively unpopulated area.

30.   EPA and DOH intend to reevaluate the remaining force mains in CCH's collection system, including those discussed in Paragraph 29, as part of the final resolution of this matter. However, in negotiating the Stipulated Order, EPA has prioritized the largest and most vulnerable force mains in CCH's system.

31.   DOH issued an Administrative Order to CCH in April 2004, requiring CCH to conduct a more broad reaching assessment of its force mains. This Administrative Order will, among other things, assist EPA and DOH in evaluating other aspects of CCH's force mains that warrant remedial action as part of the final resolution of this matter.

32.   CCH has already commenced work under the Stipulated Order despite the fact that the Stipulated Order has not yet been entered. For example,

8

CCH has installed the temporary back-up to the Beachwalk force main.  In addition, EPA and DOH have met and conferred with CCH on one condition assessment required by the Stipulated Order and plan to meet again in mid-September 2007.

33.    In the Stipulated Order, the parties stated their intention to negotiate in good faith a comprehensive remedy addressing all compliance issues associated with CCH's wastewater system.  Stipulated Order at 2.  To begin this task, the parties have scheduled negotiations to commence on October 1, 2007, to deal with other compliance issues identified by the United States and the State.

I declare under penalty of perjury that the foregoing is true and correct.  Executed this __6th__ day of September, 2007, at San Francisco, California.

_____
JOANN COLA